UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SINA CHENARI,

           Plaintiff,

      v.

GEORGE WASHINGTON UNIVERSITY,

           Defendant.

Civil Action No. 14-929  (ABJ)

Judge Amy Berman Jackson

**DECLARATION OF ROBERT L. MAPOU, Ph.D.**

Robert L. Mapou, Ph.D., hereby declares, pursuant to 28 U.S.C. § 1746, as follows:

1.  My name is Robert L. Mapou, Ph.D. I hold a B.S. (Electrical Engineering) from the University of Maryland (Summa Cum Laude with General Honors – 1977), an M.A. (Psychology) from Emory University (APA-approved clinical program – 1981), and a Ph.D. (Psychology), Emory University (APA-approved clinical program – 1985).

2.  Beginning in 1986, I have worked in various settings as a staff neuropsychologist and research neuropsychologist all as is more fully set forth in my professional *curriculum vitae*, a copy of which is attached as Exhibit A hereto. Since 1993 to the present, I have worked in private practice as a Clinical Neuropsychologist with the Stixrud Group, LLC, in Silver Spring, MD, from 1993-1999 on a part-time basis while also employed as a Senior Scientist, Henry M. Jackson Foundation for the Advancement of Military Medicine, Rockville, MD (1992-1996), and Neuropsychology Director, Centers for Neuro-Rehabilitation, Bethesda, MD (1996-1999). Since 1999, I have practiced full-time as a Clinical Neuropsychologist with the Stixrud Group.

3.  I am Board Certified in Clinical Neuropsychology, American Board of Professional Psychology, and am licensed as a Psychologist in Maryland and Virginia. I have served on the

Editorial Boards and as a peer reviewer for professional journals in neuropsychology and related fields. My further professional credentials are set forth in Exhibit A hereto.

4. Through my education, knowledge, training and experience I have gained expertise in the field of neuropsychology, including the requirements for diagnosing Attention-Deficit/Hyperactivity Disorder ("ADHD") in accordance with the accepted scientific standard for the diagnosis as set forth in the Diagnostic and Statistical Manual of Mental Disorders-IV-TR ("DSM-IV-TR") in effect at the time of the events in this matter.

5. Psychiatric Diagnoses are categorized by the Diagnostic and Statistical Manual of Mental Disorders, 4th. Edition. Better known as the DSM-IV (now in 5th Edition, DSM-V), the manual is published by the American Psychiatric Association and covers all mental health disorders for both children and adults. It also lists known causes of these disorders, statistics in terms of gender, age at onset, and prognosis as well as some research concerning the optimal treatment approaches. Mental Health Professionals use this manual when working with patients in order to better understand their illness and potential treatment and to help 3rd party payers understand the needs of the patient. The book is typically considered the 'bible' for any professional who makes psychiatric diagnoses in the United States and many other countries.

6. I have reviewed materials concerning issues related to the Surgery Shelf Examination in which Plaintiff Sina Chenari participated as a medical student at the George Washington University School of Medicine and Health Sciences on December 14, 2012, and have prepared a report concerning the materials reviewed and my opinions concerning the neuropsychological issues herein. A true and accurate copy of my report is attached as Exhibit B hereto and incorporated herein by reference.

2

3079768v.1

7. I hold the opinions set forth in my report (Exhibit B hereto) and hereinbelow to a reasonable degree of scientific certainty within the field of neuropsychology.

8. My opinions or conclusions in this matter include the following:

a. Mr. Chenari does not have ADHD.

b. Mr. Chenari does not have a disability warranting accommodations. Rather, this appears to be a case of a behavior in search of a diagnosis to explain it.

9. My reasons for these conclusions are as follows:

a. ADHD is a developmental disorder, with symptoms dating to childhood. Although symptoms may not affect a person's functioning until high school, there must be evidence that the symptoms were present in childhood and/or adolescence and did not simply appear at a time of increasing academic demands. There must also be impairment in two or more settings. The primary symptoms that Mr. Chenari reported in medical school were distractibility and difficulty concentrating. Although this appears to have led to Dr. Durr's diagnosis of ADHD and prescription of Adderall, these symptoms are insufficient to diagnose ADHD, because there are many different causes of distractibility and problems concentrating. These include stress, anxiety, depression, poor or insufficient sleep, or a sleep disorder. In essence, problems with attention and concentration are similar to a fever. The presence of attention problems tells a clinician that something is wrong, but the clinician must look further, to determine what that is. Furthermore, based on what Mr. Chenari submitted, there was no evidence in impairment in two or more settings. Specifically, he had an excellent academic record before medical school and completed his schooling through college without difficulty, without accommodations, and without extra support, based on the records that I reviewed. He had no problems in the jobs that he held before medical school, never required accommodations, and was never fired. To the

3

contrary, he was seen as talented in his field. Although he had some problems in medical school, these were largely specific to patient interactions and interviewing. An added problem was arriving late to class, due to poor sleep.

b. Dr. Durr did not diagnose ADHD using currently accepted standards for diagnosis. Although "ADD" was listed in his medical records starting in January 2011 and a prescription was written for Adderall, there was nothing that indicated a basis for this diagnosis. Specifically, there is no evidence that Dr. Durr took an oral history from childhood through the current time of diagnosis; reviewed academic records; had Mr. Chenari, his parents, and a current informant complete rating scales; or reviewed past and present difficulties using the DSM-IV (now DSM-5) diagnostic criteria for ADHD.

c. If individuals have ADHD, then continuous treatment is standard and necessary. However, Dr. Durr noted that Mr. Chenari did not take the medication on weekends, and Mr. Chenari acknowledged this in his deposition. Although Dr. Durr reported that Mr. Chenari benefitted from treatment, it is well established that even people without ADHD will benefit from a psychostimulant, just as a strong cup of coffee can help anyone concentrate more effectively, especially if they are tired. So, a positive response to Adderall is not *prima facie* evidence of ADHD. Also, in his deposition, Mr. Chenari was mixed in his responses when asked if the Adderall had helped.

d. Even if it were to be concluded that Mr. Chenari had ADHD, a diagnosis is not equivalent to a disability. Rather, one must show that the diagnosed disorder causes a significant functional impairment in a major life activity. This is why an evaluation and documentation is required. Records and Mr. Chenari's responses during his deposition showed no evidence of such impairment or completion of an evaluation to determine whether there was impairment.

4

e.  Even if it were to be concluded that Mr. Chenari had ADHD and was disabled, there is no evidence in the records, other than his response in the Interrogatories and his deposition, that he ever disclosed this to medical school staff or requested accommodations. It is not the responsibility of the medical school staff to identify and accommodate a "hidden disability." Rather, it is the responsibility of the student to provide adequate documentation that supports the presence of a disability and the need for reasonable accommodations.

f.  Based on his own report, Mr. Chenari was anxious and depressed from the start of medical school, related to personal issues, family issues, and some medical issues of his own. He even noted that he discussed these symptoms with Dr. Durr, who prescribed Adderall. Although I am not a physician and do not prescribe medication, as a neuropsychologist working regularly with adults with ADHD and other psychiatric disorders, I am familiar with appropriate treatments. Adderall was not an appropriate treatment for the reported symptoms. Rather, counseling, as recommended by Dr. Durr and medical school staff, and, perhaps, medication for depression and anxiety, would have been the appropriate treatment. However, Mr. Chenari did not pursue counseling and was even reluctant to speak with Dr. Durr about his symptoms.

g.  Interacting with people is *part of the job* of being a physician. If Mr. Chenari is not able to do this, regardless of a disability, he is *not otherwise qualified* to do the job of a physician, and dismissal is appropriate. Difficulty with patient interactions does not mean he is disabled. It simply means that he does not have the skill set required to be a physician and would be better off using his strengths in another line of work. It is also expected that physicians in training function with less than a normal amount of sleep, manage stress effectively, and take steps to manage their stress if told they are not coping well before this affects their ability to work effectively.

h. Similarly, based on what Mr. Chenari reported in several places (deposition, emails), he was aware of the rules for the shelf exam and chose to defy them. His behavior was unacceptable in that context, and there are consequences for this. Interacting appropriately with supervisors, colleagues, and staff is also part of the job of a physician. If Mr. Chenari cannot control his responses in stressful situations, then he does not have the qualifications to be a physician.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __7th__ day of August, 2015.


Robert L. Mapou, Ph.D.

# Robert L. Mapou, Ph.D.
## Board Certified in Clinical Neuropsychology
## American Board of Professional Psychology

8720 Georgia Avenue
Suite 300
Silver Spring, MD  20910
(301) 802-0538
E-mail: rmapou@verizon.net

**CONFIDENTIAL REPORT**
**NOT TO BE RELEASED TO ANYONE WITHOUT WRITTEN PERMISSION**

REPORT OF RECORD REVIEW AND OPINION REGARDING CLAIMED DISABILITY
DUE TO ATTENTION-DEFICIT/HYPERACTIVITY DISORDER (ADHD)

Name: Chenari, Sina "Charlie"
Date of Birth: 31 January 1987
Date of Report: 14 April 2015

REASON FOR REVIEW

In a legal Complaint filed in May 2014, Mr. Chenari has claimed that the George Washington University School of Medicine (GWU), where he was a student from the fall of 2010 to the spring of 2013, failed to recognize and accommodate him for a disability due to ADHD. He has claimed that he was unfairly dismissed from medical school at the end of the spring 2013 semester, because of this. A record review was requested by Allyson C. Kitchel, of Jackson & Campbell, PC, who is representing GWU against Mr. Chenari's claim. I was specifically asked to determine, based on the records, 1) whether Mr. Chenari met established diagnostic criteria for ADHD, 2) whether he had been disabled by ADHD in medical school, and 3) whether his behavior in response to an exam proctor on 14 December 2012 was due to his alleged ADHD.

The following records were considered in preparation of this report:

- Plaintiff's Complaint (30 May 2014)
- Defendant George Washington University's Initial Disclosures (8 August 2014)
- Plaintiff Sina Chenari's Initial Disclosures (13 August 2014), which included the following records (listed chronologically):
  - Typed notes labeled "Prior Events," specifying contributing stresses (Undated; covering before medical school through Summer 2012)
  - AMCAS Summary Application Report - 2010 Entering Class (29 July 2010)
  - CAP Evaluations (Fall 2010 through December 2012)
  - Typed notes labeled "Meeting at GWU 12/01/13 - 12:30 p.m. - 4:00 p.m."
  - Emails related to the December 2012 incident and decisions regarding the alleged Honor

**Report of Record Review and Opinion**
**Chenari, Sina "Charlie"/Page 2**

Code violation (14 December 2012 through 9 July 2013)
- ○ Memo to Mr. Chenari from Rhonda Goldberg, Associate Dean for Student Affairs, regarding an alleged Honor Code violation (4 February 2013)
- ○ Unofficial medical school transcript (26 February 2013)
- ○ Letter to Members of the Subcommittee for Professional Comportment from Dean Goldberg, with attached memos and emails (28 February 2013)
- ○ Report pertaining to allegations of academic dishonesty against Mr. Chenari to Jeffrey S. Akman, M.D., Vice President for Health Affairs and Dean, School of Medicine and Health Sciences, GWU, from Anthony J. Caputy, M.D., Chair, Subcommittee on Professional Comportment (15 March 2013)
- ○ Recommendations to Dean Akman from Marie Borum, M.D., Chair of the Medical Student Evaluation Committee (MSEC) (30 April 2013)
- ○ Letter to Mr. Chenari from Dean Akman regarding the final decision for dismissal from medical school (22 May 2013)
- ○ Letter to Steven Lerman, Provost, GWU, from Robin Anthony Bergsohn, Esq., Mr. Chenari's attorney, appealing Mr. Chenari's dismissal from medical school (30 May 2013)
- ○ Letter to Mr. Chenari from Provost Lerman upholding his dismissal from medical school (8 July 2013)
- Plaintiff's Response to Defendant's First Request for Production of Documents of George Washington University to Plaintiff (3 November 2014)
- Plaintiff's Response to Defendant's Second Request for Production of Documents of George Washington University to Plaintiff (3 November 2014)
- Plaintiff's Response to Defendant's First Interrogatories of George Washington University to Plaintiff (3 November 2014), with Exhibit 1, a listing of Mr. Chenari's submitted job applications
- Plaintiff's Response to Defendant's Second Interrogatories of George Washington University to Plaintiff (3 November 2014)
- Plaintiff Sina Chenari's Supplemental Disclosures (3 November 2014) with attachments (listed in chronological order)
  - ○ Medical records
    - Vienna Internal Medicine Associates, PC (3 August 2010 through 26 November 2013)
    - Various laboratory and imaging test results (5 August 2010 through 20 February 2012)
    - Todd. B. Tescher, M.D. (2 May 2011)
    - Physiotherapy Associates (22 May to 21 June 2012)
    - Commonwealth Orthopedics (2 July 2012)
  - ○ Emails between Mr. Chenari and various GWU staff prior to the 14 December 2012 incident (24 February 2011 through 13 December 2012)
  - ○ GWU Cost of Attendance, 2010-2011 and 2011-2012 Financial Aid Years (28 October 2014)

**Report of Record Review and Opinion**
**Chenari, Sina "Charlie"/Page 3**

- Various consent forms and medical school/university bylaws, regulations, and procedures
- Transcript of deposition of Sina Chenari (27 February 2015) and associated Exhibits 1 to 21:
  - Medical records (already included above)
  - Full AMCAS Application Report - 2010 Entering Class
  - Information from the website of GWU Disability Support Services: Getting Started (23 January 2015)
  - Brochure: Resources for Students Needing Academic, Personal, or Mental Health Counseling (Undated)
  - Disability Support Services Registration Packet (Undated, Blank)
  - Policy on GW SMHS M.D. Program - Technical Standards (1 April 2014)
  - Information from the website of GWU Disability Support Services: Guidelines for Documentation of Attention-Deficit Hyperactivity Disorders (14 August 2014)
  - Class of 2014 First Year Survival Guide, The George Washington University School of Medicine and Health Sciences (Selected pages)
  - Emails to medical students with Exam Guidelines attached (22 September 2010)
  - Required Information Sheet (Undated)
  - Policy Review Verification (20 August 2010)
  - National Board of Medical Examiners (NBME) Subject Examination Program Score Interpretation Guide for Students, NBME Comprehensive Basic Science Examination with score (4 May 2012)
  - Chief Proctor's Manual, NBME Subject Examination Program, Clinical Science Examinations (2010)
  - Emails noting the need for Mr. Chenari to remediate a conditional grade in the Practice of Medicine course and his responses (27 to 30 July 2012)
  - Emails including in previous documents above (4 to 5 October 2012)

Summary of Events Leading to Plaintiff's Dismissal from Medical School

Records indicate that Mr. Chenari had some difficulties in his first year of medical school, in the fall of 2010. He was advised to seek counseling, because of stress and depression that he reported, but he did not follow through with this recommendation. In the fall of 2011 and spring of 2012, there were concerns about how Mr. Chenari was doing in several classes, especially with patients. Concerns that were most noteworthy came from Richard Cytowic, M.D., in The Practice of Medicine, who noted that Mr. Chenari was anxious and advised Mr. Chenari to take steps to address these issues. Mr. Chenari was required to do remediation for this class in both semesters and passed these classes with remediation (CNP in transcript). He passed all other classes normally (P in transcript) and was listed as in "Good Standing" at the end of the spring 2012 semester. Mr. Chenari took Step 1 of the U.S. Medical Licensing Exam, in August 2012, following his second year, which is the typical time for medical students. However, at the time of this report, I did not have any records of the Exam results.

Emails in September 2012 indicated that Mr. Chenari had set up a meeting with Dean Goldberg "to discuss developing a plan for how I can continue with my medical education, hopefully this fall." There was a meeting on 1 October, with Dean Goldberg and Dean Yolanda

**Report of Record Review and Opinion**
**Chenari, Sina "Charlie"/Page 4**

Haywood, the Associate Dean for Student and Curricular Affairs, although there were no notes from this meeting. An email on 4 October to Mr. Chenari from Andrea Flory, M.D., the course director of The Practice of Medicine, provided the name of a counselor who worked with students "who have a lot of anxiety around the PBE exams." There was no mention of ADHD. An email from Mr. Chenari on 5 October thanked the Deans for meeting with him and stated his plan to start his third rotation. Dean Haywood concurred with the plan in a subsequent email.

On 14 December 2012, Mr. Chenari did not follow the proctor's instructions to turn in a shelf exam. Instead, he continued working and refused to give her the exam. This was witnessed by at least one other student in the class. Mr. Chenari ultimately turned in the exam and subsequently apologized to the proctor for his behavior. Nonetheless, he was charged with having violated the GWU student Honor Code. He presented his case to the medical school and denied that this had been cheating or an Honor Code violation, as charged. However, based on a review of what had occurred, the Subcommittee on Professional Comportment sent a recommendation for dismissal from medical school to Dean Ackman in March 2013. This recommendation was reviewed by the Medical Student Evaluation Committee in mid-April. The Committee unanimously concurred with the recommendation for dismissal and sent this to Dean Akman at the end of April. Dean Ackman reviewed and upheld the decision in late May. In the series of documents related to his dismissal, there was no mention of ADHD, although Mr. Chenari's stress, anxiety, and personal issues were noted several times. Mr. Chenari's attorney at the time, Mr. Bergsohn, appealed the decision. However, in his June 2013 letter, there was no mention of any medical diagnosis, including ADHD, as an explanation of Mr. Chenari's behavior. There was also no mention of any external stresses that might have contributed to Mr. Chenari's behavior. The decision for dismissal was ultimately upheld by Provost Lerman in July. Despite no mention of ADHD in any of these documents, in his initial Complaint filed over a year later, in June 2014 by his current attorneys, Tracy D. Rezvani and Jason J. Bach, Mr. Chenari claimed that GWU had failed 1) to recognize a disability due to ADHD and 2) to accommodate him for that disability.

<u>Plaintiff's Subsequent Responses to Record Requests and Interrogatories</u>

When documents related to a disability and accommodations due to ADHD or any other medical condition were requested by GWU, Mr. Chenari's response in November was that there were none. Similarly, when academic records related to ADHD, a disability, and accommodations were requested by GWU, Mr. Chenari's response was that he was "not in possession of records responsive to this request." Mr. Chenari responded similarly to a request for electronic communications related to ADHD. In the response to interrogatories from GWU, also in November, Mr. Chenari claimed to have discussed his depression and anxiety with Deans Haywood and Dean Goldberg in October 2012. He also said that, he "informed them both that he had been diagnosed with ADHD by his primary care physician and had been prescribed Adderall daily." He also informed them "of his disability." However, there was no documentation of any discussion of ADHD or a disability with the medical school Deans or other medical school staff in any of the documents related to the dismissal from March through July 2013. Similarly, there was no mention of ADHD or a disability in any of the email

**Report of Record Review and Opinion**
**Chenari, Sina "Charlie"/Page 5**

exchanges from the fall of 2012 through July 2013. All other references in the interrogatories were related to anxiety, which was documented in the records. Mr. Chenari also responded that the only "counseling" that he pursued, following Dean Goldberg's recommendation in 2010, was speaking with his primary care provider, Dr. Durr. Based on the records, Dr. Durr was not a psychiatrist or a qualified mental health professional.

Plaintiff's Reported Performance in Medical School from CAP

Most CAP comments were very positive and showed adequate progress. Some noted the unique perspective Mr. Chenari brought, due to his background in engineering. There were, however, some concerns in these records, which included:
- Not organizing gathered information effectively
- Not applying academic knowledge to clinical care
- Not being prepared for clinic
- Not contacting his professors when he knew he would miss class
- Arriving late to class
- Variable participation in discussion, sometimes being quiet and "removed"
- Not volunteering for a patient interview and needing to be asked to do so
- Struggling with patient interviews before an audience
- Nervousness, "difficulty relaxing into the interview and directing it."
- Periodic inappropriate comments or jokes
- Difficulty with surgical skills

There were some ratings of "Poor, Unacceptable, 1" or "Needs Improvement/Below Expected Level, 2" which occurred mainly in The Practice of Medicine class run by Dr. Cytowic. However, the vast majority of Mr. Chenari's ratings were "Very Good/At Expected Level, 3" or "Outstanding/Above Expected Level, 4." Also, several professors noted that he was receptive to feedback about his problems and made improvements. Ratings in his rotations in the fall of 2012 were mostly 4s and 5s, with some 3s.

Contributing Factors According to Plaintiff's Written Reports

Mr. Chenari identified family stresses before entering medical school (mother's breast cancer, breakup with a girlfriend) and continued stresses after starting medical school (friend committed suicide, feeling depressed and anxious with this and the academic stress of medical school). He acknowledged having been advised to seek counseling in the fall of 2010, but having not followed up on this advice. Family stress (uncle diagnosed with bladder cancer) continued in the spring of 2011. Mr. Chenari also had a painful muscle strain. He wrote that because of difficulty concentrating on his studies, he consulted his physician in the fall of 2011, disclosed all of these problems, and was prescribed Adderall, which he began taking. Nonetheless, in everything that he wrote both prior to and subsequent to the fall of 2010 (see document "Prior Events"), he emphasized anxiety, depression, and stress and not symptoms of ADHD. He wrote that after having made an inappropriate comment in the spring of 2012, he subsequently received "a retaliatory Failing evaluation" and "Had to do a remediation in clinic."

**Report of Record Review and Opinion**
**Chenari, Sina "Charlie"/Page 6**

However, in this document, there was no mention at all of ADHD or a disability.

Mr. Chenari wrote a "Personal Statement," which was attached to an email to Dean Goldberg on 17 April 2013.  It was written as an appeal to the MSEC to allow him to continue in medical school.  He apologized for his behavior, but did not mention ADHD, anxiety, depression, or personal stresses as a reason for his behavior.

A subsequent document, "Meeting at GWU 12/01/13," was written by Mr. Chenari.  This meeting, if in fact it was held (there was no documentation from the meeting) occurred five months after Mr. Chenari's dismissal had been upheld.  The document mentioned anxiety, family-related stresses, depression, medical issues, and a recommendation for counseling from Dean Goldberg.  Of note, Mr. Chenari wrote, "Saw my internist in ~November because I could not handle this depression and academics, he prescribed Adderall 10 mg daily."  There was no mention of ADHD here or anywhere else in this document.  Mr. Chenari then wrote, "Met with internist during first and second year to discuss depression.  Difficult to talk to him, because of culture of medicine [sic] usually discourages seeking counseling and licensing issues with regard to disclosure."

There was no mention of ADHD in any of the email exchanges between Mr. Chenari and GWU medical school staff.

Academic History Prior to Medical School

Mr. Chenari provided no academic records before college, other than a listing of the schools he attended in response to one of the Interrogatories.  There was no evidence there had ever been any academic concerns, including concerns about ADHD.  As noted, in his response to the Interrogatories, he indicated that there were no records of an ADHD diagnosis or any other academic difficulties in his earlier schooling.  While he was an undergraduate, in September 2008, Mr. Chenari took the MCAT, on which he scored 09 (53rd to 68th percentile) Verbal, 12 (89th to 95th percentile) Physical Science, 09 (41st to 58th percentile) Biological Science, and M (11th to 32nd percentile) Essay.  His Total Score was 30M (74th to 79th percentile), which was slightly above average in comparison with peers applying to medical school.  He completed a B.S. degree at GWU in Computer Science in May 2009, with a reported cumulative GPA of 3.64.  He subsequently completed an M.S. at GWU in Physiology in June 2010, although no cumulative GPA was listed.  He then went on to medical school that fall and, as noted had passed all classes through the spring of 2012, although remediation had been necessary in two.  In summary, Mr. Chenari's academic history showed no evidence of ADHD or indications of difficulty learning or concentrating in the way that most people do.

History of the ADHD Diagnosis

Mr. Chenari's medical records from just before medical school did not mention any academic problems or symptoms of ADHD.  Specifically, a brief neurological exam during an August 2010 physical exam was normal.  Mr. Chenari responded "No" to all items on a checklist of Psychiatric Symptoms (Memory loss or confusion, Nervousness, Depression, Sleep problems).  He did not list any medications at that time.  The first reference to attention problems was on 11 January 2011, when his primary care provider (PCP) wrote, "C/O discuss

**Report of Record Review and Opinion**
**Chenari, Sina "Charlie"/Page 7**

attention span. . . .S - pt is in medical school.  He is doing fairly well but is unable to study until
the end prior to exams.  He gets distracted easily. . . .A - ↓ Attention span."  His PCP prescribed
Adderall.  He also wrote, "See therapist at school."  However, there was no evidence that his
PCP did an appropriate assessment of ADHD.  Specifically, there was no documentation that he
explored other causes for the difficulty concentrating, such as the stress Mr. Chenari was
experiencing.  In fact, contrary to what Mr. Chenari wrote elsewhere regarding his symptoms of
anxiety and depression, there was no mention of these symptoms in that note.  Also, in a
checklist as part of a physical exam on 20 February 2012, Mr. Chenari responded "No" to all
Psychiatric Symptoms, including Depression and Nervousness, but wrote that he was taking
Adderall 10 mg.  Records documented treatment with Adderall 10mg, with monthly prescription
renewal, through November 2013.  However, his PCP wrote in February 2011 that Mr. Chenari
did not take the Adderall on weekends.

Plaintiff's Deposition - 27 February 2015
    Based on Mr. Chenari's deposition and the associated documents, there was no evidence that
he had ADHD or a disability due to ADHD through the end of his graduate program.  Although
he reported occasional distractibility, turning in work late, not doing homework in math, not
being organized, and slowness on tests, he acknowledged having always done well in school
despite these issues, up until medical school.  The problems that he described are common in
most people and not diagnostic of ADHD, in the absence of impairment in two or more settings.
For example, Lewanadowski, Lovett, Codding, and Gordon (2008) found that symptoms of
ADHD, problems with attention, and a range of learning difficulties are common in college
students without ADHD.  Mr. Chenari confirmed that there were never significant concerns
about his academic functioning.  He said that he completed his work independently in high
school, with no help from his parents.  He said that he was never previously evaluated for a
learning disability or ADHD.
    The main problems that Mr. Chenari reported in medical school, from the start, were related
to stress and anxiety–difficulty sleeping, not waking up on time, arriving to class late, being
anxious when working with patients.  The only impulsivity that he reported was making
inappropriate jokes.  He did not report any forgetfulness.  He reported that there were no
concerns about his performance in the jobs that he held prior to medical school.  In fact, his
statements indicated that he was well regarded and, because of this, was invited to a forum
involving Bill Gates and former President Bill Clinton.
    Mr. Chenari remembered little of his contacts with Dr. Durr.  A limited description of the
January 2011 session with Dr. Durr confirmed that Dr. Durr did not follow established
guidelines for ADHD diagnosis in an adult (American Academy of Child and Adolescent
Psychiatry, 1997; Barkley et al., 2008).  Mr. Chenari's deposition shed no light on exactly how
Dr. Durr made this diagnosis and why he prescribed Adderall.  Rather, it indicated that he knew
that Mr. Chenari was under stress in medical school and was anxious and depressed.  He
appropriately recommended that Mr. Chenari see a counselor or therapist.  Mr. Chenari said that
he did not follow up on this recommendation.  He acknowledged that he continued to see Dr.
Durr, who was his primary care provider.  Dr. Durr was not a mental health professional, had no

**Report of Record Review and Opinion**
**Chenari, Sina "Charlie"/Page 8**

training in psychotherapy, and was not in a position to provide the therapy/counseling that Mr. Chenari needed.  His role was to attend to Mr. Chenari's medical needs.  As noted in the records, he continued to prescribe Adderall and monitor Mr. Chenari's response.  When asked whether Adderall helped, Mr. Chenari varied in his responses.  At one point, he said that he was unsure if it helped, but at another point, he said that it made him less anxious and more focused.  He also acknowledged that he did not take the medication on weekends, because he was "apprehensive" about taking the medication.

Mr. Chenari's deposition statements regarding his meetings with Dean Goldberg and, subsequently, with Dean Goldberg and Hayward, focused primarily on his stress, anxiety, and depression.  He reported meetings in March and October 2012, but said he did not disclose his ADHD diagnosis and a disability related to that until October.  This was two years into medical school and almost two years after Dr. Durr's reported diagnosis.  However, records indicated that Mr. Chenari first met with Dean Goldberg in his first semester, in the fall of 2010, when he was first experiencing stress in medical school.  That was when counseling was first recommended.  Mr. Chenari acknowledged that Dean Goldberg and others in the medical school had recommended seeing a counselor.  However, his deposition statements indicate that he had the expectation that, at the October 2012 meeting, Deans Goldberg and Hayward should have acknowledged his ADHD, should have concluded that he had a disability, and should have provided accommodations in the form of extended time on tests.  This is an incorrect understanding of the process for receiving accommodations based on a documented disability under the 1990 Americans with Disabilities Act (ADA) and the subsequent ADA Amendments Act of 2008.  As noted in the Exhibits from GWU Disability Support Services, there is an established procedure for obtaining accommodations.  A diagnosis of ADHD, in and of itself, is insufficient.  Students at the college and postgraduate level are expected to advocate for themselves (Mapou, 2009).  My understanding, based on the Exhibits, is that Dean Goldberg, in her role as Associate Dean for Student Affairs, is the point of contact for students with disabilities.  She would have assessed the situation and would have made an appropriate referral for further evaluation.  She is not, however, a mental health professional.  Consequently, she is not qualified to do such an evaluation, to document a disability, or to recommend accommodations.  Based on what Mr. Chenari reported, she responded appropriately by referring him to the Counseling Center, because of his stress, anxiety, and depression.  Notably, even after that meeting, there was no mention of ADHD or a disability in the email exchanges, raising questions as to whether this had even come up at the meeting.  Had Mr. Chenari followed through with Dean Goldberg's repeated recommendations for counseling, a psychotherapist at the Counseling Center would have made a determination as to whether ADHD was a possibility and would have referred him to the appropriate professional for further evaluation of this.  This further evaluation would also have determined if Mr. Chenari qualified for accommodations.  However, he acknowledged that he never did this and never made this a priority.  In my 20 years of evaluating medical students from all over the country who run into problems in medical school, all have made completing an evaluation a priority and have been willing to take time from their classes or even to take time off from medical school to obtain a clear diagnosis of their problems and recommendations for helping them.

Report of Record Review and Opinion
Chenari, Sina "Charlie"/Page 9

CONCLUSIONS

Based on the reviewed records, which included Mr. Chenari's academic and medical history, I conclude within a reasonable degree of certainty that 1) Mr. Chenari does not have ADHD and 2) Mr. Chenari does not have a disability warranting accommodations. Rather, this appears to be a case of a behavior in search of a diagnosis to explain it. My reasons for these conclusions are as follows:

1. ADHD is a developmental disorder, with symptoms dating to childhood (Barkley, 2014). Although symptoms may not affect a person's functioning until high school (see, for example, Barkley, Murphy, and Fischer, 2008, who found no difference in impairment between adults diagnosed before age seven and those diagnosed as late as 16), there must be evidence that the symptoms were present in childhood and/or adolescence and did not simply appear at a time of increasing academic demands (Barkley et al, 2008; Mapou, 2006, 2009). There must also be impairment in two or more settings (American Psychiatric Association, 2013). The primary symptoms that Mr. Chenari reported in medical school were distractibility and difficulty concentrating. Although this appears to have led to Dr. Durr's diagnosis of ADHD and prescription of Adderall, these symptoms are insufficient to diagnose ADHD, because there are many different causes of distractibility and problems concentrating. These include stress, anxiety, depression, poor or insufficient sleep, or a sleep disorder. In essence, problems with attention and concentration are similar to a fever. The presence of attention problems tells a clinician that something is wrong, but the clinician must look further, to determine what that is. Furthermore, based on what Mr. Chenari submitted, there was no evidence in impairment in two or more settings. Specifically, he had an excellent academic record before medical school and completed his schooling through college without difficulty, without accommodations, and without extra support, based on the records that I reviewed. He had no problems in the jobs that he held before medical school, never required accommodations, and was never fired. To the contrary, he was seen as talented in his field. Although he had some problems in medical school, these were largely specific to patient interactions and interviewing. An added problem was arriving late to class, due to poor sleep.

2. Dr. Durr did not diagnose ADHD using currently accepted standards for diagnosis (American Academy of Child and Adolescent Psychiatry, 1997; Barkley et al., 2008; Mapou, 2006, 2009). Although "ADD" was listed in his medical records starting in January 2011 and a prescription was written for Adderall, there was nothing that indicated a basis for this diagnosis. Specifically, there is no evidence that Dr. Durr took an oral history from childhood through the current time of diagnosis; reviewed academic records; had Mr. Chenari, his parents, and a current informant complete rating scales; or reviewed past and present difficulties using the DSM-IV (now DSM-5) diagnostic criteria for ADHD.

3. If individuals have ADHD, then continuous treatment is standard and necessary (Barkley,

**Report of Record Review and Opinion**
**Chenari, Sina "Charlie"/Page 10**

2014).  However, Dr. Durr noted that Mr. Chenari did not take the medication on weekends, and Mr. Chenari acknowledged this in his deposition.  Although Dr. Durr reported that Mr. Chenari benefitted from treatment, it is well established that even people without ADHD will benefit from a psychostimulant (Agay, Yechiam, Carmel, & Levkowitz, 2014; Rapoport et al., 1980; Rapoport & Inoff-Germain, 2002;), just as a strong cup of coffee can help anyone concentrate more effectively, especially if they are tired.  So, a positive response to Adderall is not *prima facie* evidence of ADHD.  Also, in his deposition, Mr. Chenari was mixed in his responses when asked if the Adderall had helped.

4.  Even if we conclude that Mr. Chenari had ADHD, a diagnosis is not equivalent to a disability.  Rather, one must show that the diagnosed disorder causes a significant functional impairment in a major life activity.  This is why an evaluation and documentation is required.  Records and Mr. Chenari's responses during his deposition showed no evidence of such impairment or completion of an evaluation to determine whether there was impairment.

5.  Even if we conclude that Mr. Chenari had ADHD and was disabled, there is no evidence in the records, other than his response in the Interrogatories and his deposition, that he ever disclosed this to medical school staff or requested accommodations.  It is not the responsibility of the medical school staff to identify and accommodate a "hidden disability." Rather, it is the responsibility of the student to provide adequate documentation that supports the presence of a disability and the need for reasonable accommodations (Mapou, 2009).

6.  Based on his own report, Mr. Chenari was anxious and depressed from the start of medical school, related to personal issues, family issues, and some medical issues of his own.  He even noted that he discussed these symptoms with Dr. Durr, who prescribed Adderall.  Although I am not a physician and do not prescribe medication, as a neuropsychologist working regularly with adults with ADHD and other psychiatric disorders, I am familiar with appropriate treatments.  Adderall was not an appropriate treatment for the reported symptoms.  Rather, counseling, as recommended by Dr. Durr and medical school staff, and, perhaps, medication for depression and anxiety, would have been the appropriate treatment.  However, Mr. Chenari did not pursue counseling and was even reluctant to speak with Dr. Durr about his symptoms.

7.  Interacting with people is *part of the job* of being a physician.  If Mr. Chenari is not able to do this, regardless of a disability, he is *not otherwise qualified* to do the job of a physician, and dismissal is appropriate.  Difficulty with patient interactions does not mean he is disabled.  It simply means that he does not have the skill set required to be a physician and would be better off using his strengths in another line of work.  It is also expected that physicians in training function with less than a normal amount of sleep, manage stress effectively, and take steps to manage their stress if told they are not coping well before this affects their ability to work effectively.

**Report of Record Review and Opinion**
**Chenari, Sina "Charlie"/Page 11**

8. Similarly, based on what Mr. Chenari reported in several places (deposition, emails), he was aware of the rules for the shelf exam and chose to defy them. His behavior was unacceptable in that context, and there are consequences for this. Interacting appropriately with supervisors, colleagues, and staff is also part of the job of a physician. If Mr. Chenari cannot control his responses in stressful situations, then he does not have the qualifications to be a physician.

I reserve the right to revise my opinion with review of additional materials. Please contact me at (301) 565-0534, x264 or via email (rmapou@stixrud.com) if clarification or additional assistance is needed.

Robert L. Mapou, Ph.D.
Board Certified in Clinical Neuropsychology, American Board of Professional Psychology
Licensed Psychologist (MD No. 2415)

References

Agay, N., Yechiam, E., Carmel, Z., & Levkowitz, Y. (2014). Methylphenidate enhances cognitive performance in adults with poor baseline capacities regardless of attention-deficit/hyperactivity disorder diagnosis. *Journal of Clinical Psychopharmacology, 34*, 261-265.

American Academy of Child and Adolescent Psychiatry. (1997). Practice parameters for the assessment and treatment of children, adolescents, and adults with attention-deficit hyperactivity disorder. *Journal of the American Academy of Child and Adolescent Psychiatry, 36* (10, suppl.), 85S-121S.

American Psychiatric Association. (2013). *Diagnostic and statistical manual of mental disorders, (DSM-5)* (5th ed.). Washington, DC: American Psychiatric Association.

Barkley, R. A. (Ed.). (2014). *Attention-deficit/hyperactivity disorder: A handbook for diagnosis and treatment* (4th ed.). New York: Guilford Press.

Barkley, R. A., Murphy, K. R., & Fischer, M. (2008). *ADHD in adults: What the science says.* New York: Guilford.

Mapou, R. L. (2006). Adult attention-deficit/hyperactivity disorder. In P. J. Snyder, P. D. Nussbaum, and D. Robins (Eds.), *Clinical neuropsychology: A pocket handbook for assessment*

**Report of Record Review and Opinion**
**Chenari, Sina "Charlie"/Page 12**

(2nd edition) (pp. 626-648).  Washington, DC: American Psychological Association Books.

Mapou, R. L. (2009). *Adult learning disabilities and ADHD: Research-informed assessment.* New York: Oxford University Press.

Rapoport, J. L., Buchsbaum, M. S., Weingartner, H., Zahn, T. P., Ludlow, C., & Mikkelsen, E. J. (1980).  Dextroamphetamine: its cognitive and behavioral effects in normal and hyperactive boys and normal men.  *Archives of General Psychiatry, 37,* 933-943.

Rapoport, J. L., & Inoff-Germain, G. (2002).  Responses to methylphenidate in attention-deficit/hyperactivity disorder and normal children: Update 2002.  *Journal of Attention Disorders, 6 (Suppl. 1),* 857-860.