## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SINA CHENARI, | |
| Plaintiff, | Civil Action No. 14-929  (ABJ) |
| v. | Judge Amy Berman Jackson |
| GEORGE WASHINGTON UNIVERSITY, | |
| Defendant. | |

## MOTION OF DEFENDANT GEORGE
## WASHINGTON UNIVERSITY FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56 and LCvR 7(h) and (l), Defendant George Washington University (the "University") moves for summary judgment as to all of Plaintiff's claims. Based upon the material facts as to which there is no genuine issue and the clear precedent in this jurisdiction that courts defer to the decisions of academic decision makers in student dismissal cases absent "the most compelling evidence of arbitrary or capricious" treatment of a student, Bain v. Howard Univ., 968 F. Supp.2d 294, 298 (D.D.C. 2013), the University is entitled to summary judgment.

In this case, Plaintiff brings his Complaint setting forth claims for alleged breach of contract (Count I), breach of the implied covenant of good faith and fair dealing (Count II), violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 705(20) (Count III), and Violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* (Count IV), arising out of the fact that while taking a nationally-administered timed standardized medical school exam (the Surgery Shelf Exam) during his third year, Plaintiff refused to comply with repeated instructions by the exam proctor – after the proctor had called "time" and the timed exam had clearly ended – to stop "bubbling in" his scantron answer sheet. Instead, Plaintiff

continued to bubble in the entire front page of the answer sheet and even physically rebuffed the proctor's efforts to collect the answer sheet from him. When he had finished bubbling in the answer sheet, Plaintiff left the scantron sheet and exam booklet on the desk where the proctor then picked them up. When the proctor reported this event to the dean of students, the University initiated academic disciplinary proceedings for violation of the Medical School's Honor Code.

The University followed the multi-layered scope of proceedings prescribed in its Medical Student Guidelines for disciplinary proceedings involving Honor Code violations, from initial investigation, to a hearing committee, to review by the Medical Student Evaluation Committee, to further review by the Dean of the Medical School and a final appeal to the Provost of the University. At no point during the proceedings did Plaintiff claim, or even mention, that he allegedly had ADHD (or any other disability) that allegedly caused or contributed to his conduct at the time of the Surgery Shelf Exam. Instead, he admitted that his behavior had been "deplorable" and that he had acted "with blatant disregard for the rules and for the rights of [his] fellow students." He did argue, however, that he should be accorded the benefit of the mitigating factor that his "behavior did not involve deception" apparently on the grounds that his behavior was non-surreptitious in that it occurred in an exam room in the presence of the exam proctor and so many of his class-mates.

At every stage of the process, the University's recommendation and decision was that Plaintiff should be dismissed for academic dishonesty.

Plaintiff's claims under Counts I and II fail as a matter of law because the undisputed facts so clearly establish a legitimate basis for the academic decision-makers to determine that Plaintiff's conduct involved dishonesty. Plaintiff cannot meet the high standard governing contractual claims in the academic dismissal context which requires a Plaintiff to prove that

"there was no rational basis for [a University's decision], or that it was motivated by bad faith or ill will unrelated to academic performance." <u>Alden v. Georgetown Univ.</u>, 734 A.2d 1103, 1109 (D.C. 1999).

Plaintiff's claims under Counts III and IV fare no better.  In order to prove that Plaintiff had a disability that GW failed to accommodate, Plaintiff must first prove (1) that he has a disability and (2) that he informed GW that he claimed he had a disability and actually requested an accommodation.  <u>Faison v. Vance-Cooks</u>, 896 F. Supp.2d 37, 57 (D.D.C. 2012) (Kollar-Kotelly, J.), <u>citing</u> <u>Crandall v. Paralyzed Veterans of Am.</u>, 146 F.3d 894, 897-98 (D.C. Cir. 1998).

In this case, the evidence is undisputed that Plaintiff never made any request for an accommodation. In fact, the University's very first notice that Plaintiff claimed he has a disability was when this suit was filed. Moreover, Plaintiff has no expert testimony sufficient to establish the other elements of a <u>prima</u> <u>facie</u> claim for disability, denial of accommodation, and a causal nexus to the injury or damages alleged under either of the statutes invoked.

In further support of its Motion, the University would respectively refer the Court to the accompanying Statement of Material Facts as to Which There Is No Genuine Issue and Memorandum of Points and Authorities.

Respectfully submitted,

JACKSON & CAMPBELL, P.C.

/s/ *Nicholas S. McConnell*
Nicholas S. McConnell (D.C. Bar #167742)
Allyson C. Kitchel (D.C. Bar #496687)
JACKSON & CAMPBELL, P.C.
1120-20TH Street, N.W. (Suite 300 S.)
Washington, D.C.  20036
(T) (202) 457-1600
(F) (202) 457-1678
nmcconnell@jackscamp.com
akitchel@jackscamp.com

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify on this 10th day of August, 2015 that the foregoing Motion of the George

Washington University for Summary Judgment, Statement of Material Facts as to Which There

is No Genuine Issue, Memorandum of Points and Authorities, and proposed form of Order, was

served via ECF to counsel of record:

Tracy D. Rezvani, P.C.
Rezvani Volin & Rotbert, P.C.
1050 Connecticut Avenue, N.W., 10th Floor
Washington, D.C. 20036

Jason J. Bach, Esq.
The Bach Law Firm, LLC
7881 W. Charleston Boulevard, Suite 165
Las Vegas, NV 89117

*Counsel for Plaintiff*

/s/  Nicholas S. McConnell
Nicholas S. McConnell (D.C. Bar #167742)

4

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SINA CHENARI, | |
| Plaintiff, | |
| | Civil Action No. 14-929  (ABJ) |
| v. | |
| | Judge Amy Berman Jackson |
| GEORGE WASHINGTON UNIVERSITY, | |
| Defendant. | |

**DEFENDANT'S STATEMENT OF MATERIAL FACTS**
**AS TO WHICH THERE IS NO GENUINJE ISSUE**

Pursuant to Fed. R. Civ. P. 56 and Local R. 7(h)(1), Defendant George Washington University hereby submits this Statement of Material Facts as to Which There Is No Genuine Issue in support of its motion for summary judgment.

**The Parties**

1.  Defendant George Washington University (the "University" or "Medical School") is a private University operating in Washington, D.C. **Exhibit 1**, Compl. ¶ 2.

2.  Plaintiff Sina "Charlie" Chenari ("Plaintiff") enrolled in the Medical School in the fall of 2010. Transcript of Deposition of Sina Chenari, taken February 27, 2015, and continued on April 20, 2015 ("Chenari Dep."), relevant portions of which are attached as **Exhibit 2** at 43:3 – 5.

**Plaintiff's Medical School Studies**

3.  Plaintiff was admitted to the Medical School's Class of 2014, and he enrolled for the Fall 2010 semester. Id.; **Exhibit 1** (Compl.) at ¶ 7.  Prior to enrolling in medical school, Plaintiff admits he was a very successful student.  **Exhibit 2** at 80:20 – 81:6; 118:19 – 119:2; 124:12 – 15; 125: 22 – 126:2.

4.   Prior to matriculation, Plaintiff was seen by Paul G. Durr, M.D., for a routine pre-medical school screening physical examination.  **Exhibit 2** (Chenari Dep.) at 12:8 – 16.  He saw Dr. Durr again on January 11, 2011. Id. at 49:14 – 50:20.  At the latter visit, he reported to Dr. Durr that he was having "attention span issues, having difficulty studying, having difficulty performing in class," "depression issues and some anxiety issues."  Id.

5.   On January 11, 2012, Dr. Durr prescribed Adderall for Plaintiff.   Transcript of Deposition of Paul G. Durr, M.D., taken April 23, 2015 ("Durr Dep.") relevant portions of which are attached as **Exhibit 3** at 57: 5 – 19.  Dr. Durr, who is Board certified in internal medicine (**Exhibit 3** at 9:19 – 10:10), was unsure whether he actually diagnosed Plaintiff as having ADHD at that time and was not sure of the official criteria for making a diagnosis of ADHD, but could prescribe Adderall if he thought it would benefit the patient apart from whether the patient had a formal diagnosis of ADHD:

> Q.     Did you diagnose Mr. Chenari as having ADHD at [the January 11] appointment?
>
> A.     I don't know because I didn't put it in the note. So I can't answer that question.

Id. at 40:19 – 22.

> Q.     What are the criteria for making an ADHD diagnosis?
>
> A.     The official criteria I am not sure of.

Id. at 41:10 – 12.

> Q.     I draw a distinction. You could decide as a physician that Adderall would benefit a patient, but that is a separate question from whether or not they have a formal diagnosis of ADHD, right?
>
> A.     Whether they have a formal diagnosis, yes.
>
> Q.     Two separate things?

2

A.      Yes.

Id. at 41:1 – 7.

Q.      And what criteria were you relying on marking yes in response to this question [that the patient has ADHD].

* * *

A.      Okay. So my guess is, and I don't remember what I saw at the time, but my guess is it was on his symptoms and how he did with the Adderall.

Q.      Would you conclude then that your marking yes was relying on the – quote – "other clinical criteria" that you have described?

A.      Yes.

Q.      Because you didn't go through the DSM checklist?

A.      Correct.

Q.      Is the DSM something that you refer to periodically?

A.      Very rarely.

Q.      Do you know if you have ever referred to it for ADD or ADHD?

A.      I don't know.

Q.      As you sit here today you can't recall?

A.      Correct.

Id. at 73:6-74:11.

6.      At the January 11, 2012 appointment, Dr. Durr also advised Plaintiff to see a therapist at his school:

Q.      You [Dr. Durr] noted that you suggested that Mr. Chenari see a therapist at school. Do you agree that is in your note?

A.      Yes.

3

Q.      And you documented it. Did you tell him that?

A.      If I wrote it down I probably told him that.

Q.      And what did you mean by therapist?

A.      Most schools have somebody who is very good about ADD and treating of ADD to give medicines and to treat them and to help students while they are in school because they deal with the students in that situation. So that is what I meant.

Q.      Would you have explained all that to him?

A.      Yes.

**Exhibit 3** (Durr Dep.) at 42:8 – 43-1.

Q.      We spoke about your suggestion to Mr. Chenari that he go see a therapist at school. Do you recall that testimony?

A.      Yes.

Q.      And this is because you understand that there are people, especially at large universities, that specialize in helping students that have diagnoses like ADHD; is that right?

A.      Yes.

Q.      And those people are specially trained to counsel those students in how to work within their systems to accommodate any disabilities they have, right?

A.      Yes.

**Exhibit 3** (Durr Dep.) at 76:4 – 17.

7.  Plaintiff admits that he did not follow Dr. Durr's advice to see a therapist:

Q.      Now, he [Dr. Durr] said see therapist at school. Did you go see a therapist?

A.      I did not see a therapist.

Q.      Did you see a therapist at any time?

A.      No.

4

**Exhibit 2** (Chenari Dep.) at 74:20 – 22.

8. Plaintiff began taking Adderall on a regular basis, however, and it helped him:

> Q.      How did you do on the Adderall?
>
> A.      I felt that it helped calm me down a little bit. It helped me focus. And I believe it helped with some of the anxiety. A little bit of the depression issues too that I was having.
>
> * * *
>
> Q.      Did you find that the Adderall was helping to resolve your concentration issues?
>
> A.      I believe so. I believe it helped. I think I was able to perform better academically. I was able to concentrate more easily and prepare better.

**Exhibit 2** (Chenari Dep.) at 79:10 – 80:11.

9. As far as Dr. Durr was aware, Plaintiff was doing well on Adderall. **Exhibit 3** (Durr Dep.) at 57:5-10; 58:20-59:11; 68:2-11.

10. Dr. Durr is not aware of any specific or even general accommodations that patients diagnosed with ADHD can receive from a college or university and does not know if ADHD qualifies for any such accommodations. **Exhibit 3** (Durr Dep.) at 78:9-79:3.

11. Plaintiff completed his first two years of Medical School and was originally scheduled to start his third-year clinical rotations in the Fall Semester of 2012. **Exhibit 2** (Chenari Dep.) at 239:6 – 9. He did not start his rotations on time, however, because he had not taken his Board exam, which was required before he could begin clinical rotations. Id. at 239: 10 – 240:13. He stated he delayed taking the exam because of exhaustion. Id.

12. As a result of the delay in his schedule, on September 20, 2012, Plaintiff sent an email to Dean Rhonda M. Goldberg, who was an Associate Dean for Students at the Medical School, requesting a discussion about how he could continue his studies. **Exhibit 2** (Chenari

5

Dep.) at 241:12 – 17; email exchange between Plaintiff and Dean Goldberg, marked as Chenari

Dep. Ex. 21, a copy of which is attached hereto as **Exhibit 4**.

      13. In response to that email, on October 3, 2012, Plaintiff met with Dean Goldberg and

Dean Yolanda Haywood, who is also a Medical School Dean. Plaintiff claims he informed them

of his ADHD diagnosis at that meeting. **Exhibit 2** (Chenari Dep.) at 241:12 – 21. Plaintiff was

given a phone number at that meeting for the University Counseling Center:

> Q.    Now, you say during this period of time you told them that
> you had ADHD and was [sic] suffering depression and anxiety and
> everything?
>
> A.    Correct.  That was part of our conversation.
>
> Q.    And in giving you the number for the University
> Counseling Center, what, if anything, did [Dean Goldberg] say was
> the purpose for giving you that information?
>
> A.    I guess mainly she focused on my anxiety and depression
> and that I could speak with them, you know, regarding that issue.

Id. at 243:1 – 16.

      14. The only time Plaintiff told anyone he had ADHD was during the meeting with Dean

Goldberg and Dean Haywood. Id. at 328:21 – 329:7.

      15. Plaintiff did not follow through on Dean Goldberg's referral to the Counseling

Center because he did not have time. Id. at 243:17 – 21.

      16. Not only did Plaintiff not follow through on Dean Goldberg's referral to the

Counseling Center, Plaintiff did not follow up in any other respect to obtain assistance.

> Q.    Well, in light of Dean Goldberg's referral to the Counseling
> Center and your inability because of time constraint to follow-up
> there, did you follow-up anywhere else on the issues that were
> discussed with Dean[s] Goldberg and Haywood?
>
> A.    I mean nobody followed up with me and I –

> Q.      Different question.  Did you do anything further about it?
>
> A.      I just started the rotation.

**Exhibit 2** (Chenari Dep.) at 243:22 – 244:8.

17. On October 4, 2012, the day after Dean Goldberg suggested to Plaintiff that he contact the Counseling Center, Plaintiff received an email from a faculty member, Andrea L. Flory, M.D.  **Exhibit 2** (Chenari Dep.) at 245:13 – 17; Flory email, marked as Chenari Dep. Ex. 22, a copy of which is attached hereto as **Exhibit 5**.  Dr. Flory referred Plaintiff to Anne Gialanella, a "highly recommended" counselor. **Exhibit 5**.

> Q.      So here is a recommendation to a therapist. When did you contact Ms. Gialanella?
>
> A.      As I said before, this is when I had started the surgery rotation and there was no time.
>
> Q.      Did you ever follow up with Ms. Gialanella?
>
> A.      No.
>
> Q.      Why?
>
> A.      I mean, the rotations took up all my time.
>
> Q.      Was that the University's fault?
>
> A.      I mean, they could have excused me from some responsibilities.
>
> Q.      Did you ask to be excused so you could go get therapy from Ms. Gialanella?
>
> A.      No.

**Exhibit 2** (Chenari Dep.) at 246:5 – 19.

## Services Offered by the University

18. The University has a Disability Support Services ("DSS") office. Declaration of Susan McMenamin, Director of Disability Support Services, dated August 4, 2015 and attached hereto as **Exhibit 6** (McMenamin Dec.). Its mission is to "work collaboratively with students, faculty and staff across the campus to foster a climate of universal academic excellence, while also promoting disability culture and GW's broader diversity and inclusion initiatives." Id. DSS maintains a website which can be accessed at http://disabilitysupport.gwu.edu/. This is true today and was also true from Fall, 2010 through December, 2012. Id.

19. DSS has specific procedures for responding to students seeking accommodation of disabilities. **Exhibit 6** (McMenamin Dec.).

20. In 2012, DSS's website contained a specific page listing the steps required to apply for ADHD accommodations entitled, "Guidelines for Documentation of Attention-Deficit Hyperactivity Disorders." **Exhibit 6** (McMenamin Dec.), Exhibit A thereto (consisting of a print out of that page).

21. Plaintiff never applied for an accommodation for any claimed disability:

> Q.      Slightly different question.   Did – do I understand, therefore, that at no time did you yourself actually make a request to anybody at The George Washington University for an accommodation of any kind as the result of your claiming to have ADHD?
>
> A.      I did not know of any accommodation to request.
>
> Q.      So you didn't make a request for accommodations?
>
> A.      I did not know of any available.  I didn't make a request. I only informed them of my diagnosis.

**Exhibit 2** (Chenari Dep.) at 338:18 – 339:7. See also **Exhibit 6** (McMenamin Dec.).

8

22. Plaintiff was aware that the University's website was available 24 hours a day, seven days per week, for information about any services that students might need.  **Exhibit 2** (Chenari Dep.) at 173:10 – 20. Plaintiff never looked into what services the University might be able to provide to him.  Id. at 343: 10 – 16.

23. Plaintiff received an orientation manual entitled "Class of 2014 First Year Survival Guide" ("Survival Guide") just prior to his matriculation to medical school. **Exhibit 2** (Chenari Dep.) at 186:4 – 17; Survival Guide excerpts marked as Chenari Dep. Ex. 14, attached hereto as **Exhibit 7**.

24. Plaintiff agrees that he looked through the Survival Guide.  **Exhibit 2** (Chenari Dep.) at 186:18 – 21.

25. The Survival Guide directs students who suspect they may have a disability to contact the Office of Disability Support Services for information. **Exhibit 7** at p. 23.

26. During the first or second week of school each year, Dean Goldberg makes a presentation to first year medical students regarding various topics related to success in medical school. Declaration of Rhonda M. Goldberg ("Goldberg Dec."), attached hereto as **Exhibit 8**. One topic she covers year after year, and that she covered with Plaintiff's class, concerns the services offered by DSS and how students should go about contacting DSS to discuss any disability-related issues. Id.

27. Dean Goldberg has personally referred medical students to DSS where they have mentioned that they have a diagnosis and need accommodation.  Transcript of Deposition of Rhonda M. Goldberg, taken April 21, 2015  ("Goldberg Dep."), relevant portions of which are attached as **Exhibit 9** at 72:5 – 22.  Most students with disabilities do not need referrals because

by the time they reach medical school, they already know what they need to do.  Id.  As a result, she has only made 10-15 such referrals over the course of her career. Id. at 72:13 – 22.

28. At no point during the October 3, 2012, meeting with Dean Goldberg, nor any other time, did Plaintiff request that the University provide him any specific accommodation related to his ADHD diagnosis.  **Exhibit 2** (Chenari Dep.) at 338:18 – 339:7.  Likewise, Plaintiff never sought any information online or from any other campus service concerning how to deal with his alleged disability.  Id. at 343:10 – 16.

**Events Leading to Plaintiff's Dismissal**

29. As discussed with Dean Goldberg and Dean Haywood at the October 3, 2012, meeting, Plaintiff, along with a number of his other classmates, began a clinical rotation in surgery in October, 2012. **Exhibit 2** (Chenari Dep.) at 241:12 – 17; **Exhibit 4**.

30. On December 14, 2012, all students in the surgical rotation were scheduled to take a standardized examination published by the National Board of Medical Examiners ("NBME") known as a "Shelf Exam." **Exhibit 9** (Goldberg Dep.) at 69:19 – 70:2.

31. Prior to this exam, Plaintiff received a copy of the Medical School's "Exam Guidelines" which provide a number of rules promulgated under the auspices of the "Honor/Professionalism Council" in October, 2005, for medical student conduct during examinations, including a requirement that students must sign a statement on the exam to abide by the Honor Code and also stating: "After the announcement that the exam period is over, all exams and answer sheets must be face down until collection by the proctor. There will be no extra time allotted, even to finish 'bubbling' in the answer sheet." **Exhibit 2** (Chenari Dep.) at 199:10 – 15; see also Exam Guidelines, marked as Chenari Dep. Ex. 16 and attached hereto as **Exhibit 10**.

32. Plaintiff admits that Exhibit 10 informed him of the rules concerning the bubbling in of answers:

> Q.     If you had read this you would certainly have realized that bubbling in after time is called on a timed exam is not permitted, correct?
>
> A.     Yes.
>
> Q.     If you had read this you would have had no doubt about that, correct?
>
> A.     I mean I know I browsed through it.
>
> Q.     Different question.  If you had read this you would have known there is no bubbling after time is called?
>
> A.     Correct.

**Exhibit 2** at 206:15 – 207:3.

33. The examination was proctored by Jessica Ruiz, who, at that time, was the Surgical Clerkship Coordinator. Transcript of Deposition of Jessica Ruiz taken April 20, 2015 ("Ruiz Dep."), relevant portions of which are attached as **Exhibit 11** at 12:22 – 13:4. In that capacity, Ms. Ruiz proctored exams six times per year. Id. at 13:21 – 14:3.

34. The administration of Shelf Exams was governed by a Chief Proctor's Manual ("Manual") published by the NBME. Declaration of Jessica Ruiz, dated August 7, 2015, attached hereto as **Exhibit 12**; Exhibit A thereto is a true and correct copy of the Manual in effect at the time of the December 14, 2012 Surgical Shelf Exam. In accordance with the Manual's requirement that proctors read verbatim certain instructions to be given to examinees at various stages of the test administration, Ms. Ruiz did so for the December 14, 2012 Surgical Shelf Exam, including the following:

(a) Instructions at the beginning of the exam:

(1) "The instructions I will give you are fairly detailed and are required by the National Board for administration of this test <u>to ensure that each examinee has the same opportunity to demonstrate his or her knowledge of the material covered by this examination</u>." (Emphasis added.)

(2) "We will now distribute the test books. **Do not break the seal on your test book until you are told to do so**." (Original emphasis.)

(3) "Be sure you understand how to complete the answer sheet . . . Are there any questions?"

(4) "Carefully break the seal on your test book, remove the answer sheet, and close your book . . . The Examinee Acknowledgment Statement is printed on the top portion of the answer sheet. Please take a minute to read the statement and sign your name in the space provided."

(5) "You are permitted to make calculations or notes in your test book, but you will receive credit for an answer only if it is properly recorded in the appropriate space on the answer sheet. <u>Time will not be extended beyond the close of this examination for transferring your answers</u>." (Emphasis added.)

(6) "You may leave the testing room one at a time. A proctor will escort you for the full duration of your absence. Your test book and answer sheet will be collected and held until you return. <u>You will not be allowed extra testing time for the time lost during your absence</u>." (Emphasis added.)

(7) "Those who want to leave early may do so one at a time until the last ten minutes of the examination session. . . . . After the ten-minute warning is announced, no one may leave the testing room until one test book and one answer sheet have been collected from each examinee and all test materials have been counted at the end of the session."

(8) "You will have two hours and thirty minutes (2 hours and 30 minutes) to complete this exam. <u>When I give the signal, you may begin to work</u>. Are there any questions?" (Emphasis added.)

(9) "BEGIN WORK." (Original emphasis.)

Exhibit A, pp. 15-17.

(b)   <u>Thirty minutes before the end of the session</u>:

12

> (1)    "You have 30 minutes in which to finish this examination. <u>Please remember that all responses must be recorded on your answer sheet in order to receive credit. No additional time will be allowed for transferring answers</u>."

Exhibit A, p. 18 (emphasis added).

> (c)    <u>Ten minutes before the end of the session</u>:
>
> (1)    "You have 10 more minutes to work. Please remain seated. You may not leave the testing room until you are dismissed at the end of the session."

Exhibit A, p. 18.

> (d)    <u>At the end of the session</u>:
>
> (1)    "STOP. Close your test book."

Exhibit A., p. 18.

35.    Plaintiff admits Ms. Ruiz read at least the 30-minute warning aloud and that he was aware of it:

> Q.  You do agree that it is likely you were read that 30 minute warning during the practice Shelf Exam as well as the actual Shelf Exam you took?
>
> A.    Yes.  I am not disputing that.
>
> Q.    So you would agree there is absolutely no dispute that you were aware when that time was called that you were to stop bubbling in your answer sheet, correct?
>
> A.    Yes.

**Exhibit 2** (Chenari Dep.) at 217:5 – 13.

36. When time was called at the end of the exam, Plaintiff continued to bubble in his answer sheet, **Exhibit 2** (Chenari Dep.) 266:10 – 267:9, and Plaintiff admits that he disregarded an express instruction directing to him to stop:

13

> Q.      All right.  So Ms. Ruiz called time, you realized you hadn't bubbled in the front of the sheet, you turned it over and started bubbling in the front of the sheet?
>
> A.      Yes.
>
> Q.      What, if anything, did Ms. Ruiz say to you?
>
> A.      She said pencils down. After a few seconds, she asked me to stop.
>
> Q.      What did she say?
>
> A.      I don't remember the exact wording she said, but she asked me to stop.
>
> Q.      Did she use your name?
>
> A.      I believe so.

**Exhibit 2** (Chenari Dep.) at 268:18 – 269:8.

37. Plaintiff actually put his hand or arm over the answer sheet so Ms. Ruiz could not retrieve it when she tried to do so, and he continued bubbling in all of the answers on the front side of the scantron answer sheet. **Exhibit 2** (Chenari Dep.), 267:4-268:12; 269:19-270:6; 271:12-272:8.

38. After he had completed bubbling in the front page of the answer sheet, during which time Plaintiff claims Ms. Ruiz was "towering over" him, Plaintiff placed the answer sheet and exam booklet on the desk and sat back. Ms. Ruiz then picked them up and Plaintiff left the room. **Exhibit 2** (Chenari Dep.) at 278:4-280:21.

39. Plaintiff admits that this conduct implicated the ethical standards required of medical student set forth in the Exam Guidelines (**Exhibit 10**) published by the Honor/Professionalism Council:

> Q:      You violated the guidelines, didn't you?

14

> A:      Yeah. I guess as you have read it.
>
> Q:      I don't want any qualifiers on it.
>
> A:      Okay.
>
> Q:      It is not as I read it.  You violated the guidelines as they were published and provided to you and to all your classmates, you violated those guidelines, didn't you?
>
> A:      Yes. I understand.
>
> Q:      And you were told that there was an ethical implication to failing to take a test appropriately?
>
> A:      Yes.

**Exhibit 2** (Chenari Dep.) at 208:13 – 209:3.

40. Ms. Ruiz reported these events in writing to various University officials, including Dean Goldberg, by way of an email sent later that day.  **Exhibit 11** (Ruiz Dep.) at 31:10 – 19; Ruiz email report of December 14, 2012 marked as Ruiz Dep. Exhibit 1, attached hereto as **Exhibit 13**.  Ms. Ruiz reported that she told Plaintiff to put his pencil down three times and he ignored her.  Id.  She described him as "aggressive" and said he did not permit her to collect his exam. Id.

**Plaintiff Was Dismissed from the University in Accordance with University Policy.**

41. Following receipt of Ms. Ruiz's email, Dean Goldberg initiated Honor Code Proceedings concerning Plaintiff's actions.  **Exhibit 6** (Goldberg Dep.) at 21:8 – 18.

42. Alleged misconduct by medical students, and any subsequent discipline, is governed by The Regulations for M.D. Candidates (the "Regulations"). **Exhibit 8** (Goldberg Dec.), ¶ 3, and **Exhibit A** thereto (Regulations).

43. Before beginning medical school at the University, every student is required to sign an agreement to uphold the principle of the Honor Code found in Section F of the Regulations.

15

Exhibit 8, attachment A at § F(2)(d).  The Honor Code governs student conduct at the University and is designed to "promote ethical behavior, to ensure the integrity of the academic enterprise, and to develop in students a sense of responsibility to maintain the honor of the medical profession." Id. at § F(1).  The Honor Code enumerates specific behaviors that constitute violations, but also acknowledges that it cannot imagine every scenario and states as a catchall provision, "Students will not . . . [v]iolate any other commonly understood principle of academic dishonesty." Id. at §  F(2)(a)(6).

44. Plaintiff was given a copy of the Regulations and Honor Code before beginning school and signed a document acknowledging that he received and reviewed them. **Exhibit 2** (Chenari Dep.), 210:12 – 211:17; Chenari Policy Review Verification, marked as Chenari Dep. Ex. 17, attached hereto as **Exhibit 14**.

45. The Regulations require that when someone observes an apparent Honor Code Violation, the person shall "submit a signed written report of the alleged infraction to the dean." **Exhibit 8**, attachment A (Regulations) at § G(1)(c).

46. The dean is next required to prepare a confidential file containing relevant documents in response to an Honor Code Violation report. Id. at § G(2). Plaintiff admits he received a copy of the confidential file. **Exhibit 2** (Chenari Dep.) at 299:10 – 300:22.

47. The dean must then "notify the student in writing" of the Honor Code violation report and provide the student a copy of the report and the Regulations.  **Exhibit 8**, attachment A at  § G(3).  Plaintiff admits he received these materials during a February 4, 2013, meeting with Dean Goldberg. **Exhibit 2** (Chenari Dep.) at 295:20 – 296:22; February 4, 2013 Memorandum and Honor Code violation reports, marked as Chenari Dep. Ex. 27, attached hereto as **Exhibit 15**.

48. The dean is then required to meet with the student.  **Exhibit 8**, attachment A at § G(4). Plaintiff admits he met with Dean Goldberg to discuss this matter on February 4, 2013. **Exhibit 2** (Chenari Dep.) at 293:3 - 6.

49. In cases where the student denies the accuracy of the charges of an Honor Code violation, the dean refers the matter "for review by a Subcommittee on Professional Comportment sitting as an Honor Code Hearing Committee." **Exhibit 8**, attachment A at § G(4)(c). The Subcommittee composition is dictated by the Regulations. Id. at § (5)-(6). Plaintiff approved of the Subcommittee's composition.  **Exhibit 2** (Chenari Dep.) at 298:6 – 13; Email from Plaintiff stating Subcommittee composition is unobjectionable, marked as Chenari Dep. Ex. 28, attached hereto as **Exhibit 16**.

50. The Subcommittee is then charged to investigate the violation alleged. **Exhibit 8**, attachment A at § G(7). The student must have the opportunity to be interviewed. Id. Plaintiff admits he had the opportunity to give a statement to the subcommittee and that he was interviewed.  **Exhibit 2** (Chenari Dep.) at 305:15 – 17; 306:16 – 20.

51. The Subcommittee is required to make recommendations to the dean, in writing. **Exhibit 8**, attachment A at § G(11). The regulations permit the Subcommittee to make a variety of recommendations, including "permanent dismissal from the M.D. program, with the notation of "Dismissed for academic dishonesty [or violation of the Honor Code]" placed permanently on the transcript." Id. at 11(h).

52. The Subcommittee prepared and issued a written report of its recommendations ("Subcommittee Report"), a copy of which was marked as Chenari Dep. Ex. 32 and is attached hereto as **Exhibit 17** (Subcommittee Report); **Exhibit 2** (Chenari Dep.) at 312:3 – 11.

53. The Subcommittee unanimously recommended that Plaintiff receive a grade of "F" for the exam and that his transcript should note "that the grade was based upon a finding of academic dishonesty." **Exhibit 17** (Subcommittee Report), p. 5. Additionally, three of the four Subcommittee members recommended Plaintiff's dismissal from the M.D. program. Id.  One member recommended a full academic year's suspension. Id.

54. The Regulations require that where a student is recommended for dismissal or suspension, "[t]he matter will be referred to the MSEC [Medical Student Evaluation Committee]." **Exhibit 8**, attachment A at § G(13). The MSEC is required to meet and review the Subcommittee Report and confidential file. Id. The student may attend, with counsel if the student so chooses, and may submit a written statement. Id.  "The MSEC will either remand the matter back to the Subcommittee if additional information is required, or it shall submit its written recommendations, along with those of the Subcommittee, to the dean." Id.

55. Plaintiff attended the MSEC hearing.  **Exhibit 2** (Chenari Dep.) at 314:14 – 19. He also submitted a personal statement to the MSEC. Id. at 315:14 – 316:16; Personal Statement, marked as Chenari Dep. Ex. 37, attached hereto as **Exhibit 18** ("Personal Statement"). In the Personal Statement, Plaintiff stated, among other things, that, "[I] should not continue to put forth excuses for my actions . . . . [Ms. Ruiz's] reaction to my deplorable behavior was to give me every possible chance to stop what I was doing.  …  I continued to transfer my answers from the exam booklet to the scantron answer sheet. In so doing, I acted with blatant disregard for the rules and for the rights of my fellow students . . .." Id. The Personal Statement then asserted that Plaintiff's "behavior did not involve deception  . . . ." Id. The Personal Statement contained no mention whatsoever concerning Plaintiff's claim that he has ADHD.  Id.

56. By memorandum dated April 30, 2013, the MSEC unanimously recommended Plaintiff's dismissal. **Exhibit 2** (Chenari Dep.) at 315:4 – 9; MSEC memorandum, marked as Chenari Dep. Ex. 36, attached hereto as **Exhibit 19** ("MSEC Memorandum").

57. The Regulations provide that the dean will then "review the student's confidential file" and the Subcommittee and MSEC reports, and, at his or her own discretion, may meet with the student. **Exhibit 8**, attachment A at § G(14).

58. Jeffrey Akman, M.D., Dean of the School of Medicine and Health Sciences, reviewed these materials. Transcript of Deposition of Jeffrey Akman, M.D., conducted on April 21, 2015 ("Akman Dep."), relevant portions of which are attached as **Exhibit 20** at 16:10 – 13.

59. Plaintiff met with Dr. Akman on May 6, 2013. **Exhibit 2** (Chenari Dep.) at 318:3 – 13.

60. During the May 6, 2013 meeting, Plaintiff did not claim or tell Dr. Akman that he had ADHD. **Exhibit 20** (Akman Dep.) at 17:7 – 8; **Exhibit 2** (Chenari Dep.) at 329:14 – 330:2.

61. In fact, Plaintiff admits that at no point during the course of the academic disciplinary proceedings did he ever raise the issue of supposedly having ADHD:

> Q:     At any point during the disciplinary proceedings involved with respect to your conduct on the exam on December 14, 2012, at any point during those proceedings, pursuant to the M.D. regulations, did you tell any of the people who were decision makers in that disciplinary process, did you tell any of the people in that process that the reason you had any problems was because you had ADHD?
>
> A:     I didn't tell anyone I had ADHD. I told them I had issues during my medical school career.

**Exhibit 2** (Chenari Dep.) at 329:14 – 330:2.

62. The Regulations require the Dean to take "whatever action s/he deems appropriate" after reviewing the matter. **Exhibit 8**, attachment A at § G(16). In this case, Dr. Akman

"conducted a thorough review of [Plaintiff's] academic record, the confidential file pertaining to this matter, and the reports and recommendations from the Subcommittee and MSEC." **Exhibit 20** (Akman Dep.) at 22:19 – 23:10; Akman letter, marked as Akman Dep. Ex. 3, attached hereto as **Exhibit 21**.  Dr. Akman concluded:

> However, your refusal to follow instructions and your reaction – after being instructed multiple times to put your pencil down – was well outside the bounds of what we expect from a future physician. Based upon my review, I have decided to uphold the recommendation of the Subcommittee and of the MSEC for dismissal for academic dishonesty.

**Exhibit 21.**

63. The Regulations then afford a student the opportunity to appeal the dean's decision to the vice president for academic affairs. **Exhibit 8**, attachment A at § G(17).  Plaintiff took this opportunity and appealed by way of a letter to the vice president from his counsel, Robin A. Bergsohn, Esq. **Exhibit 2** (Chenari Dep.) at 323:1 – 19; Bergsohn letter, marked as Chenari Dep. Ex. 40, attached hereto as **Exhibit 22** ("Bergsohn Letter").

64.    The Bergsohn letter makes no mention whatsoever of any claim that Plaintiff had ADHD and/or that he had any sort of disability which had not been accommodated. **Exhibit 22**. To the contrary, the letter argued that Plaintiff should not be dismissed from medical school because his behavior did not involve an element of "academic dishonesty" and that Mr. Chenari "did not cheat, lie, dissemble, or do anything that could reasonably be interpreted as dishonest" and therefore did not violate the Honor Code. Id. The argument presented by Plaintiff through his counsel was that while Mr. Chenari was "clearly guilty of openly violating the rules of the exam" and insubordination, this conduct of "violating a time rule and insubordination can not be construed as academic dishonesty because these actions do not involve any element of deceit." Id., pp. 1-2. The further argument was that Plaintiff "[m]ade a mistake, but that mistake was

completely out in the open." Id., p.2. The letter made no reference to ADHD as the reason for Plaintiff's conduct on the Surgical Shelf Exam. See also **Exhibit 2** (Chenari Dep.) at 323:12 – 324:15.

65. The Regulations require the vice president to make a final decision based on the written record – his or her decision is final.  **Exhibit 8**, attachment A at §G(18).  Vice President Steven Lerman reviewed this matter and made a final written decision upholding the decision to dismiss Plaintiff from the University. Transcript of Deposition of Steven Lerman conducted on April 21, 2015 ("Lerman Dep."), **Exhibit 23** at 13:15 – 14:13; Lerman letter dated July 8, 2013, marked as Lerman Dep. Ex. 2, attached hereto as **Exhibit 24**.

66. Expert witness discovery is closed and Plaintiff has identified no expert witness, nor any other potentially competent witness such as a treating physician, to testify to any of the following: (1) Plaintiff actually has ADHD as a formal diagnosis consistent with the Diagnostic and Statistical Manual of Mental Disorders-IV-TR ("DSM-IV-TR") in effect at the time of these events; (2) any ADHD Plaintiff may have is sufficiently severe as to require some form of accommodation; (3) the specific nature and purpose of any accommodation that might be appropriate or required; (4) whether any such appropriate or required accommodation would have been applicable to the Surgery Shelf Exam administered on December 14, 2012; and (5) if any appropriate or required accommodation had been accorded to Plaintiff, the events culminating in his defiance of instructions to stop answering questions on a timed exam after time had been called would not have occurred.

67. Defendant has previously disclosed the identity and report of an expert witness, Robert L. Mapou, Ph.D., in the field of clinical neuropsychology. Dr. Mapou's opinions are set

21

forth in his declaration and his report. <u>See</u> Declaration of Robert L. Mapou dated August 7, 2015 and attached as **Exhibit 25** ("Mapou Dec.").

68. Dr. Mapou's opinions and conclusions in this matter include the following:

(a) Mr. Chenari does not have ADHD.

(b) Mr. Chenari does not have a disability warranting accommodations. Rather, this appears to be a case of a behavior in search of a diagnosis to explain it.

(c) The primary symptoms that Mr. Chenari reported in medical school were distractibility and difficulty concentrating. Although this appears to have led to Dr. Durr's diagnosis of ADHD and prescription of Adderall, these symptoms are insufficient to diagnose ADHD because there are many different causes of distractibility and problems concentrating. These include stress, anxiety, depression, poor or insufficient sleep, or a sleep disorder. In essence, problems with attention and concentration are similar to a fever. The presence of fever tells a clinician that something is wrong, but the clinician must look further to determine what that is. Furthermore, based on what Mr. Chenari submitted, there was no evidence in impairment in two or more settings, as is required. Specifically, he had an excellent academic record before medical school and completed his schooling through college without difficulty, without accommodations, and without extra support. He had no problems in the jobs that he held before medical school, never required accommodations, and was never fired. To the contrary, he was seen as talented in his field. Although he had some problems in medical school, these were largely specific to patient interactions and interviewing. An added problem was arriving late to class, due to poor sleep.

(d) Dr. Durr did not diagnose ADHD using currently accepted standards for diagnosis. Although "ADD" was listed in his medical records starting in January, 2011 and a

prescription was written for Adderall, there was nothing that indicated a basis for this diagnosis. Specifically, there is no evidence that Dr. Durr took an oral history from childhood through the current time of diagnosis; reviewed academic records; had Mr. Chenari, his parents, and a current informant complete rating scales; or reviewed past and present difficulties using the DSM-IV (now DSM-5) diagnostic criteria for ADHD.

(e)  If individuals have ADHD, then continuous treatment is standard and necessary. Dr. Durr noted, however, that Mr. Chenari did not take the medication on weekends, and Mr. Chenari acknowledged this in his deposition. Although Dr. Durr reported that Mr. Chenari benefitted from treatment, it is well established that even people without ADHD will benefit from a psychostimulant, just as a strong cup of coffee can help anyone concentrate more effectively, especially if they are tired. A positive response to Adderall is not *prima facie* evidence of ADHD. Also, in his deposition, Mr. Chenari was mixed in his responses when asked if the Adderall had helped.

(f)  Even if it were to be assumed that Mr. Chenari had ADHD, a diagnosis is not equivalent to a disability. Rather, one must show that the diagnosed disorder causes a significant functional impairment in a major life activity. This is why an evaluation and documentation is required. Records and Mr. Chenari's responses during his deposition showed no evidence of such impairment or completion of an evaluation to determine whether there was impairment.

69. Plaintiff has not identified any expert witness regarding the fields of certification examinations, examination administration, and examination scoring.

70. Defendant has previously disclosed the identity and report of an expert witness, Wallace Judd, Ph.D., regarding the fields of certification examinations, examination administration, and examination scoring. Dr. Judd's opinions are set forth in his declaration and

23

his report. See Declaration of Wallace Judd, Ph.D., dated August 4, 2015, attached as **Exhibit 26** ("Judd Dec.").

71. Dr. Judd's opinions in this matter include the following:

(a)  The element of timing on a timed exam is an important factor to its scoring.

(b)  The time limit for taking the Surgery Shelf Exam was explicit.

(c)  The time limit explicitly stipulates that examination time will not be extended beyond the close of the examination for transferring answers to the answer sheet.

(d)  A student who continues to bubble in answers on an exam after time is called obtains an advantage that other students do not obtain.

(e)  In this case, according to Mr. Chenari's own testimony, after time was called, he answered an additional 30 questions. Without these additional items, Mr. Chenari would have received the lowest score on the exam.

(f)  Without specific time limits on exams, it is impossible to norm test results or interpret candidate qualifications uniformly.

(g)  Given medical students' extensive experience taking standardized tests, observing the time limits of a standardized examination is a commonly understood principle of academic honesty.

(h)  Students with a disability may be entitled to an accommodation under the federal Americans with Disabilities Act with respect to taking standardized exams, but the provisions for accommodation require the following:

(1)  The candidate must request accommodation prior to the exam.

(2)  The candidate must have his or her disability documented by a physician or board certified professional.

24

(3) The physician or board certified professional must recommend or approve an appropriate accommodation for the candidate.

Respectfully submitted,

JACKSON & CAMPBELL, P.C.

/s/ *Nicholas S. McConnell*
Nicholas S. McConnell (D.C. Bar #167742)
Allyson C. Kitchel (D.C. Bar #496687)
JACKSON & CAMPBELL, P.C.
1120-20TH Street, N.W. (Suite 300 S.)
Washington, D.C.  20036
(T) (202) 457-1600
(F) (202) 457-1678
nmcconnell@jackscamp.com
akitchel@jackscamp.com

*Attorneys for Defendant*

25

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SINA CHENARI, | |
| Plaintiff, | Civil Action No. 14-929  (ABJ) |
| v. | |
| GEORGE WASHINGTON UNIVERSITY, | |
| Defendant. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT
GEORGE WASHINGTON UNIVERSITY'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56 and LCvR 7(h), Defendant George Washington University (the "University") submits this Memorandum of Points and Authorities in support of its motion for summary judgment. On the undisputed material facts and clearly established law, the University is entitled to summary judgment as to all of Plaintiff's claims.

**I.      INTRODUCTION**

Plaintiff Sina Chenari ("Chenari" or "Plaintiff") brings this lawsuit against the University claiming breach of contract and disability discrimination based on his dismissal from the George Washington University School of Medicine and Health Sciences ("Medical School") in 2013. His allegations do not survive the slightest scrutiny. This is not a case about a broken contract. This is not a case about discrimination. This case is about academic misconduct. Plaintiff was dismissed from the University because he cheated on a standardized exam. The exam was a timed, multiple-choice exam published by the National Board of Medical Examiners ("NBME") and required of third year medical students completing a surgical rotation ("Surgery Shelf Exam"). Statement of Material Facts as to Which There Is No Genuine Issue ("SOF") ¶ 30. Specifically, when time was called on the exam, instead of putting down his pencil and stopping,

as was expected and as he and all the other students had been instructed to do by written instructions read aloud by the exam proctor immediately before the exam began, again during a 30-minute end-of-exam warning, and again when the exam was over and "time" was called, Plaintiff continued to fill in his answer sheet. SOF ¶¶ 34-36. After instructing Plaintiff multiple times to stop, the exam proctor attempted to collect Plaintiff's answer sheet from his desk. SOF ¶ 36. In response, Plaintiff put the crook of his arm over a corner of the answer sheet, physically prevented the proctor from collecting the sheet, and continued bubbling in all of the answers on the front page of the answer sheet. SOF ¶ 37. These actions clearly violated the Medical School Exam Guidelines published under the auspices of the Medical School's Honor/Professionalism Council, copies of which were provided to the students in advance of the exam and which state: "There will be no extra time allotted, even to finish 'bubbling' in the answer sheet." SOF ¶ 31. Beyond that, immediately prior to the exam, the exam proctor reminded all of the examinees, including Plaintiff, that there were detailed instructions she was about to read to them regarding their conduct during the exam "to ensure that each examinee has the same opportunity to demonstrate his or her knowledge of the material covered by this examination." SOF ¶ 34. Those instructions included information that this was a timed, 2 hour and 30 minute exam and that no additional time would be given for bubbling answers. SOF ¶ 34.

Disciplinary proceedings were initiated to review Plaintiff's conduct, and ultimately, the University concluded that Plaintiff's actions were "well outside the bounds of what [is expected] from a future physician" and he was dismissed from the University. SOF ¶ 62.

Despite admitting that he blatantly violated the University Code of Conduct in an act that was punishable by expulsion, Plaintiff now sues the University claiming that it breached a contract between him and the University by dismissing him for his actions. SOF ¶¶ 1, 65. In a

2

further attempt to avoid the consequences of his behavior and to gain a financial windfall, Plaintiff also brings claims for discrimination under Section 504 of the Rehabilitation Act of 1973 (the "Rehabilitation Act") (Complaint, Count III), and Title II of the Americans with Disabilities Act of 1990 (the "ADA") (Complaint, Count IV). SOF ¶ 1.

The governing law on contractual claims in the academic dismissal context sets a high bar that Plaintiff cannot meet: a plaintiff must prove that "there was no rational basis for [a University's decision], or that it was motivated by bad faith or ill will unrelated to academic performance." Alden v. Georgetown Univ., 734 A.2d 1103, 1109 (D.C. 1999). The issues for this Court in resolving the contract claims are straightforward: Did the University have a rational basis for its decision? Did the University conduct the disciplinary process in substantial compliance with any applicable procedures?

The undisputed facts show that the University had a rational basis for the decision to dismiss Plaintiff – he willfully ignored instructions impacting the scoring of the examination both for him and his student colleagues, in effect, cheating. By Plaintiff's own admission, he violated the Exam Guidelines and acted in "blatant disregard for the rules and for the rights of [his] fellow students." SOF ¶ 55. Similarly, the record shows, and Plaintiff's Complaint does not even allege otherwise, that the University conducted the disciplinary proceedings in substantial compliance, indeed, strict accordance, with applicable Medical School Regulations and the procedures set forth. As such, summary judgment is clearly appropriate on the contract claims.

The analysis of Plaintiff's discrimination claims is equally straightforward. Controlling law requires a plaintiff-student bringing a claim for discrimination under the ADA or the Rehabilitation Act to show that a reasonable accommodation was requested but denied by the defendant. Singh v. George Washington Univ., 597 F. Supp.2d 89, 94 (D.D.C. 2009). Plaintiff

cannot meet that burden.  Plaintiff admits that the only action he took with respect to his alleged ADHD diagnosis was allegedly to mention it to two faculty members several years after he began taking medication to improve his attention span. SOF ¶ 13. One of the faculty members suggested that Plaintiff go to the University Counseling Center, but Plaintiff opted not to because "there was no time." SOF ¶ 15. By Plaintiff's own admission, he never requested any accommodation for his alleged ADHD. SOF ¶¶ 21, 28.

Moreover, even if Plaintiff were able to show a request for accommodation and denial of the request (neither of which occurred, so he cannot), discovery in this matter has closed, and Plaintiff has no expert testimony to meet the other elements of a wrongful denial of accommodation claim. Plaintiff cannot show by appropriate expert testimony that he actually had ADHD, or even if he did, that it was sufficiently severe as to require accommodation of some kind, or that even if there were some appropriate accommodation, that the accommodation would have been of a kind that would have averted the events leading to his dismissal for academic dishonesty. As such, summary judgment is appropriate on the disability discrimination claims as well.

## II.    ANALYSIS

### A.  LEGAL STANDARD

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  While all reasonable inferences that may be drawn from the facts are to be drawn in favor of the nonmoving party, the non-movant "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

248, 255 (1986).  "Summary judgment has a special place in civil litigation. The device 'has proven its usefulness as a means of avoiding full-dress trials in unwinnable cases, thereby freeing courts to utilize scarce judicial resources in more beneficial ways.'" <u>Wynne v. Tufts University School of Medicine</u>, 976 F.2d 791, 794 (1st Cir. 1992), <u>citing</u> <u>Mesnick v. General Elec. Co.</u>, 950 F.2d 816, 822 (1st Cir.1991), <u>cert</u>. <u>denied</u>, 504 U.S. 985 (1992). "[S]ummary judgment's role is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." <u>Id</u>.

Courts are particularly deferential to universities when considering motions for summary judgment in academic dismissal cases. "[I]n cases involving academic dismissal, educational institutions will be entitled to summary judgment unless the plaintiff can provide some evidence from which a fact finder could conclude that there was no rational basis for the decision or that it was motivated by bad faith or ill will unrelated to academic performance." <u>Alden</u>, 734 A.2d at 1109, <u>quoting</u> <u>Clements v. Nassau Cnty.</u>, 835 F.2d 1000, 1004 (2nd Cir. 1987). Courts do not interfere in the academic judgment of educational institutions and limit their review to determining whether action was taken in bad faith or in an arbitrary or capricious manner.  <u>Id</u>. at 1008 ("judgment by school officials that a student has not performed adequately to meet the school's academic standards is a determination that usually calls for judicial deference."). The United States Supreme Court has spoken on the subject: "[L]ike the decision of an individual professor as to the proper grade for a student in his course, the determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decision making." <u>Bd. of Curators of the Univ. of Mo. v. Horowitz</u>, 435 U.S. 78, 90 (1978).

To avoid summary judgment, Plaintiff must establish that there was no rational basis for his dismissal or that it was motivated by bad faith unrelated to academic performance. The undisputed material facts make clear that his academic dishonesty, and only his academic dishonesty, led to his dismissal. The University is entitled to summary judgment.

### B.  ARGUMENT

#### 1.   THE UNIVERSITY DID NOT BREACH A  CONTRACT OR THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.

Plaintiff's first two causes of action raise claims for breach of contract and breach of the implied covenant of good faith and fair dealing.  Because Plaintiff's burden of proof for these two claims is virtually the same, Paulin v. George Washington Univ. Sch. of Med. and Health Sci., 45 F.3d 9, 12-13 (D.D.C. 2014) (Kessler, J.), citing Alden, 734 A.2d at 1109, and Allworth, 890 A.2d at 202, they will be analyzed together.

Courts in the District of Columbia recognize a contractual relationship between a student and a university.  See Hajjar-Nejad v. George Washington Univ., 37 F. Supp.3d 90, 116 (D.D.C. 2014) (Kollar-Kotelly, J.); see also Alden, 734 A.2d at 1103.

In the context of academic dismissals, a university is entitled to summary judgment "unless the plaintiff can provide some evidence from which a fact finder could conclude that there was no rational basis for the decision or that it was motivated by bad faith or ill will unrelated to academic performance." Hajjar-Nejad, 37 F. Supp.3d at 116. Making the requisite showing of a lack of rational basis is a very high burden for a plaintiff. Alden, 734 A.2d at 1109. Courts are directed to give great deference to university decision-making absent evidence of a failure to exercise professional judgment.  Hajjar-Nejad, 37 F. Supp.3d at 116-117. "[O]nly the most compelling evidence of arbitrary or capricious conduct" by a school will warrant judicial intervention in such decisions. Bain v. Howard Univ., 968 F. Supp.2d 294, 298 (D.D.C. 2013)

(Contreras, J.). A university that follows its own procedures and policies in reaching an academic decision will generally be found not to have breached its contractual obligations. See generally Hajjar-Nejad, 37 F. Supp.3d at 124 (court deferring to university where student alleged extensive procedural violations, each of which were ruled immaterial to dismissal decision). Courts also defer to a university's interpretation of its own regulations because contracts are to be interpreted "by reference to the norms of conduct and expectations founded upon them." Id. at 119, citing Pride v. Howard Univ., 384 A.2d 31, 35 (D.C. 1978).

Under District of Columbia law, every contract includes an implied covenant of good faith and fair dealing that assumes neither party will do anything that would have the effect of injuring the other party or of destroying the other party's right to receive the benefit of the contract. Hajjar-Nejad, 37 F. Supp.3d at 116.  To prevail on a claim for breach of the implied covenant of good faith and fair dealing, a plaintiff in an academic dismissal case must establish bad faith or conduct that is arbitrary and capricious. Alden, 734 A.2d at 1112, n. 11.  Bad faith includes a party's lack of diligence, purposeful failure to perform, and interference with the other party's ability to perform. Id. Bad faith "may be overt or may consist of [a party's] inaction." Id. The concept of "fair dealing" in the academic context consists of reasonable action – not arbitrary or capricious action.  Bain, 968 F. Supp. 2d at 299 citing Allworth, 890 A.2d at 201; Alden, 734 A.2d at 1112, n. 11.

As noted above, the deferential standard that courts apply to universities with respect to breach of contract claims asserted by students applies equally to claims for breach of the implied covenant of good faith and fair dealing. Paulin, 45 F.3d at 12-13 citing Alden, 734 A.2d at 1109, and Allworth, 890 A.2d at 202.  Courts will not overturn a university's decision to dismiss a student unless the student establishes that the decision "is such a substantial departure from

accepted academic norms as to demonstrate that the person or committee responsible failed to exercise any professional judgment." Id.; see also Alden, 734 A.2d at 1109.  The burden on the plaintiff to establish that the university acted arbitrarily or capriciously is a heavy one.  Alden, 734 A.2d at 1109.

This deference has been held to be particularly appropriate in cases involving academic dismissal from medical training programs where the reasons for dismissal – as here – relate to professional comportment, and not purely academic concerns. Hajjar-Nejad, 37 F. Supp.3d at 117. There the court noted:

> Plaintiff argues deference is inappropriate here, as GW dismissed him for reasons related to professional comportment, rather than purely academic concerns. Yet other courts have concluded that, *particularly for medical students*, professional comportment issues fall under the umbrella of deference to academic decisions. *See e.g., Halpern v. Wake Forest Univ. Health Sciences,* 669 F.3d 454, 463 (4th Cir. 2012) ("Adopting an appropriately deferential view, we find that professionalism was an essential requirement of the Medical School's program and that, without an accommodation, [plaintiff] could not satisfy this requirement."); *Shin v. Univ of Md. Med. Sys. Corp.*, 369 Fed. Appx. 472, 482 (4th Cir. 2010) ("we defer to the views of Appellees on the standards for professional and academic achievement."); *Wheeler v. Miller*, 168 F.3d 241, 250 (5th Cir. 1999) ("the university's promotion and review board 'was uniquely positioned to observe [the student's] judgment, self-discipline, and ability to handle stress, and was thus especially well situated to make the necessarily subjective judgment of [his] prospects for success in the medical profession.'") (quoting [*Regents of the Univ. of Michigan v.]Ewing*, 474 U.S. [214] at 228, n. 14, 106 S.Ct. 507 [1985]).

Id. at 117 (original emphasis).

The Alden decision, in which summary judgment was granted, is the leading student dismissal case in this jurisdiction and sets the precedent for what is to be considered appropriate,

non-arbitrary action by a university when dismissing a student. 734 A.2d at 1103.[1] <u>Alden</u> involved a fourth-year medical student who was dismissed in accordance with the school's academic performance policy after a failed clinical rotation. <u>Id.</u> at 1104-1106. After receiving the failing grade, but before being dismissed, the student was allowed to appear before a review committee to present a case for his continued admission in the program. <u>Id.</u> at 1106. After that hearing and a review of the student's file, the review committee recommended that he be dismissed. <u>Id.</u> The student was given a chance to appeal the review committee's decision to a faculty committee, as well as to supplement his file. <u>Id.</u> The faculty committee chose to affirm the student's dismissal. <u>Id.</u>

The student brought a breach of contract claim against the university alleging that its dismissal decision was motivated by ill-will. <u>Id.</u> at 1103-1104. The trial court, and eventually the D.C. Court of Appeals, looked to the multi-layer review process and found that the student "received a fair and impartial hearing on his dismissal during which time he had the opportunity to establish that his [clinical rotation] grade had been motivated solely by ill-will and to present evidence." <u>Id.</u> at 1104. The court determined that "there was sufficient evidence in the record from which a fact-finder could conclude that there was a rational basis for Georgetown's decision to dismiss," which entitled the university's decision to judicial deference and to a grant of summary judgment. <u>Id.</u> at 1104, 1111.

Based on <u>Alden</u>, the University is similarly entitled to summary judgment on Plaintiff's claims. Plaintiff received the same opportunities to present his case and supplemental material at every stage of the disciplinary process, just as did the student in <u>Alden</u>. Here the review process

---

[1] <u>Alden</u> is frequently cited by courts in this jurisdiction as the authoritative case in the context of student dismissals. <u>See</u>, <u>e.g.</u>, <u>Jung v. George Washington Univ.</u>, 875 A.2d 95, 107-108 (D.C. 2005); <u>Chandamuri v. Georgetown Univ.</u>, 274 F. Supp.2d 71, 80 (D.D.C. 2003) (Lamberth, J.).

included a hearing committee, a review by the MSEC, a review by the Dean of the Medical School (Dean Akman), and further review by the University's vice president for academic affairs (Provost Lerman). SOF ¶¶ 49 - 65. This level of review from multiple uninvolved parties meets the standard set in <u>Alden</u> because it evidences strict compliance with Medical School Regulations which govern the dismissal of University medical students for academic misconduct. SOF ¶ 42.

There is no question that cheating on an exam in violation of the Medical School Honor Code, Medical School Exam Guidelines, and the NBME standards designed "to ensure that each examinee has the same opportunity to demonstrate his or her knowledge of the material covered by this examination" constitutes a rational basis for Plaintiff's dismissal.  As such, the University did not breach its contractual duties to Plaintiff and summary judgment should be granted in its favor on Counts I and II of Plaintiff's Complaint.

### a.   <u>The University Had a Rational Basis for Dismissing Plaintiff.</u>

In order to obtain summary judgment, the University must show that it had a rational basis for its decision to dismiss Plaintiff. That rational basis is very clear: Plaintiff was expelled for an act of academic dishonesty. He, in his words, "blatantly" disregarded the rules imposing a strict time limit on completing the exam. SOF ¶ 55.  Instead, he continued filling in his answer sheet after time had expired. SOF ¶ 36.  Furthermore, after being observed breaking the exam rules, he openly refused to comply with direct instructions from the exam proctor to discontinue the examination, and continued filling in his answer sheet. SOF ¶ 37.  For those actions, Plaintiff was dismissed from the University.

Courts routinely recognize that academic dishonesty is a rational reason for dismissing a student. <u>Beauchene v. Mississippi Coll.</u>, 986 F. Supp.2d 755, 758 (S.D. Miss. 2013) (summary

judgment on breach of contract claims of law student who sued after dismissal for admitting to plagiarism); Shah v. Union Coll., 97 A.D.3d 949, 951, 948 N.Y.S.2d 456, 458 (2012) (admission of academic dishonesty a rational basis for dismissal); McCawley v. Universidad Carlos Albizu, Inc., 461 F. Supp.2d 1251, 1258-59 (S.D. Fla. 2006) (summary judgment affirmed where student dismissal was found rational as the result of student conceding unethical behavior).

It is undisputed that Plaintiff was aware of the rules regarding bubbling in answers on an exam after time was called. When Plaintiff entered the medical school program, the students were given a handout that provided instructions for exam taking. SOF ¶ 31. Notably, those exam guidelines stated:

> The proctor will announce when ten minutes remain for the exam, after which students must remain seated until the end of the exam period.  After the announcement that the exam period is over, all exams and answer sheets must be face down until collection by the proctor.  There will be no extra time allotted, even to finish "bubbling" in the answer sheet.

Id. at ¶ 14.

By way of further reminder, Plaintiff was given verbal instructions immediately prior to the actual Shelf Exam, as well as a practice exam he took months earlier, which stated explicitly: "Time will not be extended beyond the close of this examination for transferring your answers." SOF ¶ 34(a)(5).  Plaintiff admitted he knew the rules:

> Q:      So you would agree there is absolutely no dispute that you were aware when that time was called that you were to stop bubbling in your answer sheet, correct?
>
> A:      Yes.

SOF ¶ 35.

Plaintiff admitted that he broke the guidelines during the Shelf Exam and committed an ethical violation:

Q:      You violated the guidelines, didn't you?

A:      Yeah. I guess as you have read it.

Q:      I don't want any qualifiers on it.

A:      Okay.

Q:      It is not as I read it.  You violated the guidelines as they were published and provided to you and to all your classmates, you violated those guidelines, didn't you?

A:      Yes. I understand.

Q:      And you were told that there was an ethical implication to failing to take a test appropriately?

A:      Yes.

SOF ¶ 39.

The undisputed facts show that there was a clear rational basis for the University's decision to dismiss Plaintiff. By Plaintiff's own admission, he violated the Medical School's Exam Guidelines, the Medical School's Honor Code, and the NBME Regulations designed to assure fairness to all students taking these important national exams to test the knowledge of future physicians. Universities routinely dismiss students for violating standards of academic honesty, and courts routinely hold that academic misconduct is a rational basis for student dismissal. Accordingly, Plaintiff cannot prove the lack of rational basis he needs to support Counts I and II of his Complaint, thus entitling the University to summary judgment.

**b.   The University Followed All of Its Policies and Procedures in the Disciplinary Proceedings.**

In analyzing a school's dismissal decision, the <u>Alden</u> court looked to the school's provision of an opportunity for the student to be heard and adherence by the University to its

own review procedures as evidence of good faith.  <u>Alden</u>, 734 A.2d. at 1111 (acknowledging that the plaintiff "received a fair and impartial hearing on his grievance" through two separate opportunities to present his case and supplement the record with additional documentation). Plaintiff in this case was afforded a multi-stage review process in complete accordance with the Regulations governing the University's response to Honor Code violations. The University followed all of the requirements of the Regulations in connection with its decision to dismiss Plaintiff and his appeal of that decision. Indeed, Plaintiff's Complaint does not allege the contrary. Plaintiff admits he received a copy of the Regulations and Honor Code and that he signed a written document acknowledging receipt.  SOF ¶ 44.

Pursuant to the Regulations, after witnessing what she believed to be an Honor Code violation, Ms. Ruiz reported the incident immediately to Dean Goldberg, in writing. SOF ¶ 40. The Regulations then required Dean Goldberg to begin a confidential file concerning the incident, which she promptly did. SOF ¶¶ 41, 46. Plaintiff was then given written notification of the violation and had a meeting with Dean Goldberg before the case was referred to the requisite Subcommittee, all of which Plaintiff concedes. SOF ¶¶ 47, 48. The Subcommittee was formed, and Plaintiff had no objections to its composition. SOF ¶ 49. At the Subcommittee hearing, Plaintiff was given an opportunity to present his case and to respond directly to questions from the members.  SOF ¶ 50. The hearing resulted in three of the four Subcommittee members recommending dismissal from the program. SOF ¶ 53.  Pursuant to the Regulations, because dismissal was recommended, Plaintiff's case was referred to the Medical Student Evaluation Committee ("MSEC"), and he was given a second chance to defend himself against the allegations. SOF ¶ 54. After hearing from Plaintiff and reviewing the Subcommittee report, the MSEC also recommended dismissal. SOF ¶¶ 55, 56.

Even after those two layers of review, the Regulations allowed Plaintiff another chance to plead his case. SOF ¶ 57.  He met with Dean Akman to discuss the matter further. SOF ¶ 59. Dean Akman met with Plaintiff and fully considered his complete academic record and the recommendations of both the Subcommittee and the MSEC. SOF ¶ 62. Ultimately, Dean Akman decided to uphold the MSEC recommendation, concluding that Plaintiff's behavior disqualified him from continuing his efforts to become a physician. SOF ¶ 62. Finally, to ensure that all University policies were followed throughout this entire process, the Regulations called for an appellate review by the vice president for academic affairs, Provost Steven Lerman.  SOF ¶ 63. Plaintiff retained an attorney to present a letter appeal to the Provost as part of this process. SOF ¶ 63. Plaintiff, through counsel, failed to identify any process deficiency in the letter. SOF ¶ 64, Exhibit 21. The Provost reviewed the entire case file and confirmed that the University followed its procedures in the disciplinary proceedings and upheld the decision to dismiss Plaintiff. SOF ¶ 65.

The events described above represent every step of the process mandated by the Regulations. There is no evidence in the record that the University neglected or failed to carry out appropriately any step in the process. As noted, Plaintiff's Complaint raises no allegation that the University failed to afford him the complete process set forth in the Regulations. See generally, Compl. Exhibit 1.

The University followed its procedure in reviewing and deciding Plaintiff's case. Plaintiff was given ample opportunities to be heard by the University regarding the Shelf Exam incident. There were multiple layers of review. This and other jurisdictions have found this type of review to substantiate good faith in the dismissal process and have granted summary judgment in favor of defendants. See Frederick v. NW Univ. Dental Sch., 617 N.E 2d 382, 389 (Ill. App. Ct. 1993)

(summary judgment was appropriate where defendant fulfilled its contractual obligation to student by allowing him to be present for review proceedings on dismissal); See also Gill v. Franklin Pierce Law Ctr., 9 F. Supp. 850 (D.N.H. 1995) (summary judgment for defendant where it "followed the process set forth in the relevant Academic Rules and Regulations when it dismissed plaintiff"); Alden, 734 A.2d. 1111 - 13.

Because the University adhered to the procedures set forth in its regulations for the disciplinary process, it is entitled to summary judgment.

## I.   THE UNIVERSITY DID NOT VIOLATE PLAINTIFF'S RIGHTS UNDER THE REHABILITATION ACT OR THE ADA.

In his third and fourth causes of action respectively, Plaintiff alleges that the University violated the Rehabilitation Act and the ADA by failing to provide appropriate and necessary accommodations for him in connection with his alleged ADHD disability.  He also alleges that the University violated these statutes by retaliating against him when he began advocating for his rights under their provisions. **Exhibit 1**, Compl. ¶ 44.

Congress's purpose in enacting the ADA was "(1) to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities; [and] (2) to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities … ."  42 U.S.C.A. § 1210.  Title II of the ADA provides, in relevant part, that "[n]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C.A. § 12132.  Discrimination is defined, in part, as  "a failure to make reasonable modifications" that are "necessary" to provide a disabled individual with such full and equal enjoyment, "unless the entity can demonstrate that making such modifications would fundamentally alter the nature of

such goods, services, facilities, privileges, advantages, or accommodations." <u>Halpern v. Wake Forest Univ. Health Sci.</u>, 669 F.3d 454, 461 (4th Cir. 2012), <u>citing</u> 42 U.S.C. § 12182(b)(2)(A)(ii).

The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment … ."  42 U.S.C.A. § 12102. Similarly, the Rehabilitation Act defines a disability as "a physical or mental impairment that constitutes or results in a substantial impediment to employment" and incorporates the ADA definition.  29 U.S.C.A. § 705(9).

Claims under the Rehabilitation Act and the ADA are nearly identical, and, therefore, courts analyze these claims in the same manner.  <u>Di Lella v. Univ. of Dist. of Columbia David A. Clarke Sch. of Law</u>, 570 F.Supp.2d 1, 7 (D.D.C. 2008) (Kennedy, J.); <u>Howell v. Gray</u>, 843 F. Supp. 2d 49, 59 (D.D.C. 2012) (Jackson, Amy, J.) <u>Ferrell v. Howard Univ.</u>, 1999 WL 1581759 *3 (D.D.C. 1999). In order to establish a violation of either the ADA or the Rehabilitation Act, a plaintiff must prove: (1) that he or she has a disability; (2) that he or she is otherwise qualified for the benefit in question; and (3) that he or she was excluded from the benefit due to discrimination solely on the basis of the disability. <u>Singh v. George Washington Univ.</u>, 597 F. Supp.2d 89, 94 (D.D.C. 2009) (Lamberth, J.).

Fundamentally, a plaintiff bears the burden of providing notice of his or her disability and any limitations that the disability imposes.  <u>Faison v. Vance-Cooks</u>, 896 F. Supp.2d 37, 57 (D.D.C. 2012) (Kollar-Kotelly, J.), <u>citing</u> <u>Crandall v. Paralyzed Veterans of Am.</u>, 146 F.3d 894, 897-98 (D.C. Cir. 1998).

Plaintiffs also bear the burden of requesting accommodations due to a claimed disability.

Id. The D.C. Circuit has explained:

> [The Rehabilitation Act] prohibits only discriminatory acts performed solely by reason of the plaintiff's handicap. The courts of appeals have overwhelmingly agreed that for this causal link to be shown the employer must have acted with an awareness of the disability itself, and not merely an awareness of some deficiency in the employee's performance that might be a product of an unknown disability. They have so found under both the Rehabilitation Act itself and the analogous provision of the Americans with Disabilities Act … .

Crandall, 146 F.3d at 896-97.

Even if Plaintiff were able to prove he had a disability, which he cannot, he is unable to prove that his dismissal was as the result of that disability. Moreover, he cannot prove that he put the University on notice of a disability and that he requested an accommodation to ameliorate his challenges as a supposedly disabled person. The University is entitled to summary judgment.

## A. **Plaintiff's Claims Fail for Lack of Notice to the University or any Actual Accommodation Request.**

"An underlying assumption of any reasonable accommodation claim is that the plaintiff has requested — or at least made known her need for — an accommodation which the defendant has denied." Faison, 896 F. Supp. 2d at 57. Before Plaintiff can advance a claim for a failure to accommodate, he must present evidence that he properly notified the University of his disability and requested accommodations. Id.

In Kaltenberger v. Ohio College of Podiatric Med., 162 F.3d 432 (6th Cir. 1998), the court granted summary judgment in favor of a university on facts very similar to those here. During the first semester of podiatry school, the plaintiff mentioned a suspicion that she had ADHD to an academic counselor. Id. at 434. The counselor referred her to counseling services, where counselors determined she did not suffer from ADHD, but that she needed study skills

assistance, a suggestion the plaintiff ignored. Id. The student struggled through her program, and approximately a week before her final shelf examination, she presented to a professor a handwritten note from a physician who had been treating her for ADHD, but plaintiff still did not specifically request an accommodation.  Id.  The professor did not take action in response to the note based on the lack of foundation for an ADHD diagnosis and absence of information about the physician's credentials. Id. After receiving a diagnosis of ADHD and an eventual dismissal from the program for failed classes, the plaintiff pointed to the professor's failure to take further action in light of her handwritten note as proof that the school failed to properly accommodate her disability. Id. The Sixth Circuit Court of Appeals rejected this argument, finding that the "College was not obligated to provide accommodation until plaintiff had provided a proper diagnosis of ADHD and requested specific accommodation." Id. at 437. The court further ruled that a student's simply telling an academic counselor of a suspected disability did not impose an obligation to offer accommodations. Id.

In Tips v. Regents of Texas Tech Univ., 921 F. Supp. 1515, 1516 (N. D. Tx. 1996), a student claimed a disability in the form of an inability to "conceptually organize material" and brought claims against a university under the ADA and the Rehabilitation Act. The court granted the university's motion for summary judgment on the basis that the plaintiff could not prove the university discriminated against her by "not making reasonable accommodations to [her] *known* limitations. …" Id. at 1518 (emphasis in original). The court relied on the ADA's legislative history which makes clear that the "duty to accommodate is triggered by a request." Id. "It is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." Id. (quoting EEOC regulations, internal citations omitted). Going further, the court

noted that "[i]n the absence of a request, it would be inappropriate to provide an accommodation." Id. (quoting legislative history).

In Rossomando v. Bd. of Regents of Univ. of Neb., 2 F. Supp.2d 1223, 1234 (D. Neb. 1998), an orthodontics student sued under the ADA and Rehabilitation Act after she was dismissed from the program, claiming she was discriminated against for a visual disability. The student "did not tell anyone at the University that she had any visual problem or disability which affected her performance as a student, other than [a] depth-perception problem she had discussed" with a faculty member, who understood the problem was resolved by her wearing "loops." Id. at 1228. Affirming summary judgment, the court stated: "[N]o reasonable jury could return a verdict for the plaintiff regarding her disability claim. In particular, we cannot fault the defendants for failing to accommodate the plaintiff's visual/tactile problems when she did not tell the defendants about those problems or request an accommodation for them." Id. at 1230. See also Salehpour v. Univ. of Tenn., 159 F.3d 199, 206, (6th Cir. 1998) (affirming grant of summary judgment on, *inter alia*, ADA and Rehabilitation Act claims, noting inherent inconsistency in claiming the defendant discriminated against the student even though the student never told the defendant about the claimed disability); Wynne v. Tufts Univ. Sch. of Med., 976 F.2d 791, 795 (5th Cir. 1992) (affirming grant of summary judgment on Rehabilitation Act claim on basis that, *inter alia*, "an academic institution can be expected to respond only to what it knows … . For a medical school to be liable … it must know or be reasonably expected to know of a student's handicap. A relevant aspect of this inquiry is whether the student ever put the medical school on notice of this handicap by making a sufficiently direct and specific request for special accommodations.")

Here, Plaintiff cannot meet the burden of proof to support his claims. There is no evidence that Plaintiff either (1) notified the University of his disability such that any action was required, or (2) requested any accommodation for his alleged disability. According to Plaintiff, the first time that he made any mention of having ADHD was on October 3, 2012, to Deans Goldberg and Haywood. SOF ¶ 13. He did not request an accommodation during that meeting or at any other time. SOF ¶ 21.  As demonstrated in <u>Kaltenberger</u>, this does not meet Plaintiff's burden to properly notify the University of a disability. He was required to present the University with a request, and the instructions for doing so were listed on the University's website. SOF ¶ 20 (McMenamin Dec., Exhibit A). The components were linked to the criteria set forth by the ADA and Section 504 guidelines. Specifically, the website advised students considering or intending to seek accommodation for ADHD that the requirements included the following:

> Students with Attention-Deficit Hyperactivity Disorders (ADHD) requesting access to accommodations and/or services through the Office of Disability Support Services must furnish documentation that meets the criteria set forth by the ADA and Section 504 guidelines. A current psycho-educational or neuropsychological assessment completed by an objective, qualified professional is required.

SOF ¶ 20.

The details of the evidence necessary to support a request for accommodation related to ADHD were further set forth on the web site as follows:

> The documentation report for these diagnoses must include the following components:
>
> I. Diagnostic Interview
>
> Relevant information regarding the student's academic history and learning processes in elementary, secondary and post-secondary education should be investigated. The diagnostic interview should address: a description of the problem(s) being presented;

developmental, medical, psychological histories; family history; and a discussion of dual diagnosis where indicated.

II. Assessment

The diagnosis of attention-deficit/hyperactivity disorders should be based on a comprehensive review that does not rely on any one test or subtest. Evidence of a substantial limitation to learning and/or other aspects of academic performance must be apparent. The domains to be addressed should include:

a. Aptitude: a complete intellectual assessment with the Wechsler Adult Intelligence Scale or equivalent standardized tool

b. Academic Achievement: a comprehensive battery to record current levels of academic functioning and fluency in relevant areas such as reading (decoding and comprehension), mathematics (calculation and applications), and oral and written language

c. Information Processing: areas to be assessed should include short and long-term memory, sequential memory, auditory and visual perception/processing, processing speed, executive functioning and motor ability

III. Test Scores

Standard scores and percentiles should be provided for all measures. The tests should be deemed reliable and valid for use with an adolescent/adult population

IV. Specific Diagnoses

The diagnostician must use direct language in the diagnosis of a disorder, using DSM terminology where appropriate.

V. Clinical Summary

A well-written diagnostic summary is a necessary component of the documentation report. It must include:

a. an interpretation of the test findings to indicate how the pattern of scores reflect the presence of a disorder

b. the evaluator's having ruled out alternative explanations for any academic problems noted

c. an assessment of the substantial limitation to learning and/or other aspects of academic performance presented by the disorder and the degree to which it impacts upon the individual's functioning in the relevant setting

d. recommendations for specific accommodations with a clear justification linked to those academic needs identified as associated with the disorder

SOF ¶ 20.

There is no evidence that Plaintiff ever obtained or submitted any such information to the University. The only physician who apparently ever "diagnosed" Plaintiff with ADHD was his general internist, Dr. Durr, who admits that he does not know the official criteria for making an ADHD diagnosis, did not go through the DSM diagnostic criteria (as required by the University's Disability Support Services Office) in purportedly making the diagnosis, and is not sure he has ever referred to the DSM for a diagnosis of ADD or ADHD. SOF ¶ 5.

Moreover, even if Plaintiff carried a valid diagnosis of ADHD, he admits that when he met with Deans Goldberg and Haywood, he never made any request for any type of accommodation for his ADHD, but instead only told them of the diagnosis in the context of other personal problems he was having.  SOF ¶ ¶13 - 16.  Like the professor in Kaltenberger, the University directed Plaintiff to seek counseling services for follow up. SOF ¶ 13. Plaintiff opted not to do so because he did not "have time." SOF ¶15.

Plaintiff's claims of discrimination ring hollow because he never mentioned anything about his ADHD affecting his performance on the Shelf Exam, in school, generally, and/or wanting assistance with his condition, until this lawsuit was filed.  Not only did he fail to make a any effort to address his supposed disability prior to the Shelf Exam, he admittedly never offered his disability as an explanation for his behavior afterwards.

> Q: … At any point during the disciplinary proceedings involved with respect to your conduct on the exam on December 14, 2012, at any point during those proceedings, pursuant to the M.D. regulations, did you tell any of the people who were decision makers in that disciplinary process, did you tell any of the people in that process that the reason you had any problems was because you had ADHD?
>
> A: I didn't tell anyone I had ADHD. I told them I had issues during my medical school career.

SOF ¶ 61. Plaintiff's failure to disclose this information was not for lack of opportunity.  He had several opportunities to present evidence of his disability as a defense in the disciplinary proceedings. At the Subcommittee meeting held on March 5, 2013, Plaintiff did not mention his ADHD as a possible explanation. SOF ¶ 61.  There is also no indication in the Subcommittee's written report summarizing the March 5 hearing that Plaintiff mentioned his alleged ADHD diagnosis at any time. SOF ¶ 52; Exhibit 16.  He also made no mention of his disability in his written statement/apology to the Medical Student Evaluation Committee. SOF ¶55; Exhibit 17. He never mentioned it during his private meeting with Dean Akman. SOF ¶ 60.   Finally, in his appeal to the Provost, which was handled by an attorney, Plaintiff again made no mention of a disability, nor alleged any requested accommodation or discrimination, nor claimed that the failure to provide an accommodation justified or explained his conduct on the Surgery Shelf Exam.  SOF ¶ 64; Exhibit 21 (appeal letter).  At no point did he identify his supposed ADHD diagnosis as the source of his problems in medical school or make any mention of requested and/or denied accommodations.

Making these allegations of disability discrimination ring even more hollow is Plaintiff's lack of urgency and effort in seeking any type of assistance prior to the Shelf Exam. After receiving his initial diagnosis of ADHD, Plaintiff was directed by his physician to see a counselor at the University, where officials were experienced in assisting students with ADHD,

but he did not do so. SOF ¶¶ 6 – 7. Despite being given information during orientation that identified the University website as the place to seek information concerning accommodations for disabilities, and that information being readily accessible on the website, Plaintiff never looked at the website for this information. SOF ¶¶ 22, 26. Instead, the only thing that Plaintiff allegedly did do was to mention that he had been diagnosed with ADHD and was having issues with anxiety and depression in a meeting with Deans Goldberg and Haywood.  SOF ¶ 14.  When they, much like Plaintiff's physician, suggested that he seek counseling for these issues, he again chose not to do so. SOF ¶¶ 15 – 17. He stated that he did not seek counseling simply because he did not have the time.  Id. Plaintiff's alleged disability is nothing more than a search for a post hoc excuse for his behavior.

### B.  Plaintiff Cannot Prove the Elements of an ADA or Rehabilitation Act Claim.

Plaintiff bears the burden of proving (1) that he has a disability, (2) that he is otherwise qualified for the benefit in question, and (3) that he was excluded from the benefit due to discrimination solely on the basis of the disability. Singh v. George Washington Univ., 597 F.Supp.2d 89, 94 (D.D.C. 2009). Plaintiff can prove none of the three, much less all of them.

First and most importantly, there is no evidence that Plaintiff has a disability. To prove a disability, he must prove that "(1) he has an impairment (2) that is related to a major life activity (3) and that substantially limits that major life activity." Steere v. George Washington Univ. Sch. of Med. & Health Sci., 439 F. Supp. 2d 17, 24 (D.D.C. 2006) (Lamberth, J.), citing  Haynes v. Williams, 392 F.3d 478, 481-82 (D.C. Cir. 2004). In Steere, a medical student, much like Plaintiff here, was dismissed from GW's medical school. Unlike Plaintiff, Mr. Steere actually presented evidence during the dismissal proceedings that he had ADHD. Id. at 20. Regardless,

this Court rejected a claim of impairment based in part on evidence that Mr. Steere "enjoyed a great deal of academic success throughout his life." Id. at 21.

The record here makes quite clear that Plaintiff is not impaired in any life activity – he excelled in GW's undergraduate engineering program and was sufficiently talented as a student that he was admitted to medical school. SOF ¶¶ 3, 68. By all accounts, he was very successful as a student. The fact that Plaintiff was prescribed Adderall and that his physician noted a diagnosis in his medical record of "ADHD" does not mean Plaintiff is "disabled." "The Supreme Court has held that a mere diagnosis is not sufficient to establish a disability under the ADA." Steere, 439 F. Supp.2d at 24, citing Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 567 (1999). There must be proof of impairment, which simply does not exist in this case.

Plaintiff has designated no expert who might be able to opine that he is disabled or that he has ADHD. See generally Steere, 438 F.Supp.2d at 24 (disability issue ruled on at bench trial based on extensive conflicting expert testimony); D.C. v. Barriteau, 399 A.2d 563, 568-69 (D.C. 1979) ("when the subject dealt with is so distinctly related to some science, profession, business or occupation as to be beyond the ken of the average layman, its clarification calls for the use of expert testimony"); Wausau Ins. Co. v. Tillman, 765 So. 2d 123, 124 (Fla. Dist. Ct. App. 2000) ("determination of the cause of psychiatric illness is essentially a medical question, requiring expert medical evidence"). The diagnosis of ADHD is certainly a matter outside the ken of the average layperson – Plaintiff's own doctor even admits he "did not know" if he diagnosed Plaintiff with ADHD, and in any event, admitted he is completely unaware of the official criteria for making such a diagnosis. SOF ¶ 5. If Dr. Durr cannot say one way or the other whether Plaintiff has ADHD, a jury cannot be permitted to speculate on the issue.

The final nail in the coffin is that Plaintiff, himself, quite apparently did not consider himself disabled – he never even applied for services with Disability Support Services. No reasonable jury could find he has a disability on these facts.

Second, Plaintiff is not "qualified" for the benefit in question – being a GW medical student – because he was deemed academically dishonest through the honor code violation adjudication process.  Plaintiff fully admits that he violated the honor code.

Finally, Plaintiff was not excluded on the basis of any disability – even if he were able to prove he had one – because no one at GW knew he claimed he had a disability. He mentioned he had ADHD to Deans Goldberg and Haywood several years after the diagnosis, though not in the context of a request for assistance. He did not raise the issue with the Subcommittee, the MSEC, or Dean Akman, nor even with Provost Lerman at a time when he was clearly represented by counsel. He never requested accommodation for a disability. He never offered his disability as an explanation for his cheating. There is not a shred of evidence that Plaintiff's expulsion was in any way related to his supposed ADHD diagnosis. The University is entitled to summary judgment on Plaintiff's Rehabilitation Act and ADA claims.

## II.    CONCLUSION

There is not a single fact in genuine issue which entitles Plaintiff to take his case to a jury.  The undisputed evidence is that Plaintiff cheated on an exam. That this conduct was dishonest is apparent to anyone with experience in taking standardized timed exams (which every physician – to become a physician – does repeatedly before graduating with a medical degree) – although the element of dishonesty apparently remains obscure to Plaintiff. He was recommended for dismissal for academic dishonesty. He was dismissed through strict adherence to the multi-layer dismissal process established by the Medical School Regulations for review of

academic dishonesty cases. After Plaintiff exhausted his remedies, he contrived a new reason why he should not bear the burden of his behavior and presented that excuse to this Court: a disability claim. Plaintiff raises this claim, straight-faced, notwithstanding the fact that he never bothered to follow the advice of his physician to follow up with a University counselor concerning his ADHD "diagnosis," or to follow Dean Goldberg's advice to see a counselor when he told her he was having trouble, or to visit Disability Support Services for information on assistance which might be available to help him, or to raise the issue at any point during the disciplinary proceedings.

The law is clear that it was not the University's responsibility to unilaterally perceive any issues Plaintiff might be having, to manufacture a diagnosis for him, and then escort him to the DSS Office to apply for an accommodation. It was Plaintiff's responsibility to submit documentation of his condition – if he truly had one – and to meet with physicians or counselors and come up with a plan to address any disability he might have had. Plaintiff failed to take any of those steps. But his failure provides no justification for his effort through this lawsuit to disparage the University's staunch commitment through the Disability Support Services program to assure equal access for all – without regard to disability status – to its facilities and programs.

When Circuit Judge Selya commented that "[S]ummary judgment has a special place in civil litigation," Wynne, 976 F.2d at 794, he may well have had cases just like this in mind. The University should be granted Summary Judgment and the Complaint should be dismissed with prejudice.

Respectfully submitted,

JACKSON & CAMPBELL, P.C.

/s/ *Nicholas S. McConnell*
Nicholas S. McConnell (D.C. Bar #167742)
Allyson C. Kitchel (D.C. Bar #496687)
JACKSON & CAMPBELL, P.C.
1120-20TH Street, N.W. (Suite 300 S.)
Washington, D.C.  20036
(T) (202) 457-1600
(F) (202) 457-1678
nmcconnell@jackscamp.com
akitchel@jackscamp.com

*Attorneys for Defendant*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                   )
SINA CHENARI,                      )
                                   )
                Plaintiff,         )        Civil Action No. 14-929 (ABJ)
        v.                         )
                                   )
GEORGE WASHINGTON UNIVERSITY,      )
                                   )
                Defendant.         )
_____)

## ORDER

This matter is before the Court upon consideration of Defendant George Washington University's Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56. Upon review of the Motion, the Opposition thereto, and the entire record, it is, hereby

**ORDERED** that the Motion is **GRANTED**, and it is further,

**ORDERED** that this action is **DISMISSED** with prejudice.

**So Ordered.**

_____
AMY BERMAN JACKSON
United States District Judge

Date: October ____, 2015

3080740v.1