UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SINA CHENARI, | |
| Plaintiff, | CIVIL ACTION NO.: 14-929 (ABJ) |
| v. | |
| GEORGE WASHINGTON UNIVERSITY, | |
| Defendant. | |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Jason J. Bach, Esq.
D.C. Bar No.: 974126, *pro hac vice*
THE BACH LAW FIRM, LLC
7881 W. Charleston, Suite 165
Las Vegas, NV 89117
Telephone: (702) 925-8787
Facsimile: (702) 925-8788
Email:  jbach@bachlawfirm.com

Tracy Rezvani
REZVANI VOLIN P.C.
1050 Connecticut Avenue, N.W., 10th Floor
Washington, D.C. 20036
Telephone:  (202) 350-4270 x 101
Facsimile:  (202) 351-0544
Email:  trezvani@rezvanivolin.com

*Attorneys for Plaintiff Sina Chenari*

September 18, 2015

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Sina Chenari (Chenari) brings this lawsuit against Defendant George Washington University (GWU) claiming breach of contract and disability discrimination based on his unlawful dismissal from the GWU School of Medicine and Health Sciences in 2013. Pursuant to Fed. R. Civ. P. 56, Chenari submits this Memorandum of Points and Authorities in Opposition to Defendant's Motion for Summary Judgment as there are genuine issues of material facts that are in dispute making summary judgment inappropriate in this matter.

## **BACKGROUND FACTS**

As a student at GWU's School of Medicine and Health Sciences, Chenari was expected to graduate with his Medical Degree (M.D.) in May of 2014. Throughout the program, Chenari experienced various bouts of anxiety and serious difficulty focusing related to his Attention Deficit Hyperactivity Disorder (ADHD). There existed a manifestation of disability. *Exhibit 1* (Chenari Dep.), p. 22.

Prior to matriculation, Chenari was seen by Paul G. Durr, M.D., for a routine pre-medical school screening physical examination. *Exhibit 2* (Durr Dep.), pp. 37 – 40. Chenari saw Dr. Durr again on January 11, 2012. *Id.* At the latter visit, he reported to Dr. Durr that he was having "attention span issues, having difficulty studying, having difficulty performing in class," and "depression issues and some anxiety issues." *Id.*

Chenari saw Dr. Durr again on January 11, 2012. *Id.* At the latter visit, Chenari reported to Dr. Durr that he was having "attention span issues, having difficulty studying, having difficulty performing in class," and "depression issues and some anxiety issues." *Id.*

On January 11, 2012, Dr. Durr prescribed Adderall for Chenari for his ADD/ADHD symptoms. *Id.*, at 9 – 10. Chenari also visited a Dr. Anastasiou who diagnosed him with ADHD.

2

*Id.*, at 84 – 85.  Dr. Anastasiou also prescribed Chenari Adderall, 20 milligrams, extended release daily.  *Id.*  Chenari is still being treated for ADHD today.  *Id.*

In February 2011, during his first year of medical school, Chenari met with GWU faculty members and class mentors, Dr. Richard Cytowic and Dr. Seema Kakar, to discuss his mental-health issues, particularly that they were impacting his performance as a medical student.  At that time, no recommendations for accommodations were made by GWU.  Neither faculty member recommended that Chenari visit any departmental office to seek proper accommodations or counseling.  *Exhibit 1*, (Dep. Chenari) p. 82.  It is clear that several key members of the GWU faculty knew Chenari was suffering from anxiety and needed some sort of counseling – yet no one on staff thought to refer him to seek proper accommodations.  *Exhibit 3* (Goldberg Dep.) pp. 42 – 52.   Had GWU faculty referred Chenari for accommodations he could have received more test time, private testing area, and other assistance to relieve his anxiety, depression, and ADHD issues during examination time.

In February 2012, Chenari met with Dean Rhonda Goldberg and with Dean Matthew Mintz to discuss issues of depression that were affecting his ability to perform as a medical student.  *Id.*  At that meeting, Chenari told Dean Yolanda Haywood and Dean Rhonda Goldberg about his ADHD diagnosis and did not know of any possible accommodations at the time. Chenari "informed Dean Goldberg and Dean Yolanda Haywood at [the] meeting with them in the summer of, I think late summer 2012." *Id.*, at 92.  He went on to say, "I wasn't aware of the Student Office I didn't know to contact them. *Id.*, at 94.  He also said that he didn't have time to go to counseling because of the heavy demands of medical school at the time. *Id.*

In March of 2012, Chenari met with Dr. Goldberg because of concerns in his POM course wherein the Chenari had anxiety issues. *Exhibit 3*, (Goldberg Dep.) p. 20.   In October of 2012,

Chenari met with Dean Goldberg and Dean Yolanda Haywood. At that time he reported his anxiety issues and his diagnosis of Attention Deficit Hyperactivity Disorder (ADHD) and disclosed that he was prescribed medication for ADHD, Dean Goldberg again suggested that Chenari see a therapist or counselor but once again no action was taken by GWU in response to Chenari's report. Id. Nothing was done by GWU faculty to help Chenari cope with his overwhelming symptoms associated with his diagnosis.

In October 2012, Chenari spoke to Andrea Flory, M.D., his course director at GWU, and informed her that he had severe test anxiety – especially during multiple-choice examinations.  Dr. Flory was also aware that he was struggling in his courses.  *Exhibit 6*, (Flory Dep. pp. 31 – 32). Nothing was done on the part of GWU to provide him with much needed accommodations and he was not told about the Disability Services Center either:

> Q:    Do you recall any conversations that you had with Mr. Chenari about him needing assistance?
>
> A:    I recall that at least on one occasion he told me that he had a lot of test-taking anxiety and that he felt that his performance was far worse on the performance based exams than it was in other settings, and he felt that this may be due to anxiety. So I suggested this woman because she had helped me come up with ideas for helping other students around the problem of test-taking anxiety on the performance based exams.

Id.

She went on to say that, "I don't consider it my role to direct students to mental health resources.  It's only upon their request."  Id. at 35.  Most importantly, Dr. Flory does not recall that she was even aware of the Disability Services Center.  Id. She said, "[I] don't know. I'm primarily aware of it [Disability Services Center] now for a different issue."  Id.  In other words, Dr. Flory only learned of the Disability Services Center due to this lawsuit and, thus, was incapable of referring Chenari there in 2011 and 2012.  Defendants argue that Chenari should have

known to go to the Disability Services Center, but his own course director didn't even know it existed.

During an examination on December 14, 2012, even though Chenari had completely answered all questions and completed the exam in his workbook, he continued to transfer his answers to the multiple choice examination answer sheet, or scantron, and pencil in bubbles on the scantron after the time for the examination was up.  Chenari was charged with a violation of the Honor Code, Section F, which states that students may not "violate any other commonly understood principals of academic dishonestly."  Throughout this entire period of time and up until the date of the incident Chenari was continuing to see his Primary Care Physician, Dr. Durr.  (Durr Dep.) p. 40.

On December 12, 2012, Ms. Jessica Ruiz, General Surgery Residency Coordinator, informed Dean Goldberg, Schroth, and Haywood, about a "unfortunate incident", that occurred with Chenari wherein Chenari continued to fill in bubbles on his Shelf Exam after the allotted time was complete.  At no time, did Ms. Ruiz characterize the incident as academic dishonesty.  *Exhibit 4*, (Ruiz Dep.) Ex. 1 of deposition.  On December 12, 2012, Ms. Jessica Ruiz, determined that Chenari did in fact pass the Shelf Exam.  *Exhibit 4*, (Ruiz Dep.) Ex. 2. Of deposition.

Regarding the incident itself, Dr. Goldberg met with Mr. Chenari after it occurred and they discussed what happened:

Q:     Okay. Did you ask for Mr. Chenari to come and meet with you?

A:     Yes.

Q:     And did he?

A:     Yes.

Q:     What was discussed at that meeting?

A:      I gave him -- I had received that – Jessica's letter. I also received another one, an
        e-mail from other student -- from a student. I gave him the information and told
        him that I was going to proceed with the honor code proceedings.

Q:      Did you ask him for his version of events?

A:      Yes.

Q:      And what did he tell you?

A:      He told me that he hadn't finished bubbling in his answers and he needed to do
        that and he probably made a mistake, but he needed to do that.

Q:      Did he tell you that he panicked?

A:      I don't know if he used that word.

Id. at 21 -22.

On or about February 4, 2013, Chenari received a notice from the Associate Dean of

Student Affairs of GWU that he was accused of a possible violation of the Honor Code.  Dean

Jeffrey Akman, M.D., a trained Psychiatrist, was charged with making a final determination in the

matter and dismissing Chenari from GWU; however, he did not even know that Chenari suffered

from ADHD and had been approaching medical school faculty and administration concerning his

mental illness for many months.  As Dr. Akman did not have that information, his determination

is patently flawed.  *Exhibit 5*, (Akman Dep.) p. 22.

As was the common and accepted practice of the GWU medical school, students were

permitted to transfer their final answers from the examination onto a multiple choice answer sheet

after the time for the examination expired, which is what Chenari did in this case.  Chenari was

well aware that the examination proctor knew he was transferring his responses after the

examination time expired and he acknowledges that the proctor instructed him to stop transferring

his examination responses but he continued to do so.  At no time did Chenari ever attempt to

engage in academic dishonesty or to conceal his actions from the proctor, nor did he ever intend

to gain an unfair advantage or to cheat on the examination. He simply completed the examination in a manner in which he had always been allowed to do in the past at CWU.  *Exhibit 3* (Goldberg Dep.) p. 68 – 70.

On March 5, 2013, Chenari was called before a Subcommittee regarding to the allegation of academic dishonestly in violation of the Honor Code.  During the March 5, 2013 meeting with the Subcommittee, Chenari acknowledged the fact that he continued to pencil in bubbles on a multiple choice examination after the time for the examination was up, he further acknowledged that he was well aware that the examination proctor knew he was transferring his responses after the examination time expired and he acknowledges that the proctor instructed him to stop transferring his examination responses but he continued to do so. The Chenari informed the Subcommittee that he did not attempt to engage in academic dishonesty or to conceal his actions from the proctor, nor did he ever intend to gain an unfair advantage or to cheat on the examination. He stated that he simply completed the examination in a manner in which he had always been allowed to do in the past at GWU.  Id.  68 - 71

On March 15, 2013, the Subcommittee on Professional Comportment issued a decision that Chenari's actions on December 14, 2012 constituted a violation of Honor Code, Section F (2)(a)(6), which states that students may not "violate any other commonly understood principals of academic dishonestly." This conclusion is not possibly supported by any of the facts presented to the Subcommittee and therefore constitutes an arbitrary and capricious decision, not supported by the evidence. The Subcommittee recommended that Chenari be dismissed from GWU as a result of the incident.  Id.

Pursuant to the Honor Code, due to the recommendation of dismissal, Chenari was referred to the Medical School Executive Council (MSEC) to review the findings and recommendations of

the Subcommittee. Once again, Chenari admitted the facts of the allegation against him to the MSEC and maintained that his conduct did not involve academic dishonesty because there was no attempt to conceal his actions from the proctor, nor did he ever intend to gain an unfair advantage or to cheat on the examination- his answers were complete but not transferred. He stated once again that he simply completed the examination in a manner in which he had always been allowed to do in the past at GWU.

The decision of the Subcommittee failed to acknowledge the fact that Chenari suffered from ADHD, which caused him to act compulsively during the examination which resulted in the charge of academic dishonesty.   On April 30, 2013, the MSEC submitted its decision upholding the erroneous decision of the Subcommittee and recommending that Chenari be dismissed from GWU.

On May 22, 2013, the Dean of the School of Medicine and Health Sciences issued a decision upholding the recommendation of the Subcommittee and the MSEC and dismissing Chenari from GWU.   This decision was based upon the facts of the December 14, 2012, incident and failed to address the requirements of the Code or the fact that the undisputed facts of the December 14, 2012 incident cannot constitute academic dishonesty.

Chenari appealed this decision to the Provost.  The Provost issued a decision on Chenari's Appeal on July 8, 2013, upholding the erroneous decisions of the Subcommittee, the MSEC and the Dean.  Chenari was removed from the medical school and was not permitted to reapply.

Later in the deposition, Dr. Durr testified to the following regarding Chenari's impulsivity control issues which directly relate to the incident in question:

> Q:     And previously you I believe testified that impulsive behavior is one of the symptoms of ADHD; is that correct?
>
> A:     Impulsivity is. Yes.

Q:     And how would you define impulsivity?

A:     I just have to think about it for a second.

Q:     Sure.

A:     I guess doing things without thinking about the consequences.

Q:     Do you know if extreme stress or anxiety would increase the chance of impulsive behavior or impulsivity?

A:     I would assume. Yes. It makes most things worse.

Q:     You said that Chenari had explained to you why it was that he was dismissed from medical school; is that correct?

A:     Yes.  We talked about it at some point.

Q:     And he explained to you that he was taking an exam and that the time had been called but he continued to fill in the answer sheet; is that correct?

A:     That is my impression. Yes.

Q:     Did he say that he panicked?

A:     I don't remember him using that term, but it is certainly very possible he did. You know, I just remember that he said he was doing it. I thought it was very odd.  That is all I really remember. I don't know what else he told me.

Q:     Would you characterize that type of behavior as him completing to fill in the answer sheet as acting with impulsivity?

A:      I would.

*Exhibit 2*, (Durr Depo), pp. 78 – 80.

While Defendants would like for this case to be a simple academic misconduct case, it is clear that Chenari is a disabled individual whose behavior on December 14, 2012 was a manifestation of his disability.  Defendants dismissed Chenari from medical school for exhibiting

symptoms of his disability.  In addition, had Defendants provided Chenari with accommodations prior to December 14, 2012, like he had sought, this incident would not have taken place.

## BREACH OF CONTRACT AND IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

This is a case about a broken Contract with GWU and about a student that was unquestionably discriminated against.  At every turn – he was unable to obtain proper recourse from GWU.  We are not claiming the administration of the proceedings were unlawful – the outcome(s) were.

Courts in the District of Columbia recognize a contractual relationship between a student and a university. See Hajjar-Nejad v. George Washington Univ., 37 F. Supp.3d 90, 116 (D.D.C. 2014) (Kollar-Kotelly, J.); see also Alden, 734 A.2d at 1103.  A university that follows its own procedures and policies in reaching an academic decision will generally be found not to have breached its contractual obligations. Hajjar-Nejad, 37 F. Supp.3d at 124 (court deferring to university where student alleged extensive procedural violations, each of which were ruled immaterial to dismissal decision). Courts also defer to a university's interpretation of its own regulations because contracts are to be interpreted "by reference to the norms of conduct and expectations founded upon them." Id. at 119, citing Pride v. Howard Univ., 384 A.2d 31, 35 (D.C. 1978).

To prevail on a claim for breach of the implied covenant of good faith and fair dealing, a Chenari in an academic dismissal case must establish bad faith or conduct that is arbitrary and capricious. Alden v. Georgetown Univ., 734 A.2d 1103, 1112 (D.C. 1999).  Bad faith includes a party's lack of diligence, purposeful failure to perform, and interference with the other party's ability to perform.  Id.  Bad faith "may be overt or may consist of [a party's] inaction." Id.

All three factors exist under the present facts.  First, when Chenari informed GWU faculty of his disability they did absolutely nothing to help him – including but not limited to referring him to their Disability Service Office.  Chenari was a challenge for school officials to deal with. He suffered from anxiety and had difficulties during his third year of medical school.  Instead of supporting him and offering him proper accommodations, they watched Chenari spiral downward. GWU faculty did this to avoid having to service a student with special needs all of which was done in bad faith.

Next, the Defendant erroneously relies on the decision in <u>Alden</u>.  First and foremost – the plaintiff in <u>Alden</u> was not someone who suffered from a well diagnosed and longstanding medical disability.  The Defendant wants to erroneously paint this case to be about academic dishonesty and academic dishonesty only.  There are genuine facts in contention related to the Chenari's ADHD diagnosis in addition to his multiple attempts to seek help from GWU faculty for depression and anxiety related issues.

Additionally, there are several key themes in the present matter that are not analogous to the facts found in <u>Alden</u>.  Here, Chinari did not cheat on his exam – he completed writing all of his answers in his workbook, but bubbled in answers on the separate form after the allotted time. The analysis should stop there as this is a genuine issue of material fact demonstrating a complete lack of rational basis for the decision rendered by GWU.  Nevertheless, if the Court finds that Chenari did in fact cheat – there still exist several genuine issues of material fact that must be reviewed by a jury.

The following analysis demonstrates that Summary Judgment in wholly inappropriate on the first two counts of Chenari's Complaint.  First, as was the common and accepted practice of the GWU medical school, students were permitted to transfer their final answers from the

examination onto a multiple choice answer sheet after the time for the examination expired, which is what Chenari did in this case.  Chenari did absolutely nothing out of the ordinary.

Second, at no time did Chenari attempt to engage in academic dishonesty or to conceal his actions from Ms. Jessica Ruiz, General Surgery Residency Coordinator, who was proctoring the exam.  Nor did he ever intend to gain an unfair advantage or to cheat on the examination.  He had completed writing all of his answers in his workbook, but simply completed "bubbling" in a manner in which he had always been allowed to do in the past at GWU.  *Exhibit 1*, (Dep. Chenari) p. 15.

Third, on December 14, 2012, Ms. Jessica Ruiz informed Dean Goldberg, Schroth, and Haywood, about an "unfortunate incident", that occurred with Chenari wherein Chenari continued to fill in bubbles on his exam after the allotted time was complete.  At no time, did Ms. Ruiz characterize the incident as academic dishonesty or cheating.  *Exhibit 4*, (Ruiz Dep.) Exhibit #1 to deposition.  She never cited the Medical School Honor Code, Medical School Exam Guidelines, or the NBME standards.  Lastly, and most importantly, on December 14, 2012, Ms. Jessica Ruiz, determined that Chenari did in fact pass the exam.  *Exhibit 4*, (Ruiz Dep.) Ex. #2 to deposition. His disability clearly caused him to continue bubbling answers – a disability GWU was well aware of.

In order to obtain summary judgment, the University must show that it had a rational basis for its decision to dismiss Chenari which they have not done in the present matter.  In addition, as demonstrated above, GWU failed to provide accommodations to Chenari as they had agreed to do. As such, the University did in fact breach its contractual duties to Chenari and summary judgment should be denied Counts I and II of Chenari's Complaint.

## GWU VIOLATED THE ADA AND REHABILATION ACT

### Standard Under the ADA and Rehabilitation Act

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." Constantine v. Rectors, George Mason Univ., 411 F.3d 474 (4th Cir. 2005) quoting 42 U.S.C. § 12132. Similarly, § 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, or be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." Id. quoting 29 U.S.C. § 794 (a).

In general, a Chenari seeking recovery for violation of either statute must allege that (1) he has a disability, (2) he is otherwise qualified to receive the benefits of a public service, program, or activity, and (3) he was excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of his disability. Singh v. Geo. Wash. Univ. Sch. of Med. & Health Scis., 439 F. Supp. 2d 8, 16 (D.D.C. 2006); Haynes v. Williams, 392 F.3d 478, 482 (D.C. Cir. 2004).

The causation standards under Title II of the ADA and § 504 of the Rehabilitation Act are significantly dissimilar. Singh, 439 F. Supp. 2d 8 at 16. A plaintiff seeking relief under Title II of the ADA must prove that disability "played a motivating role" in the adverse action, while a Chenari seeking relief under § 504 of the Rehabilitation Act must prove that the defendants' discriminatory conduct was "solely by reason" of the Chenari's disability. Id. at 16 - 17.

### Chenari Suffered a Disability for the Purposes of the ADA and Rehabilitation Act

ADHD is a disability per the ADA and Rehabilitation Act. Haynes, 392 F.3d 478 at 482.

Moreover, Defendant's impairment caused a substantial limitation on learning.  Id.

An individual is disabled if he (A) [has] a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) [has] a record of such an impairment; or (C) [has been] regarded as having such an impairment. 42 U.S.C. § 12102(2). [T]hese terms need to be interpreted strictly to create a demanding standard for qualifying as disabled...."  Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 197 (2002).  Chenari's disabled because (1) his ADHD depression and mood disorder are mental impairments, (2) these impairments substantially limit him in the major life activity of learning and participating in [their] medical school curriculum. Singh, 439 F. Supp. 2d 8 at 10.

The term major life activities refers to those activities that are of central importance to daily life.  Toyota Motor, 534 U.S. at 197, and that the average person in the general population can perform with little or no difficulty.  Pack v. Kmart Corp., 166 F.3d 1300, 1305 (10th Cir.1999). The regulations do provide a representative, but nonexhaustive, list of major life activities that includes "learning and working."  A Helping Hand, LLC v. Baltimore County, Md, 515 F.3d 356, 367 (4th Cir. 2008) quoting 28 C.F.R. § 35.104 (Rehabilitation Act regulation similarly defining major life activities); 45 C.F.R. S 84.3(j)(2)(ii) (2000).

Chenari saw Dr. Durr again on January 11, 2012.  Id. At the latter visit, he reported to Dr. Durr that he was having "attention span issues, having difficulty studying, having difficulty performing in class," and "depression issues and some anxiety issues." Id.  On January 11, 2012, Dr. Durr prescribed Adderall for Chenari for his ADD/ADHD symptoms.  Id. at 9 – 10.  On that date, he was diagnosed with ADHD by Dr. Durr, his Primary Care Physician. Id. at 41.   Chenari is still being treated for his ADHD disorder.  *Exhibit 1*, (Dep. Chenari) p. 82.

Moreover, it is clear that several key members of the GWU faculty knew Chenari was

suffering from anxiety and depression and needed some sort of counseling – yet no one on staff thought to refer him to seek proper accommodations. *Exhibit 3* (Goldberg Dep.) pp. 42 – 52. Moreover, Chenari reported that he had mental-health issues as early as February of 2011 and three additional times in February of 2012, March of 2012, and October of 2012. He was being treated by Dr. Durr this entire stretch of time and GWU knew about. Id.

The Defendant argues that there is no evidence that Chenari either (1) notified the University of his disability such that any action was required, or (2) requested any accommodation for his alleged disability. Both factors cannot be further from the truth. Chenari did everything reasonable within his power to seek help from GWU. They even knew he needed counseling – yet they failed to mention the GWU Disability Services Office. Id. Also, to claim that Dr. Durr is not qualified to make an ADHD diagnosis is plainly false. He is fully qualified to make such a diagnosis and treat such patients. To make such a claim, in in essence, claiming that Dr. Durr was engaging in unlawful conduct. Additionally, the Defendant cites to their termed expert, Dr. Robert L. Mapou. He made his findings without interviewing or ever meeting Chenari. However, even he admits that Chenari suffered from distractibility and difficult concentrating. Just because Chenari was a good student – does not mean he is not disabled. These are two fundamental symptoms of ADHD – making the remainder of his findings not credible.

In this case, Chenari was prescribed Adderall to treat his disabling condition of ADHD. Indeed, the *Steere* case cited by Defendant clearly states that if a plaintiff took a medication to treat an underlying disability, the side effects of that medication could be considered a disability in and of itself. S*ee also Weigert v. Georgetown Univ.*, 120 F.Supp. 2d 1, 9-10 (D.C. 2000).

### Chenari Provided Timely Notice of His Disability to GWU Officials, as Early as February 2011

It is clear that administrators at GWU were well aware of the Chenari's mental-health issues as early as February 2011.  It was at that time, during his first year of medical school, Chenari met with GWU faculty members and class mentors, Dr. Richard Cytowic and Dr. Seema Kakar, to discuss his mental-health issues, particularly that they were impacting his performance as a medical student.  *Exhibit 1* (Dep. Chenari), p. 82.

Approximately one year later, in February 2012, Chenari met with Dean Rhonda Goldberg and with Dean Matthew Mintz to discuss issues of depression that were affecting his ability to perform as a medical student.  *Exhibit 3* (Goldberg Dep.), p. 52.  Then again, in March 2012, they met because of concerns in his POM course wherein the Chenari had anxiety issues.  *Exhibit 3* (Goldberg Dep.), p. 20.

In October 2012, Chenari met with Dean Goldberg and Dean Yolanda Haywood.  At that time, he again reported his anxiety issues.  More critically, he informed them of his Attention Deficit Hyperactivity Disorder (ADHD) diagnosis and disclosed that he was prescribed medication for ADHD. He also informed them that he was being treated for his ADHD by his Primary Care Physician - Dr. Durr.  Dean Goldberg again suggested that Chenari see a therapist or counselor but, once again, no action was taken by GWU in response to Chenari's report of his disability.

Each time Chenari met with GWU faculty, beginning as early as February 2011, he was under a physician's care for ADHD.  *Exhibit 1* (Dep. Chenari), p. 82.  However, at no point in all that time did they refer him to the Disability Services Center for proper accommodations. Defendant argues that Chenari should have known about the Disability Services Center and that he could have found out about it by doing research online.  But, GWU's own faculty, Dr. Flory, was not even familiar with the Disability Services Center.

**Chenari Was Otherwise Qualified to Participate in the Medical School Curriculum,
Was Excluded On the Basis of His Disabilities and Sought Reasonable Accommodations.**

A qualified individual is one who, with or without reasonable modifications to rules, policies, or practices....meets the essential eligibility requirements for participation in a program or activity.  42 U.S.C. § 12131(2); *see also Cmty. Coll. v. Davis*, 442 U.S. 397, 406 (1979) ("An otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap.").  A plaintiff asserting a violation of the ADA or Rehabilitation Act bears the burden to establish that he is qualified.  *Tyndall v. Nat'l Educ. Ctrs., Inc.*, 31 F.3d 209, 213 (4th Cir.1994). To determine whether a plaintiff has satisfied this burden, a court must decide whether he has presented sufficient evidence to show (1) that he could satisfy the essential eligibility requirements of the program, i.e., those requirements "'that bear more than a marginal relationship to the [program] at issue,' and (2) if not, whether 'any reasonable accommodation by the [defendant] would enable'" the plaintiff to meet these requirements.  *Id.* (quoting *Chandler v. City of Dallas*, 2 F.3d 1385, 1393–94 (5th Cir.1993)).

Federal law mandates that federal grantees and public accommodations make "reasonable," but not "substantial" or "fundamental," modifications to accommodate persons with disabilities. *See Alexander v. Choate*, 469 U.S. 287, 300 (1985).  A modification is not reasonable if it either imposes undue financial and administrative burdens ... or requires a fundamental alteration in the nature of the program.  *Sch. Bd. v. Arline*, 480 U.S. 273, 287 n. 17 (1987); *see also PGA Tour, Inc. v. Martin*, 532 U.S. 661, 683 n. 38 (2001) (requiring that a modification be reasonable, be necessary, and not fundamentally alter the nature of the program).  A modification to "an essential aspect" of the program constitutes a "fundamental alteration" and, therefore, is an unreasonable accommodation. *PGA Tour*, 532 U.S. at 682–83.  Although determination of the reasonableness of a proposed modification is often fact-specific, a court may grant summary

judgment in favor of a defendant if the Chenari fails to present evidence from which a jury may infer that the accommodation is "reasonable on its face, i.e., ordinarily or in the run of cases," or if the defendant establishes as a matter of law that the proposed modification will cause "undue hardship in the particular circumstances." *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401–02 (2002).

In this case, Defendant argues that Chenari was not otherwise qualified to participate in the medical school curriculum due to several "professionalism" violations. Even if this were the case, and Chenari could not satisfy the essential eligibility requirements of the program, Defendant was required to determine if there was any reasonable accommodation that would enable Chenari  to meet these requirements. Defendant failed to do so.

In Chenari's case, Defendant completely failed to comply with its own Policy and did not send him for an evaluation or Performance Improvement Plan despite knowing that he needed counseling. *Exhibit 3* (Goldberg Dep.), pp. 42 – 52. GWU also knew the extreme amount of time constraints placed on all of its medical students, like Chenari was at the time, but yet they did not permit him to miss class to attend counseling. In addition, GWU knew that Chenari was being seen by Dr. Durr for mental-health disabilities. *Exhibit 1* (Chenari Dep.), pp. 92 – 93.

Whether it was through GWU's Disability Services Office or the medical school, the Defendant had the ability to provide reasonable accommodations for his disability, i.e. extended time to take exams, separate location to take exams where there are no distractions. Through his completion of a plan created in conjunction with said Office, Chenari could have met Defendant's standards for professionalism. It is clear that the violations complained of in Dr. Goldberg's report were behaviors associated with a manifestation of Chenari's disabilities. *Exhibit 2*, (Durr Dep.) pp. 78 – 80. Dr. Goldberg reported multiple instances of impulsive, disinhibited and potentially

18

disorganized behavior.

Moreover, even if Defendant does not believe its own Policy regarding impaired students was a reasonable accommodation, Defendant is required under the ADA to engage in an interactive process to identify a reasonable accommodation.  *Haneke v. Mid–Atl. Capital Mgmt.*, 131 Fed.Appx. 399, 400 (4th Cir. 2005).  Defendant failed to do so in this case and simply removed Chenari from medical school.

Accordingly, Chenari has presented sufficient evidence which shows that he was otherwise qualified to participate in the medical school curriculum and he was dismissed from the program on the basis of alleged professionalism violations.  Moreover, Defendant's argument that this matter is simply related to academic dishonesty is baseless.  Defendant also erroneously claims that because Chenari did not assert his ADHD disability during the Honor Code proceedings that somehow they are not relevant.  In fact, Chenari reported his disability to Defendant in February 2011, in February 2012, in March 2012, and in October 2012 two months before the incident in question occurred.  Dr. Goldberg, as a counselor, should have been aware of the manifestations of Chenari's disabilities and his right to accommodations under the ADA and the Rehabilitation Act, such as extended time to take exams and taking exams in a separate location free from distractions. Those accommodations to which Chenari was entitled should have been presented to him in accordance with Defendant's Student Disability Policy.  But, Defendant never mentioned accommodations to him, and neither she nor Defendant's own administrators had any idea a Student Disability Services Office existed.  Andrea Flory, M.D., the GWU's course director, testified, "I don't consider it my role to direct students to mental health resources.  It's only upon their request."  Exhbit #6, (Flory Depo) p. 35.  Most importantly, Dr. Flory does not recall that she was even aware of the Disability Services Center.  Id. She said, "[I] don't know.  I'm primarily

aware of it [Disability Services Center] now for a different issue." Id.  In other words, Dr. Flory only learned of the Disability Resource Center due to this lawsuit, thus was incapable of referring Plaintiff there in 2011 and 2012.  Defendants argue that Chenari should have known to go to the Disability Resource Center, but his own course director didn't even know that such a place existed.

Had Defendant properly complied with its own policies and the law, the reasonable accommodations Chenari needed would have been in place.  Defendant denies these assertions in its motion.  Thus, material questions of fact exist regarding all elements of Chenari's *prima facie* case against Defendant for violations of the ADA and the Rehabilitation Act, and these claims should survive summary judgment.

## Deference to Academic Decisions of the University

Although the court affords deference to the academic decisions of universities, the Fourth Circuit noted that, in doing so, it must take care not to allow academic decisions to disguise truly discriminatory requirements.  *Halpern v. Wake Forest Univ. Health Sciences*, 669 F.3d 454 (4th Cir. 2012); citing *Zukle v. Regents of the Univ. of Cal.*, 166 F.3d 1041, 1048 (9th Cir. 1999).  The Court should assiduously review the record to ensure that the educational institution has conscientiously carried out [its] statutory obligation to provide reasonable accommodations to persons with disabilities.  *Id*.  Chenari has set forth that Defendant failed to provide him with the reasonable disability accommodation of allowing him to proceed through the Student Impairment Assistance Policy.  This would have provided Chenari with a supportive environment for his alleged professionalism issues, which were really manifestations of his disabilities, could have been effectively addressed and he could have been provided a plan for improvement to allow him to return to medical school without the impairment he suffered at the time the report was submitted against him.  Defendant's decision to simply dismiss Chenari from medical school without any

regard for its own policy and the requirements of the ADA is truly discriminatory conduct and must not be allowed to stand.

## **<u>CONCLUSION</u>**

For the reasons set forth above, material facts in genuine dispute exist regarding Chenari's claims under ADA and Rehabilitation Act.  Accordingly, Chenari respectfully requests that this Court deny Defendant's Motion for Summary Judgment in its entirety.

Respectfully submitted,

By:___ */s/ Jason J. Bach*_____
  Jason J. Bach, Esq.
  D.C. Bar No.: 974126, *pro hac vice*
  THE BACH LAW FIRM, LLC
  7881 W. Charleston, Suite 165
  Las Vegas, NV 89117
  Telephone: (702) 925-8787
  Facsimile: (702) 925-8788
  Email:  jbach@bachlawfirm.com

Tracy Rezvani
REZVANI VOLIN P.C.
1050 Connecticut Avenue, N.W., 10th Floor
Washington, D.C. 20036
Telephone:  (202) 350-4270 x 101
Facsimile:  (202) 351-0544
Email:  trezvani@rezvanivolin.com

*Attorneys for Plaintiff Sina Chenari*

September 18, 2015