UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SINA CHENARI,<br><br>        Plaintiff,<br><br>v.<br><br>GEORGE WASHINGTON UNIVERSITY,<br><br>        Defendant. | CIVIL ACTION NO.: 14-929 (ABJ) |

**STATEMENT OF MATERIAL FACTS IN GENUINE DISPUTE
WHICH PRECLUDE SUMMARY JUDGMENT**

Plaintiff Sina Chenari, by and through his attorneys of record, hereby submits this Statement of Material Facts in Genuine Dispute, pursuant to Local Rule 56.1, in support of his opposition to Defendant's Motion for Summary Judgment (Doc. 18) on the grounds that Defendant (1) breached its contract with Chenari; (2) breached the implied covenant of good faith and fair dealing; (3) violated Chenari's rights under of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 705(20); and (4) violated Chenari's rights under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et. seq*.

    1.    Chenari was expected to graduate with his Medical Degree (M.D.) in May of 2014. Throughout the program, Chenari experienced various bouts of anxiety and serious difficulty focusing related to his Attention Deficit Hyperactivity Disorder (ADHD). There existed a manifestation of disability. *Exhibit 1* (Chenari Dep.), p. 22.

    2.    Prior to matriculation, Chenari was seen by Paul G. Durr, M.D., for a routine pre-medical school screening physical examination. *Exhibit 2* (Durr Dep.), pp. 37 – 40.

1

3. Chenari saw Dr. Durr again on January 11, 2012. *Id.* At the latter visit, he reported to Dr. Durr that he was having "attention span issues, having difficulty studying, having difficulty performing in class," and "depression issues and some anxiety issues." *Id.*

4. On January 11, 2012, Dr. Durr prescribed Adderall for Chenari for his ADD/ADHD symptoms. *Id.*, at 9 – 10.

5. Dr. Durr is qualified to diagnose and prescribe Adderall. *Id.*, at 37- 40.

6. While Dr. Durr did not have the exact notes of an ADHD diagnosis, he testified at his deposition regarding his diagnostic procedures, as follows:

> Q: What questions do you ask?
>
> A: I ask when they started to have trouble, how long they have had trouble, what problems they have, did they do well in school, if they are working do they do well in work, do they have problems with [im]pulsivity, do they have problems with sleep, do the people around them complain about how they are doing, have they ever been diagnosed before, have they ever been treated before? Those are the common questions.

*Id.*, at 41.

7. Later in the deposition, Dr. Durr testified to the following regarding Chenari's impulsivity control issues which directly relate to the incident in question:

> Q: And previously you I believe testified that impulsive behavior is one of the symptoms of ADHD; is that correct?
>
> A: Impulsivity is. Yes.
>
> Q: And how would you define impulsivity?
>
> A: I just have to think about it for a second.
>
> Q: Sure.
>
> A: I guess doing things without thinking about the consequences.
>
> Q: Do you know if extreme stress or anxiety would increase the chance of impulsive behavior or impulsivity?

> A: I would assume. Yes. It makes most things worse.
>
> Q: You said that Chenari had explained to you why it was that he was dismissed from medical school; is that correct?
>
> A: Yes. We talked about it at some point.
>
> Q: And he explained to you that he was taking an exam and that the time had been called but he continued to fill in the answer sheet; is that correct?
>
> A: That is my impression. Yes.
>
> Q: Did he say that he panicked?
>
> A: I don't remember him using that term, but it is certainly very possible he did. You know, I just remember that he said he was doing it. I thought it was very odd. That is all I really remember. I don't know what else he told me.
>
> Q: Would you characterize that type of behavior as him completing to fill in the answer sheet as acting with impulsivity?
>
> A: I would.

*Id.*, at 78 – 80.

    8.    Chenari has also recently seen Dr. Anastasiou who diagnosed him ADHD. *Id.*, at 84 – 85. Dr. Anastasiou prescribed Chenari Adderall, 20 milligrams, extended release daily. *Id*. Chenari is still being treated for ADHD today. *Id*.

    9.    In February 2011, during his first year of medical school, Chenari met with GWU faculty members and class mentors, Dr. Richard Cytowic and Dr. Seema Kakar, to discuss his mental-health issues, particularly that they were impacting his performance as a medical student. At that time, no recommendations for accommodations were made by GWU. Neither faculty member recommended that Chenari visit any departmental office to seek proper accommodations or counseling. *Exhibit 1* (Dep. Chenari), p. 82.

10. In February 2012, Chenari met with Dean Rhonda Goldberg and with Dean Matthew Mintz to discuss issues of depression that were affecting his ability to perform as a medical student. *Id*.

11. During Dr. Goldberg's depositions, she testified that in March 2012 they met because of concerns in his POM course wherein Chenari had anxiety issues. *Exhibit 3*, (Goldberg Dep.) p. 20. She said the following about those concerns:

> Q: Okay. What were the concerns that he had?
>
> A: That he was anxious, and maybe uncomfortable would be the right word.
>
> Q: And was this in the course where he was interviewing mock patients?
>
> A: That was part of it.
>
> Q: Were there concerns that they had outside of this about – outside of him interviewing mock patients?
>
> A: I don't know if it was solely that. I think it was just within the course.
>
> Q: Okay. So there came a point in time where you actually did meet with –
>
> A: Uh-huh.
>
> Q: What did you talk about at that meeting?
>
> A: If he was feeling uncomfortable, what might be going on. I suggested that he go talk to a counselor.

*Id.*, at 19.

12. It is clear that several key members of the GWU faculty knew Chenari was suffering from anxiety and needed some sort of counseling – yet no one on staff thought to refer him to seek proper accommodations. *Exhibit 3* (Goldberg Dep.), pp. 42 – 52.

> Q: Was it discussed – did you have any discussions with these other doctors about any concerns of mental health issues involving Chenari?

> A:   I mean, we talked about – his behavior was – was of concern to them, like they expressed in their letter.
>
> Q:   Was there any discussion with you and these doctors concerning whether or not Chenari should seek medical help?
>
> A:   Medical help?
>
> Q:   Yes.
>
> A:   I'm not sure what you mean by that.
>
> Q:   That he should go see a doctor.
>
> A:   No. We did talk about counseling, and I said that I would talk to him about that, but –
>
> Q:   What was the hope – or what was the reason it was decided to recommend counseling for Chenari?
>
> A:   To help him. So my recollection is that I met with them and then met with him, and he seemed anxious. He told me he was embarrassed sometimes when he was interviewing patients or talking in groups, and I thought a therapist might help him get through that.
>
> Q:   Did he tell you that he was depressed?
>
> A:   No.
>
> Q:   Did he tell you at this time that he had any anxiety?
>
> A:   I don't know if he said anxiety, but he said sometimes he gets nervous.
>
> Q:   Okay.
>
> A:   I don't remember.
>
> A:   So I – my best recollection is that he was going to get some counseling, that he thought that would be an okay idea.

*Id.*, at 50 – 52.

13.   In October 2012, Chenari met with Dean Goldberg and Dean Yolanda Haywood. At that time Chenari reported his anxiety issues and his diagnosis of ADHD and disclosed that he was prescribed medication for ADHD. *Exhibit 3* (Goldberg Dep.), p. 19. Chenari said, "I informed

5

Dean Goldberg and Dean Yolanda Haywood at my meeting with them in the summer of, I think, late summer 2012." *Exhibit 1* (Chenari Dep.), at 92.  He went on to say, "I wasn't aware of the Student Office I didn't know to contact them.  *Id.*, at 94.  He was asked:

> Q: Did you have a sense that you yourself needed to be responsible to some extent for your own well-being?
>
> A: I believe I took the initiative to reach out to Dean Rhonda Goldberg and Dean Yolanda Haywood about my diagnosis.

*Id.*, at 95.  Dean Goldberg again suggested that Chenari see a therapist or counselor but, once again, no action was taken by GWU in response to Chenari's report. *Exhibit 3*, p. 19.

      14.    Also in October 2012, Chenari spoke to Andrea Flory, his course director, and informed her that he had severe test anxiety – especially during multiple-choice examinations.  Dr. Flory was also aware that Chenari was struggling in his courses. *Exhibit 4* (Flory Dep.), pp. 31 – 32.  Nothing was done on the part of GWU to provide Chenari with much needed accommodations, and he was not told about the Disability Services Center either:

> Q: Do you recall any conversations that you had with Chenari about him needing assistance?
>
> A: I recall that at least on one occasion he told me that he had a lot of test-taking anxiety and that he felt that his performance was far worse on the performance based exams than it was in other settings, and he felt that this may be due to anxiety. So I suggested this woman because she had helped me come up with ideas for helping other students around the problem of test-taking anxiety on the performance based exams.

*Id*.

      15.    Dr. Flory went on to testify that, "I don't consider it my role to direct students to mental health resources.  It's only upon their request." *Id.*, at 35.  Most importantly, Dr. Flory does not recall that she was even aware of the Disability Services Center. *Id.*  She said, "[I] don't know.  I'm primarily aware of [the Disability Services Center] now for a different issue." *Id.*  In

6

other words, Dr. Flory only learned of the Disability Services Center due to this lawsuit and, thus, was incapable of referring Chenari there in 2011 and 2012.

16. Had GWU faculty referred Chenari for accommodations, he could have received more test time, private testing area, and other assistance to relieve his anxiety, depression, and ADHD issues during examination time. These are routine accommodations, required under Section 504, provided to millions of students across the United States.

17. During an examination on December 14, 2012, even though Chenari had completely answered all questions and completed the exam in his workbook, he continued to transfer his answers to the multiple choice examination answer sheet, or scantron, and pencil in bubbles on the scantron after the time for the examination was up. Chenari was charged with a violation of the Honor Code, Section F, which states that students may not "violate any other commonly understood principals of academic dishonesty."

18. Throughout this entire period of time, and up until the date of the incident, Chenari was continuing to see his Primary Care Physician, Dr. Durr, who was treating Chenari for his ADHD. *Exhibit 2* (Durr Dep.), p. 40.

19. Chenari had particular issues with taking multiple choice examinations like the one he took on December 14, 2012. *Id.*, at 41.

20. On December 14, 2012, Ms. Jessica Ruiz, General Surgery Residency Coordinator, informed Dean Goldberg, Schroth, and Haywood, about an "unfortunate incident" that occurred with Chenari when Chenari continued to fill in bubbles on his examination scantron after the allotted time was complete. At no time did Ms. Ruiz characterize the incident as academic dishonesty. *Exhibit 5* (Ruiz Dep.), at Exhibit 1. On December 27, 2012, Ms. Jessica Ruiz learned that Chenari did, in fact, pass the exam. *Id.*, at Exhibit 2.

21. Regarding the incident itself, Dr. Goldberg met with Chenari after it occurred and they discussed what happened:

> Q: Okay. Did you ask for Chenari to come and meet with you?
>
> A: Yes.
>
> Q: And did he?
>
> A: Yes.
>
> Q: What was discussed at that meeting?
>
> A: I gave him – I had received that – Jessica's letter. I also received another one, an e-mail from other student – from a student. I gave him the information and told him that I was going to proceed with the honor code proceedings.
>
> Q: Did you ask him for his version of events?
>
> A: Yes.
>
> Q: And what did he tell you?
>
> A: He told me that he hadn't finished bubbling in his answers and he needed to do that and he probably made a mistake, but he needed to do that.
>
> Q: Did he tell you that he panicked?
>
> A: I don't know if he used that word.

*Id.*, at 21 -22.

22. On or about February 4, 2013, Chenari received a notice from the Associate Dean of Student Affairs of GWU that he was accused of a possible violation of the Honor Code.

23. Dean Jeffrey Akman, M.D., a trained Psychiatrist, was charged with making a final determination in the matter and dismissing Chenari from GWU; however, he did not even know that Chenari suffered from ADHD and had been approaching medical school faculty and

8

administration concerning his mental illness for many months.  As Dr. Akman did not have that information, his determination is patently flawed:

> Q: Did Dean Goldberg, at any point, inform you that Chenari had been diagnosed with ADHD?
>
> A: No.
>
> Q: Has Dean Haywood ever informed you of –
>
> A: No.
>
> Q: If they had informed you before you made your decision, do you believe that that would have impacted your decision?
>
> A: No.
>
> Q: You don't believe it's relevant?
>
> A: Well, I never had that information.

*Exhibit 6* (Akman Dep.), p. 22.

24. As was the common and accepted practice of the GWU medical school, students were permitted to transfer their final answers from the examination booklet onto a multiple choice answer sheet, or scantron, after the time for the examination expired, which is what Chenari did in this case. *Chenari Declaration*, ¶ 17.

25. On March 5, 2013, Chenari was called before the Subcommittee of Professional Comportment (Subcommittee) regarding the allegation of academic dishonestly in violation of the Honor Code.  During the March 5, 2013, meeting with the Subcommittee, Chenari acknowledged that he continued to pencil in bubbles on the multiple choice examination scantron after time for the examination was up, that he was well aware that the examination proctor knew he was transferring his responses from his test booklet to his scantron after the examination time expired and that the proctor instructed him to stop transferring his examination responses but that he

continued to do so.  Chenari informed the Subcommittee that he did not attempt to engage in academic dishonesty or to conceal his actions from the proctor, nor did he ever intend to gain an unfair advantage or to cheat on the examination.  He stated that he simply completed the examination in a manner in which he had always been allowed to do in the past at GWU.  *Exhibit 3* (Goldberg Dep.), pp. 68 –71.

26. On March 15, 2013, the Subcommittee issued a decision that Chenari's actions on December 14, 2012, constituted a violation of Honor Code, Section F (2)(a)(6), which states that students may not "violate any other commonly understood principals of academic dishonestly." *Id*.

27. This conclusion is not possibly supported by any of the facts presented to the Subcommittee and therefore constitutes an arbitrary and capricious decision, not supported by the evidence.  The Subcommittee recommended that Chenari be dismissed from GWU as a result of the incident.  *Id*.

28. Pursuant to the Honor Code, due to the recommendation of dismissal, Chenari was referred to the Medical School Executive Council (MSEC) to review the findings and recommendations of the Subcommittee.  Once again, Chenari admitted the facts of the allegation against him to the MSEC and maintained that his conduct did not involve academic dishonesty because there was no attempt to conceal his actions from the proctor nor did he ever intend to gain an unfair advantage or to cheat on the examination – his answers were complete in the examination booklet but not transferred onto the examination scantron at the moment time allotted for the examination expired.  He stated once again that he simply completed the examination in a manner in which he had always been allowed to do in the past at GWU.  *Chenari Declaration*, ¶ 19.

29.     The Subcommittee's decision failed to acknowledge the fact that Chenari suffers from ADHD, for which he had been seeking assistance from medical school faculty and administrators for many months and which caused him to act impulsively during the examination due to ADHD-related anxiety that resulted in the charge of academic dishonesty. *Id*., at ¶ 20.

30.     On April 30, 2013, the MSEC submitted its decision upholding the erroneous decision of the Subcommittee and recommending that Chenari be dismissed from GWU. *Id*., at ¶ 21.

31.     On May 22, 2013, the Dean of the GWU School of Medicine and Health Sciences issued a decision upholding the recommendation of the Subcommittee and the MSEC and dismissing Chenari from GWU.  This decision was based upon the facts of the December 14, 2012, incident and failed to address the requirements of the Code or the fact that the undisputed facts of the December 14, 2012, incident cannot constitute academic dishonesty. *Id*., at ¶ 23.

32.     Chenari appealed this decision to the Provost.  The Provost issued a decision on Chenari's appeal on July 8, 2013, upholding the erroneous decisions of the Subcommittee, the MSEC and the Dean of the GWU School of Medicine and Health Sciences. *Id*., at ¶ 24.

///

///

33. Subsequently, Chenari was removed from the GWU School of Medicine and Health Sciences and was not permitted to reapply.  *Id*., at ¶ 25.

          Respectfully submitted,

By:   */s/ Jason J. Bach*
      Jason J. Bach, Esq.
      D.C. Bar No.: 974126, *pro hac vice*
      THE BACH LAW FIRM, LLC
      7881 W. Charleston, Suite 165
      Las Vegas, NV 89117
      Telephone: (702) 925-8787
      Facsimile: (702) 925-8788
      Email:  jbach@bachlawfirm.com

Tracy Rezvani
REZVANI VOLIN P.C.
1050 Connecticut Avenue, N.W., 10th Floor
Washington, D.C. 20036
Telephone:  (202) 350-4270 x 101
Facsimile:  (202) 351-0544
Email:  trezvani@rezvanivolin.com

*Counsel for Plaintiff Sina Chenari*

Dated:  September 18, 2015