UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SINA CHENARI,<br><br>  Plaintiff,<br><br>v.<br><br>GEORGE WASHINGTON UNIVERSITY,<br><br>  Defendant. | Civil Action No. 14-929 (ABJ)<br><br>Judge Amy Berman Jackson |

**DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT**

Plaintiff's Opposition ("Pltfs' Opp.") [Docket 24-8] makes clear that this lawsuit is nothing more than an effort to pry open the proverbial back door to a medical school education as described – and closed – by the Hon. William T. Lawrence in Healy v. National Bd. Of Osteopathic Medical Examiners, Inc., 870 F. Supp. 2d 607,616 (S.D.Ind. 2012).

1.  Plaintiff Cannot Meet the "Substantially Limits" Standard for an ADA Claim

In Healy, Judge Lawrence noted that under the ADA, even as amended by Congress in 2008[1] to include significant changes to the "substantially limits" standard regarding a major life activity and expressly overruling the strict standard which had been articulated by the Supreme Court in Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002),[2] the determination of whether a person is "substantially limited in a major life activity" continues to be measured not by the abilities demonstrated by those functioning at

---

[1] See ADA Amendments Act of 2008 ("ADAA"), Pub.L. No. 110-325, 122 Stat. 3553 (2008), effective January 1, 2009.

[2] For unfathomable reasons, Plaintiff apparently cites Toyota, and the strict standard set forth there, as the standard this Court should apply. Pltf's Opp., p. 14. That, of course, has not been true since January 1, 2009, and is not the standard upon which Defendant relies in asserting entitlement to summary judgment herein.

relatively high levels (such as – in Healy – those taking a national medical licensure examination) but "by comparison to most people in the general population." Healy, 870 F. Supp. 2d at 617, 620. For all of his protestation that a disability precipitated his behavior at the end of the Surgery Shelf Exam, Plaintiff does not meet and cannot meet that threshold showing of a disability for ADA purposes. Plaintiff is a lifelong successful student, including an undergraduate engineering degree Magna Cum Laude from Defendant George Washington University followed by a Masters degree in Human Physiology at Georgetown University and then admission to Defendant's School of Medicine and Health Sciences.  He had obviously taken many multiple-choice timed exams without any claim of disability, much less any "accommodation," during his entire academic career. When compared with "most people in the general population," Plaintiff cannot possibly be said to be "substantially limited" in the major life activity of learning, or even in the sub-category (if one exists) of "test taking."

As Judge Lawrence further noted in Healy, 870 F. Supp.2d at 620, courts have considered a variety of factors in assessing whether a plaintiff's major life activities are substantially limited. Those include the plaintiff's objective test results as compared to the average person, Rumbin v. Assoc. of Am. Med. Colls., 803 F. Supp. 2d 83, 94 (D. Conn. 2011), whether there exists a pattern of substantial academic difficulties, Price v. Nat'l Bd. of Med. Exam'rs, 966 F. Supp. 419, 423 (S.D.W.Va. 1997), and whether the plaintiff has been afforded testing accommodations in the past. Gonzalez v. National Bd. of  Med. Exam'rs, 60 F. Supp. 2d 703, 708 n. 1 (E.D.Mich. 1999). The record establishes that Plaintiff cannot offer proof to establish any of those factors.

Oddly, Plaintiff cites Singh v. Geo. Wash. Univ. Sch. of Med. & Health Scis., 439 F. Supp. 2d 8 (D.D.C. 2006) (Lamberth, J.) ("Singh I"), in support of his opposition. Pltf's Opp., p.

2

13.[3] But there, Judge Lamberth's ruling that a medical student's disability status should be assessed in the context of her medical student peers was reversed on appeal. Singh v. Geo. Wash. Univ. Sch. of Med. & Health Scis., 508 F.3d 1097 (D.C. Cir. 2007). The Court of Appeals, addressing the issue for the first time in this circuit, held that the proper standard is whether an ADA claimant's alleged limitation "is substantial as compared to the average person in the general population." Id., at 1100. As noted, that is a benchmark Plaintiff cannot possibly meet.

On remand for clarification of other rulings, Judge Lamberth stated (based on a record established at an earlier bench trial but which mirrors the record in this case on summary judgment) that the conclusion was "compelled" that plaintiff, who claimed to have a disability that interfered with her performance on multiple-choice timed exams,[4] had failed to establish a

---

[3] Plaintiff also there cites Constantine v. Rectors, Geo. Mason Univ., 411 F.3d 474 (4th Cir. 2005) (Pltf's Opp., p. 13). But Constantine was before the court on the trial court's Rule 12(b)(6) dismissal. On appeal, the court noted that the allegations of the Complaint sufficiently alleged matters for Rule 12(b)(6) purposes "[w]hatever may happen at summary judgment or trial . . . ." Id. There was no discussion of the evidence a plaintiff must adduce where, as here, discovery is closed and defendant has filed a motion for summary judgment. Plaintiff also cites Haynes v. Williams, 364 U.S. App. D.C. 108, 392 F.3d 478 (2004) (Pltf's Opp., p. 13). There, the court affirmed a grant of summary judgment against plaintiff's claim that an idiopathic pruritis was substantially limiting where plaintiff's evidence at best showed the condition was triggered by some locations in addition to the specific building in which he worked. Id. at 115. The court noted that this evidence would not have permitted a reasonable jury to determine that plaintiff had an impairment substantially limiting a major life activity since it left open the possibility the condition could be eliminated by avoiding his workplace and those other specific locations. As this evidence was merely colorable or not significantly probative of the existence of a disability for ADA purposes, summary judgment was affirmed. Id. The case supports Defendant's position that on summary judgment in an ADA case, plaintiff has the burden to present evidence establishing the existence of a substantially limiting impairment or face dismissal.

[4] Like Mr. Chenari, Ms. Singh had been referred by Dean Goldberg to the Student Counseling Center. Unlike Mr. Chenari, Ms. Singh went to the counseling center, but then, after an initial visit, she failed to follow up. Unlike Mr. Chenari, Ms. Singh later self-referred to the University's Center for Disability Support Services Center where she was referred further to a clinical psychologist who evaluated Ms. Singh and diagnosed her with two learning disabilities: reading disorder (dyslexia), and a mild disorder of processing speed. Singh, 439 F. Supp. 2d at 11 – 12. In subsequent proceedings, Judge Lamberth noted in determining that Ms. Singh was

disability where the record demonstrated a lifetime of academic achievement in competitive environments. Singh v. Geo. Wash. Univ. Sch. of Med. & Health Scis., 597 F.Supp.2d 89, 95 (D.D.C. 2009).[5]

Here the record shows that Plaintiff was admitted to Defendant's School of Medicine and Health Sciences and enrolled for the fall semester in 2010 (Defendant's Statement of Facts, ¶ 3 [Docket 19] ("Def's SOF")), that immediately prior to his admission to medical school, Plaintiff had completed an undergraduate degree in engineering (also at Defendant George Washington University) and testifies that he did "very well" and that the degree program "was very difficult," (Def's SOF ¶ 3, Exh. 2 at 80:20 – 81:6), that in middle school he performed well, got relatively good grades, and did not have any academic struggles as a middle school student (Def's SOF ¶ 3, Exh. 2 at 118:13 – 119:3), that at no time during middle school through junior high school and high school did Plaintiff or anyone acting on his behalf ever request an accommodation of any kind related to his educational program (Def's SOF ¶ 3, Exh. 2 at 122:15 – 20), that Plaintiff performed well in high school and graduated with honors (Def's SOF ¶ 3, Exh. 2 at 124:12 – 15), and that none of his high school teachers ever commented that Plaintiff was disorganized or needed to do better or that he was not living up to his potential (other than a math teacher in advanced math classes where he never did the homework but was able to do well on the exams and make up for it – he "got B pluses and stuff" – "always a homework grade away from getting

---

not disabled for ADA purposes that "a mere diagnosis of a learning disability . . . does not establish 'disability' under the ADA absent sufficient corroborative evidence from the patient's own experiences." Singh v. Geo. Wash. Univ. Sch. of Med. & Health Scis., 597 F.Supp.2d 89, 97 (D.D.C. 2009) ("Singh II"). So, too, in this case, Dr. Durr's alleged diagnosis of ADHD (Pltf's Opp., p. 2) does not establish disability absent corroborative evidence. There is none. In fact, all the evidence runs the other way.

[5] That ruling was affirmed on appeal, Singh v. Geo. Wash. Univ. Sch. of Med. & Health Scis., 667 F.3d 1 (D.C. Cir. 2011), cert. denied, 133 S.Ct. 172 (2012),

the A.") (Def's SOF ¶ 3, Exh. 2 at 125:2 – 126:7). The record further shows that Plaintiff performed well enough in high school that he received a full – or nearly full (80 – 90 percent) – scholarship to the undergraduate engineering program at Defendant George Washington University (Pltf's Opp., Exh. 1 – Transcript of Plaintiff's Deposition, 100:3 – 101:4), that he was enrolled as an undergraduate in Computer Science with a pre-medicine subclass focus, and that he graduated Magna Cum Laude. Id., at 101:2 – 13. The record further shows that in order to fulfill pre-medical school requirements, Plaintiff then obtained a Masters degree in Human Physiology at Georgetown University, which was a "pretty intense" program where again he did "pretty well." Id. at 113:15 – 115:2.

Plaintiff's lifetime of academic achievement in distinguished, competitive programs without claim of disability, request for accommodation, or accommodation of any kind shows that Plaintiff cannot as a matter of law establish a *prima facie* claim that he has an impairment that "substantially limits" one or more of the "major life activities of an individual," particularly as it relates to a claim of disability in the major life activity of learning. Plaintiff's effort to portray his behavior at the end of the Surgery Shelf Exam as the one and only example in his entire life of the consequences of his disability rising to the surface and causing him to act "compulsively" to defy the clearly announced rules of a timed exam (Pltf's Opp., p. 8) does not suffice to prove disability.[6]

---

[6] Plaintiff's claim throughout his Opposition that it was "common and accepted practice of the GWU medical school" for students to transfer final answers after time was called on a timed exam, Pltf's Opp., p. 6, is at best anecdotal – no confirmatory evidence is offered – and defies Plaintiff's admission that whatever had happened on other occasions, for the Surgery Shelf exam there was an exam proctor who, before and during the exam, had announced that after-time bubbling would not be permitted and who stood over him after time had been called repeatedly demanding that he stop, orders which he admittedly repeatedly defied. As in Singh II, such "overwhelmingly anecdotal evidence" hardly suffices to create a genuine issue as to a material fact. Singh, 597 F.Supp.2d at 97. Whatever Plaintiff may claim he had routinely done – with the

As Judge Lamberth observed in Singh II, "[I]f [the student] has an impairment that substantially interferes even with test-taking, multiple-choice or otherwise, this Court would expect such interference to consistently appear throughout similar academic environments." Singh, 597 F. Supp. 2d at 97. The undisputed material facts show not only that Plaintiff cannot meet his threshold burden to prove – even if it were to be assumed he has a disability – that the alleged disability "substantially limits" a major life activity, but also that it is incontrovertible that Plaintiff does not have a disability for ADA purposes.

2. Plaintiff Does Not Have Adequate Expert Medical Proof of Disability or Causation

The only medical expert testimony presented by Plaintiff to support the diagnosis of ADHD and to establish the presence of an ADHD-related impairment which "substantially limits" a major life activity is the deposition testimony of Dr. Durr. Pltf's Statement of Facts, ¶¶ 2 – 7 [Doc. 24-8]. But it is apparent from Dr. Durr's deposition transcript that his testimony does not establish the existence of an ADA disability related either to his "diagnosis" of ADHD or to the prescription of Adderall for Plaintiff. Dr. Durr agrees that he did not make a diagnosis of ADHD in conformity with prevailing medical standards for the diagnosis. Def's SOF, ¶ 5. The testimony of Dr. Mapou through his declaration that no such diagnosis was properly made and that no such diagnosis could be properly made given Plaintiff's academic history and lack of impairment throughout his academic career (Def's SOF, ¶¶ 67 – 68) stands unrebutted on this record.

Nor did Dr. Durr's deposition testimony establish that there was any ADHD-related substantial limitation on any of Plaintiff's major life activities. Although Plaintiff cites the fact

---

University's alleged acquiescence if not outright endorsement – at the end of other timed exams cannot be squared with the events during the Surgery Shelf exam.

that Dr. Durr testified that he had prescribed Adderall for Plaintiff, Dr. Durr gave no testimony concerning any substantial limits on Plaintiff's major life activities, much less such limits attributable to ADHD. Moreover, Dr. Durr not only failed to express an opinion that Plaintiff's alleged ADHD or prescription for Adderall had anything to do with Plaintiff's behavior on the Surgery Shelf Exam, the testimony cited by Plaintiff in his Statement of Facts, ¶ 7, actually suggests a lack of any connection between ADHD and that behavior. Dr. Durr testified that it was "possible" that Plaintiff had told him he had "panicked" during the exam and that he would characterize that type of behavior as acting with impulsivity, which is a symptom of ADHD, but Dr. Durr also testified that he thought what Plaintiff told him he had done "was very odd." Id. If Dr. Durr held an opinion that Plaintiff had ADHD which caused impulsivity such as to have precipitated Plaintiff's behavior on that one particular occasion, that would not be "odd," it would be expected. During the deposition, Plaintiff's counsel did not ask and Dr. Durr did not express an opinion as to whether Plaintiff's alleged ADHD in fact caused or contributed to Plaintiff's conduct leading to his dismissal from the University.

Equally significantly, Dr. Durr offered no opinions on whether, even assuming Plaintiff has ADHD, there were any accommodations that would have been appropriate and stated he does not know if ADHD qualifies for any such accommodations. Def's SOF, ¶ 10. Dr. Mapou's opinions expressed to a reasonable degree of certainty within the field of neuropsychology that Plaintiff does not have ADHD and does not have a disability warranting accommodations (Def's SOF, ¶¶ 67 – 68 and Exh. 25 (Mapou Declaration)), all as is more fully set forth in Dr. Mapou's declaration, again stand unrebutted – and not genuinely disputed – on this record.

For these reasons, it is also strange that Plaintiff cites Weigert v. Georgetown University, 120 F.Supp.2d 1 (D.D.C. 2000) (Urbina, J.), for the proposition that where an individual takes a

7

medication "to treat an underlying disability, the side effects of the medication could be considered a disability in and of itself." Pltf's Opp., p. 15. In Weigert, an ADA employment discharge and retaliation case, Judge Urbina actually granted summary judgment to the defendant noting that under the ADA, a plaintiff "'has the burden of establishing with medical evidence the existence of the alleged disability, and presenting the documentation during the term of employment, not following termination.'" Weigert, 120 F.Supp.2d at 7, citing Kalekiristos v. CTF Hotel Management Corp., 958 F. Supp. 641, 656 (D.D.C. 1997); accord Harris v. H & W Contracting Col, 102 F.3f 516, 520 (11th Cir. 1996). Judge Urbina then further noted that on the record, as is true here, plaintiff had failed to establish that any allegedly disabling condition had substantially limited one of plaintiff's major life activities and entered summary judgment. In Kalekiristos, another ADA employment discharge case, the court likewise emphasized that in opposing summary judgment, the plaintiff "[h]as a burden of establishing with medical evidence the existence of the alleged disability, and presenting the documentation during the term of employment, not following termination." Kalekiristos, 958 F. Supp. at 657. Neither case supports Plaintiff's argument that because he was taking Adderall, he was entitled to accommodation under the ADA. To the contrary, these cases support Defendant's entitlement to summary judgment.

      3.      <u>Plaintiff's ADA Claim Fails Because He Did Not Request an Accommodation</u>

Plaintiff insists that because (1) he had various discussions with Dean Goldberg and others that he had "mental health" issues or "depression" that were affecting his academic performance and that he had ADHD for which he had been prescribed Adderall and (2) no accommodations were provided by the University, an ADA violation occurred. Pltf's Opp., pp. 3 – 4, 15 – 16. Unfortunately for Plaintiff, neither the law nor the facts support this argument.

Plaintiff's assertion that "GWU failed to provide accommodations to Chenari as they had agreed to do," Pltf's Opp., p. 12, not surprisingly, contains no citation to any part of the record. Plaintiff never requested an accommodation – that he admits – and there is no evidence the University ever was aware of a need for an accommodation, much less "agreed" to one of any kind. Plaintiff's argument that the University somehow failed to engage in an "interactive process" to identify a reasonable accommodation, Pltf's Opp., p. 19, relies upon an unreported ADA employment related case, Haneke v. Mid-Atl. Capital Mgmt, 131 Fed. Appx. 399 (4th Cir. 2005). But the argument fails for the reason that the undisputed record shows that Plaintiff was referred by Dean Goldberg to the University's Counseling Center for evaluation – the place where a determination would presumably be made as to the need, if any, for further referral either for therapy or to the Disability Services Office for disability evaluation or to some other office or provider for other appropriate intervention – but Plaintiff simply did not have the time to pursue that course. His conduct stands in marked contrast to that of the plaintiffs in Singh and Steere. But even those two plaintiffs – both of whom, unlike Plaintiff, actually did present a request for accommodation supported by medical evidence – failed to establish an ADA claim where, as here, the record also failed to establish an impairment substantially limiting a major life activity.

The only material facts remain undisputed that Plaintiff never presented to anyone at the University, and certainly not to the University's Disability Support Services office, medical evidence of a "proper diagnosis" and a request for a "specific accommodation." Kaltenberger v. Ohio Coll. of Podiatric Med., 162 F.3d 432, 437 (6th Cir. 1998).

    4.    Plaintiff Engaged In Academic Dishonesty

9

Plaintiff continues to insist that his "compulsive" behavior in continuing to bubble in after time was called on a timed exam "cannot constitute academic dishonesty." Pltf's Opp., p. 8. That assertion cites no portion of the record and rests solely on Plaintiff's self-serving reiteration of his clear misunderstanding of what it means to cheat. Plaintiff's "own speculations and allegations," however, do not suffice to overcome defendant's evidence on a motion for summary judgment. Weigert, 120 F. Supp. at 22.

Plaintiff seems to be the only person who does not understand the implications of what he did. He suggests that the exam proctor, Jessica Ruiz, did not believe he had cheated because she reported the matter to Dean Goldberg as an "unfortunate incident" and further asserts that "[A]t no time, did Ms. Ruiz characterize the incident as academic dishonesty." Pltf's Opp., p. 5, citing Pltf's Opp., Exhibit 4 Ex. 1 of deposition. The assertion ignores Ms. Ruiz's testimony on the deposition taken by Plaintiff that immediately after she had collected the exam materials, the following occurred:

> Q. So when you went to the Dean's office to drop off the exams, you said that you informed the Executive Coordinator of what had occurred with Mr. Chenari?
>
> A. Yes.
>
> Q. What exactly did you tell him?
>
> A. I had told him that there was a cheating incident that I needed to discuss with the Deans, and I had to tell him because he's the chief proctor.
>
> \*   \*   \*
>
> Q. Have you been involved in other incidents as a proctor where, in your mind, there has been some cheating?
>
> A. No.
>
> Q. This is the first time?

10

    A.  This is my only and first time.

Ruiz Tr., 29:3 – 30:5, Pltf's Opp., Exhibit 5 [Docket 24-5].

  As noted in Defendant's motion, at every layer of review during the multi-layered review process conducted by the University under the applicable Honor Code Proceeding provisions of The Regulations for M.D. Candidates, including review by fellow students, faculty members, the Dean of the Medical School and the University Provost, there was unanimous agreement that Plaintiff had engaged in academic dishonesty. Def's SOF, ¶¶ 42 – 65.

  The now unrebutted Declaration of Wallace Judd, Ph.D. (Def's SOF, ¶¶ 70), further indisputably establishes that "[G]iven medical students' extensive experience taking standardized tests, observing the time limits of a standardized examination is a commonly understood principle of academic honesty." Id., ¶ 71(g).

  5.  <u>Defendant's Academic Disciplinary Decision Is Entitled to Judicial Deference</u>

  Leaving aside Plaintiff's apparently persisting obtuseness, the cases make clear, particularly in a medical academic setting, that decision-making on matters of academic dismissal rest with the academy, and certainly not with individual students such as Plaintiff, who would like to believe he can simply pronounce his conduct as not deceitful and end the matter. But it is the University's prerogative to decide such matters, provided appropriate processes are in place and followed, which Plaintiff concedes occurred in this case. The University's decision that this episode involved academic dishonesty and justified Plaintiff's dismissal is one to which the courts will defer absent evidence by Plaintiff from which a fact finder could conclude that there was "no rational basis for the decision or that it was motivated by bad faith or ill will unrelated to academic performance." <u>Hajjar-Nejad v. George Washington Univ.</u>, 37 F. Supp. 3d 90, 116 (D.D.C. 2014) (Kollar-Kotelly, J.).

Plaintiff cites Halpern v. Wake Forest Univ. Health Sciences, 669 F.3d 454 (4th Cir. 2012), and Zukle v. Regents of the Univ. of Cal., 166 F.3d 1041 (9th Cir. 1999), for the unexceptionable proposition that in academic dismissal cases bound up in ADA and Rehabilitation Act claims, the courts should proceed with caution to assure that the academic decisions do not disguise discriminatory conduct. Pltf's Opp., p. 20. But that broad issue aside, the cases roundly support the University's entitlement to summary judgment here.

In Halpern, the Court of Appeals affirmed summary judgment in a suit brought by a student who had attended the Wake Forest medical school for over four years but was then dismissed following a number of instances of unprofessional behavior which Plaintiff attributed to his diagnosis of ADHD and the side effects of medication he took to treat his ADHD. On the issue of judicial deference to the medical school's professional judgment whether plaintiff could meet the school's essential eligibility requirements, the court noted that in the context of due process challenges, the Supreme Court "has held that a court should defer to a school's professional judgment regarding a student's academic or professional qualifications." Halpern, 669 F.3d at 669, citing Regents of the Univ. of Mich. v. Ewing, 474 U.S. 214, 225, 106S.Ct. 507, 88 L.Ed.2d 523 (1985). But more to the point in the instant case, the court noted that "professionalism was an essential requirement" of the medical school's program, Halpern, 669 F.3d at 463, and, importantly, stated that "[t]he law does not require the school to ignore misconduct that has occurred because the student subsequently asserts it was the result of a disability." Id. at 465.[7]

---

[7] The court specifically noted that "[T]he school was not obligated to accommodate Halpern's disability until he 'provided a proper diagnosis . . . and requested specific accommodation.'" Id. at 465, citing Kaltenberger v. Ohio Coll. of Podiatric Med., 162 F.3d 432, 437 (6th Cir. 1998) (emphasis added). Plaintiff Chenari did neither at any time.

In Halpern, the court further noted that where a demand for accommodation is presented for the first time only after the unprofessional behavior has already occurred, the demand does not truly seek "a disability accommodation, but a 'second chance to better control [the student's] treatable medical condition.'" Id. at 465, citing Hill v. Kan. City Area Transp. Auth., 181 F.3d 891, 894 (8th Cir. 1999). This, however, "'is not a cause of action under the ADA.'" Id. (further citing Hill, 181 F.3d at 894). The Halpern case fully supports summary judgment for the University here.

In Zukle, supra, the court affirmed summary judgment for the defendant medical school on ADA and Rehabilitation Act claims brought by a student with a reading disability documented by diagnostic testing which affected "reading comprehension and rate when under timed constraints." Id., at 1043. Over a course of time, the student had requested certain specific accommodations which had been granted but she continued to confront difficulties and failures in the program. She was eventually dismissed from the medical school on a determination that her tenure "demonstrated an incapacity to develop or use the skills and knowledge required to competently practice medicine." Id. at 1044.

In reviewing the grant of summary judgment, the Court of Appeals noted that a majority of circuits had adopted the deferential standard set forth in Southeastern Community College v. Davis, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979) – applicable to review of academic decisions in the context of due process claims – for purposes of reviewing claims involving academic decisions in the context of ADA and Rehabilitation Act cases. Id., at 1047. The Court did state that while being deferential, there must be care not to allow academic decisions to disguise truly discriminatory behavior, and specifically noted that "[T]he educational institution has a 'real obligation . . . to seek suitable means of reasonably accommodating a handicapped

13

person and to submit a factual record indicating that it conscientiously carried out this statutory obligation.'" Id., at 1048, citing Wynne v. Tufts Univ. Sch. of Med., 932 F.2d 19, 27-28 (10th Cir. 1991).

Those remarks, however, came in the context of a fact pattern in which the school had been given appropriately documented evidence of a disability and presented with a specific request – in fact a series of specific requests – for accommodation. The inquiry then became whether the requested accommodations were reasonable or whether, as the University contended, the requested accommodations were not reasonable "because they would have required a fundamental or substantial modification of its program." Zukle, 166 F.3d at 1048. The court's statement regarding an academic institution's "real obligation" to act "conscientiously" in pursing accommodations for a student with a disability is a reaffirmation of the laudable intent, purpose and goals embodied within both the ADA and the Rehabilitation Act. But the court in Wynne was not purporting to disregard the steps the student must first take, recognized in Kaltenberger, to trigger the obligation of the academic institution to engage in an effort to seek suitable means of reasonable accommodation.

Significantly, in Zukle, the court took particular note of the testimony of the Medical School's Associate Dean of Medical Affairs during his appearance before the internal reviewing board. The Dean had testified as follows:

> There is a certain point when everyone has to be able to respond in the same time frame. A physician does not have extra time when in the ER, for example. Speed of appropriate reaction to crisis is essential.

Zukle, 166 F.3d at 1044. In affirming the grant of summary judgment, the Court of Appeals stated that it agreed with the trial court's determination that the University's denial of Ms. Zukle's requested accommodation – a significantly decelerated schedule to accommodate her

14

slower information processing disability – was a "'rationally justifiable conclusion." Id., at 1050, citing Wynne v. Tufts Univ. Sch. of Med., 976 F.2d 791, 793 (1st Cir. 1992). The Court of Appeals concluded that allowing the student to remain in the Medical School on such a decelerated schedule "would have lowered the Medical School's academic standards, which it was not required to do to accommodate Zukle." Id., at 1051, citing Southeastern Community College v. Davis, 442 U.S. 397, 413, 99 S.Ct. 2361. 60 L.Ed.2d 980 (1979).[8]

None of the cases Plaintiff cites involves a medical student seeking accommodation for conduct determined by the academic institution to have been dishonest. And for good reason: It would be difficult to imagine any such accommodation that would not simply lower but shred the institution's academic standards. Perhaps nowhere in academe are such standards more paramount than in the health care professions. Hajjar-Nejad, 37 F. Supp. 3d at 117.

## Conclusion

Plaintiff's opposition fails to raise a single material fact that is genuinely disputed. Instead, the record discloses that the claims Plaintiff purports to assert are nothing more than what the courts have variously described as a "back door" or "second chance" and not an appropriate demand for relief within the nationally declared policy to accord people with

---

[8] The Court further noted that the specific accommodations requested which formed the basis of Plaintiff Zukle's claims had been requested after the Medical School's decision to dismiss her. In that regard, the Court commented: "Her failure to request this accommodation earlier contributes to our finding of unreasonableness. See Wynn II, 976 F.2d at 796 n. 3 (finding relevant to reasonableness inquiry the fact that student did not ask for accommodation 'until after [the school] sent him packing and adversary proceedings were underway')." Zukle, 166 F.3d at 1051 n. 16. Plaintiff Chenari never requested an accommodation at any point before his dismissal, and even with the filing of this lawsuit does not point to any accommodation he contends he was entitled to receive, much less a request for a "specific accommodation" as is required to trigger an academic institution's obligations under the ADA and the Rehabilitation Act.

disabilities a proper chance enshrined in the ADA and Rehabilitation Act. On this record, Defendant is entitled to summary judgment.

>Respectfully submitted,
>
>JACKSON & CAMPBELL, P.C.
>
>/s/ *Nicholas S. McConnell*
>Nicholas S. McConnell (D.C. Bar #167742)
>James N. Markels (D.C. Bar #982476)
>JACKSON & CAMPBELL, P.C.
>1120 20TH Street, N.W. (Suite 300 S.)
>Washington, D.C.  20036
>(T) (202) 457-1600
>(F) (202) 457-1678
>nmcconnell@jackscamp.com
>
>*Counsel for Defendant*

# CERTIFICATE OF SERVICE

I hereby certify on this 2nd day of October, 2015 that the foregoing Reply of the George Washington University's Motion for Summary Judgment, was served via ECF to counsel of record:

>Tracy D. Rezvani, P.C.
>Rezvani Volin & Rotbert, P.C.
>1050 Connecticut Avenue, N.W., 10th Floor
>Washington, D.C. 20036
>
>Jason J. Bach, Esq.
>The Bach Law Firm, LLC
>7881 W. Charleston Boulevard, Suite 165
>Las Vegas, NV 89117
>
>*Counsel for Plaintiff*
>
>/s/  *Nicholas S. McConnell*
>Nicholas S. McConnell (D.C. Bar #167742)