# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: <u>1:14−cv−00929−ABJ</u>

CHENARI v. GEORGE WASHINGTON UNIVERSITY
Assigned to: Judge Amy Berman Jackson
Demand: $75,000
Cause: 28:1332 Diversity−Breach of Contract

Date Filed: 05/30/2014
Date Terminated: 03/23/2016
Jury Demand: Plaintiff
Nature of Suit: 190 Contract: Other
Jurisdiction: Diversity

**Plaintiff**

**SINA CHENARI**

represented by **Tracy Diana Rezvani**
REZVANI VOLIN P.C.
1050 Connecticut Ave, N.W.,
10th Floor
Washington, DC 20036
(202) 350−4270 (ext 101)
Fax: (202) 351−0544
Email: <u>trezvani@rezvanivolin.com</u>
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jason J. Bach**
BACH LAW FIRM LLC
7881 W. Charleston Boulevard
Suite 165
Las Vegas, NV 89117
(702) 925−8787
Fax: (702) 925−8788
Email: <u>jbach@bachlawfirm.com</u>
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**GEORGE WASHINGTON UNIVERSITY**

represented by **James N. Markels**
JACKSON & CAMPBELL, P.C.
1120 20th Street, NW
Suite 300 South Tower
Washington, DC 20036
(202) 457−1610
Fax: (202) 457−1678
Email: <u>jmarkels@jackscamp.com</u>
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicholas S. McConnell**

1

JACKSON & CAMPBELL, P.C.
1120 20th Street, NW
Suite 300 South Tower
Washington, DC 20036
(202) 457–1628
Fax: (202) 457–1678
Email: nmcconnell@jackscamp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Allyson C. Kitchel**
JACKSON & CAMPBELL, P.C.
1120 20th Street, NW
Suite 300 South Tower
Washington, DC 20036
(202) 457–1665
Fax: (202) 457–1678
Email: akitchel@jackscamp.com
*TERMINATED: 09/18/2015*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 05/30/2014 | 1 | | COMPLAINT against All Defendants with Jury Demand ( Filing fee $ 400 receipt number 0090–3733023), CIVIL COVER SHEET by SINA CHENARI filed by SINA CHENARI. (Attachments: # 1 Civil Cover Sheet, # 2 Summons)(Rezvani, Tracy) (Entered: 05/30/2014) |
| 05/30/2014 | | | Case Assigned to Judge Ketanji Brown Jackson. (kb) (Entered: 06/02/2014) |
| 06/02/2014 | 2 | | SUMMONS Issued (1) Electronically as to GEORGE WASHINGTON UNIVERSITY. (Attachments: # 1 Consent Form, # 2 Notice of Consent)(kb) (Entered: 06/02/2014) |
| 06/09/2014 | 3 | | Case randomly reassigned to Judge Amy Berman Jackson. Judge Ketanji Brown Jackson no longer assigned to the case. (gt, ) (Entered: 06/09/2014) |
| 06/25/2014 | 4 | | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. SINA CHENARI served on 6/9/2014, answer due 6/30/2014 (Rezvani, Tracy) (Entered: 06/25/2014) |
| 06/26/2014 | 5 | | ANSWER to Complaint by GEORGE WASHINGTON UNIVERSITY.(Kitchel, Allyson) (Entered: 06/26/2014) |
| 06/27/2014 | | | MINUTE ORDER. Meet and Confer Initial Scheduling Conference set for 7/18/2014 at 9:30 AM in Courtroom 3 before Judge Amy Berman Jackson. The parties shall meet, confer, and file a Joint Report pursuant to Local Rule 16.3 by 7/11/2014. Any dates contained in the Report should be expressed as specific dates (month/day/year) rather than as time frames (e.g., "60 days after the entry of the scheduling order"). Counsel are directed to contact the Court's Deputy Clerk in the first instance to request the rescheduling of court appearances. The party seeking the change in schedule must first confer with counsel for all other parties and be prepared to provide the Deputy Clerk with proposed mutually agreeable dates. Signed by Judge Amy Berman Jackson on 06/27/2014. (jth) |

| | | | |
|---|---|---|---|
| | | | (Entered: 06/27/2014) |
| 07/11/2014 | 6 | | Corporate Disclosure Statement by GEORGE WASHINGTON UNIVERSITY. (Kitchel, Allyson) (Entered: 07/11/2014) |
| 07/11/2014 | 7 | | MEET AND CONFER STATEMENT. (Rezvani, Tracy) (Entered: 07/11/2014) |
| 07/18/2014 | 8 | | SCHEDULING ORDER: The deadline for written discovery requests is October 31, 2014; plaintiff shall designate any expert witnesses by December 12, 2014, and defendant shall designate any expert witnesses by January 30, 2015; discovery shall close on March 13, 2015; and dispositive motions are due by April 10, 2015, with oppositions due on May 11, 2015, and replies due on May 21, 2015. A status conference is schedule for March 24, 2015, at 10:00 am in Courtroom 3. (SEE ORDER FOR DETAILS). Signed by Judge Amy Berman Jackson on 7/18/2014. (lcabj1) (Entered: 07/18/2014) |
| 07/18/2014 | | | Minute Entry for proceedings held before Judge Amy Berman Jackson: Meet and Confer Hearing held on 7/18/2014. (SCHEDULING ORDER WAS ISSUED THIS DATE). (Court Reporter Vicki Eastvold) (jth) (Entered: 07/18/2014) |
| 07/18/2014 | | | Set/Reset Deadlines/Hearings: All written requests for written discovery are due by 10/31/2014; Plaintiff shall designate any expert witnesses pursuant to Rule 26(a)(2) by 12/12/2014, Defendant shall designate any expert witnesses pursuant to Rule 26(a)(1) by 1/30/2015; Discovery closes on 3/13/2015; Dispositive motions are due by 4/10/2015, Oppositions are due by 5/11/2015, Replies are due by 5/21/2015. A Status Conference is schedule for 3/24/2015, at 10:00 am in Courtroom 3 before Judge Amy Berman Jackson. (jth) (Entered: 07/18/2014) |
| 07/18/2014 | 9 | | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Jason J. Bach, :Firm– The Bach Law Firm LLC, :Address– 6053 South Fort Apache Road, Suite 130, Las Vegas NV 89148. Phone No. – 702–925–8787. Fax No. – 702–925–8788 Filing fee $ 100, receipt number 0090–3783454. Fee Status: Fee Paid. by SINA CHENARI (Rezvani, Tracy) (Entered: 07/18/2014) |
| 07/21/2014 | | | MINUTE ORDER granting 9 Motion for Leave of Jason J. Bach to Appear Pro Hac Vice only upon condition that the lawyer admitted, or at least one member of the lawyer's firm, undergo CM/ECF training, obtain a CM/ECF username and password, and agree to file papers electronically. No court papers will be mailed to any lawyer. Signed by Judge Amy Berman Jackson on 7/21/14. (DMK) (Entered: 07/21/2014) |
| 08/08/2014 | 10 | | RULE 26a1 STATEMENT. (Kitchel, Allyson) (Entered: 08/08/2014) |
| 10/30/2014 | 11 | | REQUEST for Production of Documents by GEORGE WASHINGTON UNIVERSITY.(Kitchel, Allyson) (Entered: 10/30/2014) |
| 10/30/2014 | | | NOTICE OF ERROR re 11 Request for Production of Documents; emailed to akitchel@jackscamp.com, cc'd 9 associated attorneys –– The PDF file you docketed contained errors: 1. Do not file Discovery (LcvR 5.2), 2. DO NOT REFILE (jf, ) (Entered: 10/30/2014) |
| 01/21/2015 | 12 | | NOTICE of Change of Address by Jason J. Bach (Bach, Jason) (Entered: 01/21/2015) |
| 01/28/2015 | 13 | | |

| | | | |
|---|---|---|---|
| | | | Consent MOTION to Amend/Correct *Scheduling Order* by GEORGE WASHINGTON UNIVERSITY (Kitchel, Allyson) (Entered: 01/28/2015) |
| 01/29/2015 | | | MINUTE ORDER granting 13 Motion to Amend Scheduling Order. Plaintiff's expert witness designations are due on or before February 27, 2015. Defendant's expert witness designations are due on or before April 14, 2015. All discovery shall be completed on or before July 13, 2015. Any dispositive motions shall be filed on or before August 10, 2015, with oppositions due on or before September 10, 2015, and replies due on or before September 24, 2015. The status conference scheduled for March 24, 2015 is rescheduled for July 14, 2015 at 10:00 AM in Courtroom 3. SO ORDERED. Signed by Judge Amy Berman Jackson on 1/29/2015. (lcabj2) (Entered: 01/29/2015) |
| 01/29/2015 | | | Set/Reset Deadlines/Hearings: Plaintiff's expert witness designations are due by 2/27/2015; Defendant's expert witness designations are due by 4/14/2015; Discovery shall be completed by 7/13/2015; The Status Conference is reset for 7/14/2015 at 10:00 AM in Courtroom 3; Any Dispositive Motions shall be filed by 8/10/2015, Oppositions are due by 9/10/2015, Replies are due by 9/24/2015. (jth) (Entered: 01/29/2015) |
| 02/11/2015 | | | Minute Entry for proceedings held before Judge Amy Berman Jackson: Discovery Telephone Conference Call held in chambers on 2/11/2015. (No Court Reporter Present). (jth) (Entered: 02/11/2015) |
| 02/25/2015 | 14 | | Joint MOTION for Order *Joint Motion For Entry Of Stipulated Confidentiality Order* by SINA CHENARI (Rezvani, Tracy) (Entered: 02/25/2015) |
| 02/26/2015 | 15 | | NOTICE of Appearance by Nicholas S. McConnell on behalf of GEORGE WASHINGTON UNIVERSITY (McConnell, Nicholas) (Entered: 02/26/2015) |
| 02/26/2015 | 16 | | STIPULATED CONFIDENTIALITY ORDER (see the order for complete details). Signed by Judge Amy Berman Jackson on 02/26/2015. (jth) (Entered: 02/26/2015) |
| 03/26/2015 | 17 | | NOTICE by Wilfred Njah (non−party) "Leave to file as a Notice GRANTED" signed Amy B. Jackson on 03/26/2015 (jf, ) (Entered: 03/26/2015) |
| 07/14/2015 | | | Minute Entry for proceedings held before Judge Amy Berman Jackson: Status Conference held on 7/14/2015. The Parties are directed to confer and to notify chambers whether or not they would like to send this matter to mediation/settlement. The existing schedule for the filing of dispositive motions remains unchanged. (Court Reporter: Janice Dickman) (jth) (Entered: 07/14/2015) |
| 08/10/2015 | 18 | | MOTION for Summary Judgment by GEORGE WASHINGTON UNIVERSITY (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26)(McConnell, Nicholas) (Entered: 08/10/2015) |
| 08/10/2015 | 19 | | ERRATA *TO CORRECT SIGNATURE* by GEORGE WASHINGTON UNIVERSITY 18 MOTION for Summary Judgment filed by GEORGE |

| | | | |
|---|---|---|---|
| | | | WASHINGTON UNIVERSITY. (McConnell, Nicholas) (Entered: 08/10/2015) |
| 09/10/2015 | 20 | | Unopposed MOTION for Extension of Time to *Modify the Briefing Schedule* by SINA CHENARI (Bach, Jason) (Entered: 09/10/2015) |
| 09/14/2015 | | | MINUTE ORDER granting 20 Motion for Extension of Time. Plaintiff's opposition to defendant's motion for summary judgment shall be filed on or before September 18, 2015, and defendant's reply in support of its motion shall be filed on or before October 2, 2015. Signed by Judge Amy Berman Jackson on 9/14/2015. (lcabj2) (Entered: 09/14/2015) |
| 09/14/2015 | | | Set/Reset Deadlines: Plaintiff's Opposition to Defendant's Summary Judgment Motion is due by 9/18/2015; Defendant's Reply is due by 10/2/2015. (jth) (Entered: 09/14/2015) |
| 09/18/2015 | 21 | | NOTICE OF WITHDRAWAL OF APPEARANCE as to GEORGE WASHINGTON UNIVERSITY. Attorney Allyson C. Kitchel terminated. (Kitchel, Allyson) (Entered: 09/18/2015) |
| 09/18/2015 | 22 | | NOTICE of Appearance by James N. Markels on behalf of GEORGE WASHINGTON UNIVERSITY (Markels, James) (Entered: 09/18/2015) |
| 09/18/2015 | 23 | | Memorandum in opposition to re 18 MOTION for Summary Judgment filed by SINA CHENARI. (Bach, Jason) (Entered: 09/18/2015) |
| 09/18/2015 | 24 | | Memorandum in opposition to re 18 MOTION for Summary Judgment filed by SINA CHENARI. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Declaration of Sina Chenari in support of Opposition to Motion for Summary Judgment, # 8 Statement of Facts, # 9 Text of Proposed Order)(Bach, Jason) (Entered: 09/19/2015) |
| 10/02/2015 | 25 | | REPLY to opposition to motion re 18 MOTION for Summary Judgment filed by GEORGE WASHINGTON UNIVERSITY. (McConnell, Nicholas) (Entered: 10/02/2015) |
| 03/23/2016 | 26 | 37 | ORDER granting 18 Motion for Summary Judgment. See Order for details. Signed by Judge Amy Berman Jackson on 3/23/2016. (lcabj2) (Entered: 03/23/2016) |
| 03/23/2016 | 27 | 8 | MEMORANDUM OPINION. Signed by Judge Amy Berman Jackson on 3/23/2016. (lcabj2) (Entered: 03/23/2016) |
| 04/13/2016 | 28 | | BILL OF COSTS by GEORGE WASHINGTON UNIVERSITY. (McConnell, Nicholas) (Entered: 04/13/2016) |
| 04/21/2016 | 29 | 6 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 26 Order on Motion for Summary Judgment, 27 Memorandum & Opinion by SINA CHENARI. Filing fee $ 505, receipt number 0090–4495377. Fee Status: Fee Paid. Parties have been notified. (Bach, Jason) (Entered: 04/21/2016) |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SINA CHENARI, | |
|         Plaintiff, | Civil Action No. 14-929 (ABJ) |
|     v. | Judge Amy Berman Jackson |
| GEORGE WASHINGTON UNIVERSITY | |
|         Defendant. | |

**NOTICE OF APPEAL**

Notice is hereby given this 21st day of April, 2016, that Plaintiff, Sina Chenari, hereby appeals to the United States Court of Appeals for the District of Columbia Circuit from the Order [Docket No. 26] and Memorandum Opinion [Docket No. 27] granting Defendant, George Washington University's Motion for Summary Judgment [Docket No. 18], entered in this action on the 23rd day of March, 2016.

Respectfully submitted,
  /s/ Jason J. Bach _____
Jason J. Bach, Esq.
**THE BACH LAW FIRM, LLC**
D.C. Bar No.: 974126, *pro hac vice*
7881 W. Charleston Blvd., Suite 165
Las Vegas, Nevada 89117
Telephone: (702) 925-8787
Facsimile: (702) 925-8788
Email:  jbach@bachlawfirm.com

Tracy D. Rezvani, Esq.
**Rezvani Volin, P.C.**
1050 Connecticut Avenue, N.W., #500
Washington, D.C. 20036
Office: 202-350-4270 x 101
Fax: 202-351-0544
Email: trezvani@rezvanivolin.com
*Counsel for Plaintiff Sina Chenari*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 21st day of April, 2016, that the foregoing Notice of Appeal

was served via ECF to counsel of record:

Nicholas S. McConnell (D.C. Bar #167742)
James N. Markels (D.C. Bar #982476)
**Jackson & Campbell, P.C.**
1120-20th Street, N.W. (Suite 300 S.)
Washington, D.C. 20036
Office: 202-457-1600
Fax: 202-457-1678

/s/  Jason J. Bach
Jason J. Bach, Esq.
**THE BACH LAW FIRM, LLC**
D.C. Bar No.: 974126, *pro hac vice*
7881 W. Charleston Blvd., Suite 165
Las Vegas, Nevada 89117
Telephone: (702) 925-8787
Facsimile: (702) 925-8788
Email:  jbach@bachlawfirm.com

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

)
SINA CHENARI,                              )
                                           )
            Plaintiff,                     )
                                           )
    v.                                     )        Civil Action No. 14-0929 (ABJ)
                                           )
GEORGE WASHINGTON UNIVERSITY,              )
                                           )
            Defendant.                     )
_____)

## MEMORANDUM OPINION

Plaintiff Sina Chenari has brought this lawsuit against George Washington University, challenging the University's decision to dismiss him from the medical school on the grounds that he had violated the school's Honor Code while taking a nationally-administered examination. Compl. [Dkt. # 1]. Plaintiff does not deny that he continued to fill in the answer sheet after time had expired and even after he had been directed to stop, but he maintains that his behavior did not involve deceit. *Id.* ¶¶ 12–13. So, he posits that the University breached its contractual obligations and the covenant of good faith and fair dealing when it dismissed him for committing an offense involving "academic dishonesty." *Id.* ¶¶ 12–16, 28–37. Plaintiff also contends that he suffers from Attention Deficit Hyperactivity Disorder ("ADHD"), and that the University violated the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, and the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, when it failed to provide him with reasonable accommodations for that disability, "including not being dismissed from [the] medical school," and when it discriminated and retaliated against him. *Id.* ¶¶ 17, 39–55. Defendant has moved for summary judgment, Mot. of Def. for Summ. J. [Dkt. # 18] ("Def.'s Mot."), and plaintiff has opposed defendant's motion. Pl.'s Mem. of P. & A. in Opp. to Def.'s Mot. [Dkt. # 24] ("Pl.'s Opp.").

Since plaintiff has failed to come forward with any evidence that would enable a fact finder to conclude that there was no rational basis underlying the University's decision to dismiss him for academic dishonesty, the Court will grant defendant's motion for summary judgment on the contract claims in Counts I and II. And since it is undisputed that plaintiff never requested an accommodation for his alleged disability, and there is no evidence beyond plaintiff's own testimony that he ever mentioned it to University officials at all, the motion for summary judgment on the Rehabilitation Act and ADA claims in Counts III and IV will be granted, as well. Thus, this case will be dismissed in its entirety.

## BACKGROUND

The following facts are undisputed except where noted. Plaintiff enrolled at the George Washington University School of Medicine and Health Sciences ("Medical School") in the fall of 2010. Dep. of Sina Chenari (Feb. 17 & Apr. 20, 2015), Ex. 2 to Def.'s Mot. [Dkt. # 18-2] ("Chenari Dep.") 43:3–5. He was scheduled to graduate from the Medical School in 2014. *Id.* 186:10–12.

Prior to enrolling at the Medical School, on August 3, 2010, plaintiff saw Dr. Paul Durr for a "[g]eneral check up and immunizations." Dep. of Paul G. Durr, M.D., Ex. 2 to Pl.'s Opp. [Dkt # 24-2] ("Durr Dep.") 30:1–13. Durr did not conduct any mental health or psychiatric assessment for plaintiff at this visit. *Id.* 34:15–20. On January 11, 2011,[1] plaintiff saw Durr again, and he

---

1    The parties' respective statements of fact place this visit on January 11, 2012, but plaintiff's and Durr's deposition testimony indicate that the visit occurred on January 11, 2011. *See* Def.'s Statement of Material Facts as to Which There is No Genuine Issue [Dkt. # 18] ¶¶ 4–5 (stating that plaintiff saw Durr on January 11, 2011, and that Durr prescribed plaintiff Adderall on January 11, 2012); Pl.'s Statement of Material Facts in Genuine Dispute Which Preclude Summ. J. [Dkt. # 24-8] ¶¶ 3–4 (stating that plaintiff saw Durr on January 11, 2012). *But see* Durr Dep. 38:1–39:5 (describing January 11, 2011 visit where Durr prescribed Adderall); Chenari Dep. 49:14–50:3, 79:5–7 (stating that plaintiff saw Durr on January 11, 2011). Because the date of this visit is not material to the resolution of defendant's motion for summary judgment, the Court will refer to the date of this visit as January 11, 2011, consistent with the deposition testimony.

complained that he was having "issues in school with attention span issues, having difficulty studying, having difficulty performing in class," as well as suffering from depression and anxiety. Chenari Dep. 49:14–50:20; Durr Dep. 38:1–17. Durr wrote plaintiff a prescription for Adderall, set a follow-up appoint for a month later, and recommended that plaintiff see a therapist at school. Durr Dep. 39:1–3; *see also* Chenari Dep. 79:5–7. Despite Durr's recommendation, plaintiff did not see a therapist at school or anywhere else. Chenari Dep. 75:12–18.

Durr testified that he was not required to diagnose plaintiff with ADHD before prescribing him Adderall, and he could not recall or otherwise determine whether he had in fact diagnosed plaintiff with ADHD at the January 11, 2011 appointment. Durr Dep. 40:15–22. However, at plaintiff's follow-up appointments, Durr would write "ADD" in the assessment section of his notes. *Id.* 57:5–19, 59:5–11.

Plaintiff completed his first two years at the Medical School on time, but he did not start his clinical rotations in the fall of 2012 as scheduled because he postponed taking his Step 1 Shelf Examination, also called the Board Exam. Chenari Dep. 239:6–17. Plaintiff states that he postponed taking the exam because he was exhausted, depressed, and having difficulty studying for the exam. *Id.* 239:18–240:8. Plaintiff was unable to begin his clinical rotations until he completed the Board Exam. *Id.* 240:9–13.

On September 20, 2012, plaintiff contacted Dean Rhonda Goldberg, an Associate Dean for Students at the Medical School, to discuss developing a plan to continue with his education. Ex. 4 to Def.'s Mot. [Dkt. # 18-4] ("Goldberg Email"). Plaintiff met with Dean Goldberg and Dean Yolanda Haywood on October 3, 2012, and he claims that he informed them of his ADHD

diagnosis at that meeting. Chenari Dep. 242:3–9, 243:1–5.[2] However, Dean Goldberg could not recall plaintiff informing her that he had recently been diagnosed with ADHD, at that meeting or at any other time. Dep. of Rhonda Goldberg (Apr. 21, 2015), Ex. 3 to Pl.'s Opp. [Dkt. # 24-3] ("Goldberg Dep.") 56:3–57:21. It is clear, though, that at the meeting, a plan was developed to enable plaintiff to continue with his studies. *See* Goldberg Email. Dean Goldberg also provided plaintiff with information about the University's Counseling Center so that he could get assistance there for his depression and anxiety issues. Chenari Dep. 243:1–16. Plaintiff did not contact the Counseling Center because, he says, he felt "there was no time" to do so. *Id.* 243:17–21.

The next day, on October 4, 2012, plaintiff received an email from a University faculty member, Dr. Andrea L. Flory. Ex. 5 to Def.'s Mot. [Dkt. # 18-5] ("Flory Email"). Plaintiff had previously met with Flory because "he felt that his performance was far worse on the performance based exams . . . and he felt that this may be due to anxiety." Dep. of Dr. Andrea Flory (July 8, 2015), Ex. 4 to Pl.'s Opp. [Dkt. # 24-4] 32:10–16. In her email, Flory provided plaintiff with the contact information for Anne Gialanella, a licensed professional counselor who specialized in helping students experiencing test-taking anxiety. Chenari Dep. 245:9–246:5; *see also* Flory Email. Plaintiff never contacted Gialanella, again because he felt he had no time to do so. Chenari Dep. 246:6–19.

On December 14, 2012, plaintiff sat for the Step 1 Surgery Shelf Exam, a standardized exam published by the National Board of Medical Examiners ("NBME"). Compl. ¶ 12; Goldberg Dep. 69:4–70:2. The exam was administered by Surgical Clerkship Coordinator Jessica Ruiz. Decl. of Jessica Ruiz, Ex. 12 to Def.'s Mot. [Dkt. # 18-12] ("Ruiz Decl.") ¶ 1. Prior to

---

2    Plaintiff states that the October 3, 2012 meeting with Deans Haywood and Goldberg was "the only time" he spoke to anyone at the University about his ADHD diagnosis. Chenari Dep. 328:21–329:10.

4

administering the exam, Ruiz read instructions aloud from the NBME Chief Proctor's Manual, advising students that they would "receive credit for an answer only if it is properly recorded in the appropriate space on the answer sheet," and that "[t]ime will not be extended beyond the close of this examination for transferring your answers." *Id.* ¶ 3; Ex. A to Ruiz Decl. [Dkt. # 18-12] ("NBME Manual") at 16. Ruiz also gave a warning thirty minutes before the exam period had elapsed, again telling students that "all responses must be recorded on your answer sheet in order to receive credit," and that "[n]o additional time will be allowed for transferring answers." Ruiz Decl. ¶ 3; NBME Manual at 18.

Plaintiff agrees that it was likely that he was read the thirty-minute warning during the exam, and he admits that he knew that he was to stop filling in the bubbles on the answer sheet once time had been called. Chenari Dep. 217:5–13. However, when Ruiz called time on the exam, plaintiff realized he had not filled in answers on an entire page of the answer sheet, and he continued to transfer his answers from his test booklet to the answer sheet after time had expired. *Id.* 266:10–267:9. Ruiz asked plaintiff to stop transferring his answers, but plaintiff did not. *Id.* 269:1–18. Ruiz eventually approached plaintiff and reached over him to take his exam booklet, but plaintiff "put [his] hand over the booklet and the exam and just continued to bubble in [his] answers." *Id.* 269:19–270:6. Plaintiff continued filling in his answer sheet for between ninety seconds and two minutes after the exam had concluded. *Id.* 271:10–13. Once plaintiff had filled in all of the remaining answers, Ruiz collected his answer sheet, and plaintiff left the exam room. *Id.* 278:7–280:21.

Later that day, Ruiz reported the incident via email to Dean Goldberg, Dean Haywood, and other faculty, explaining that plaintiff continued transferring his answers after time had been called, even after Ruiz "told him 3 times to put his pencil down." Ex. 13 to Def.'s Mot. [Dkt. # 18-

5

13] at 1. She informed the faculty members that when she attempted to take the exam and answer sheet away from plaintiff, "he became aggressive and would not allow [her] to take the exam/answer sheet," and that he "put both of his arms on top of the exam and answer sheet and kept filling the circles." *Id.* Ruiz also stated that plaintiff approached her after the incident and apologized, and she told him that his behavior was not appropriate. *Id.*

Alleged misconduct by students at the Medical School is governed by the Regulations for M.D. Candidates, which includes an Honor Code. Decl. of Rhonda M. Goldberg, Ex. 8 to Def.'s Mot. [Dkt. # 18-8] ("Goldberg Decl.") ¶ 3; Ex. A to Goldberg Decl. [Dkt. # 18-8] ("Regulations"). The Honor Code identifies a number of specific violations, and it also directs that "[s]tudents will not . . . [v]iolate any other commonly understood principle of academic honesty." Regulations § F(2)(a)(6). Plaintiff received a copy of the Regulations, including the Honor Code, when he enrolled at the Medical School in August 2010, and he signed a document acknowledging that he had reviewed them. Chenari Dep. 210:12–211:16; Ex. 14 to Def.'s Mot. [Dkt. # 18-14] at 2.

In response to Ruiz's email regarding plaintiff's conduct at the December 14, 2012 exam, Dean Goldberg initiated proceedings to address a possible violation of the Honor Code. Goldberg Dep. 21:8–21. On February 4, 2013, Goldberg met with plaintiff to discuss the incident. Chenari Dep. 293:3–6. She provided plaintiff with a copy of the Regulations and an Honor Code violation report, which included emails from Ruiz and a student describing plaintiff's conduct at the exam. Goldberg Dep. 22:8–18; Chenari Dep. 293:7–17; Ex. 15 to Def.'s Mot. [Dkt. # 18-15] ("Honor Code Violation Report"). She gave plaintiff the opportunity to provide his version of events, and he explained that "he hadn't finished bubbling in his answers and he needed to do that and he probably made a mistake." Goldberg Dep. 22:19–23:3.

Pursuant to the Regulations, Goldberg referred the matter to a Subcommittee on Professional Comportment ("Subcommittee"). Regulations § G(4)(c); Goldberg Dep. 23:6–24:10. Dean Goldberg provided plaintiff with notice of the composition of the Subcommittee as is required by the Regulations, and plaintiff gave his approval. Regulations § G(5)–(6); Ex. 16 to Def.'s Mot. [Dkt. # 18-16]. The Subcommittee interviewed plaintiff about the incident and provided him with the opportunity to give a statement, but he declined. Regulations § G(7); Chenari Dep. 305:12–19, 306:16–307:1.

On March 15, 2013, the Subcommittee issued its written report, in which it "unanimously concluded, by a preponderance of the evidence . . . that Mr. Chenari violated Section F(2)(a)(6) of the Honor Code that states that students will not 'violate any other commonly understood principles of academic honesty.'" Ex. 17 to Def.'s Mot. [Dkt. # 18-17] ("Subcommittee Report") at 4. The Subcommittee agreed that plaintiff should receive an "F" on the exam and an "F" in the course, and that plaintiff's transcript should state that the grade was based on a finding of academic dishonesty. *Id.* at 5. Three Subcommittee members recommended that plaintiff be dismissed from the Medical School, and one member recommended that he be suspended for a year. *Id.*

When a student is recommended for dismissal or suspension, the Regulations require that the case be referred to the Medical Student Evaluation Committee ("MSEC"). Regulations § G(13). The MSEC held a hearing in plaintiff's case on April 18, 2013, at which plaintiff gave a statement and was briefly questioned. Ex. 19 to Def.'s Mot. [Dkt. # 18-19] ("MSEC Recommendation"); Regulations § G(13). Plaintiff also submitted a written personal statement, in which he admitted that he "continued to transfer [his] answers from the exam booklet to the . . . answer sheet" in "blatant disregard for the rules and for the rights of [his] fellow students and those of Ms. Ruiz." Ex. 18 to Def.'s Mot. [Dkt. # 18-18] ("Personal Statement"). Plaintiff called his

behavior "deplorable," and he admitted that he acted in "blatant disregard of the authority of Ms. Ruiz and th[e] University." *Id.* He insisted that he "did not act dishonestly nor was [he] untruthful," but he recognized that "[his] actions were a clear violation of the most basic rules of th[e] University." *Id.* Plaintiff asked the MSEC "to allow [him] to continue as a medical student" at the University. *Id.* Plaintiff did not mention his ADHD at any point in his Personal Statement, nor did he allege that he suffered from any disability or ask for any accommodation. *See id.*

After reviewing the Subcommittee Report and considering plaintiff's testimony and his Personal Statement, the MSEC issued a written opinion on April 30, 2013, in which it unanimously recommended that plaintiff be dismissed from the Medical School. MSEC Recommendation.

On May 6, 2013, the Dean of the Medical School, Dr. Jeffrey Akman, reviewed plaintiff's file and met with him to discuss the matter. Regulations § G(14); Chenari Dep. 318:3–20; Ex. 20 to Def.'s Mot. [Dkt. # 18-20] ("Akman Dep.") 16:6–17:1. Plaintiff did not mention his ADHD during this meeting. Akman Dep. 17:2–8; *see also* Chenari Dep. 329:8–330:2. On May 22, 2013, Akman rendered his final decision in plaintiff's case, making the following findings:

> [Y]our refusal to follow instructions and your reaction – after being instructed multiple times to put your pencil down – was well outside the bounds of what we expect from a future physician. Based upon my review, I have decided to uphold the recommendation of the Subcommittee and of the MSEC for dismissal for academic dishonesty.

Ex. 21 to Def.'s Mot. [Dkt. # 18-21] ("Akman Letter") at 2. The letter advised plaintiff that he had the right to appeal the decision to the Provost and Executive Vice President for Academic Affairs, pursuant to section G(17) of the Regulations. *Id.* at 3; Regulations § G(17).

On May 30, 2013, through counsel, plaintiff appealed the dismissal decision to Provost Steven Lerman. Ex. 22 to Def.'s Mot. [Dkt. # 18-22] ("Appeal Letter"). In his appeal, plaintiff admitted that he "was clearly guilty of openly violating the rules of the exam when he continued

8

to pencil in his answers after time was up," and that he was also "guilty of insubordination when he did not comply with the proctor's request to put down his pencil." *Id.* at 1. But plaintiff maintained that the dismissal was inappropriate because it was based on a charge of "academic dishonesty," and plaintiff "did not cheat, lie, dissemble, or do anything that could reasonably be interpreted as dishonest" because his actions lacked the "element of deceit." *Id.* Once again, plaintiff's ADHD was not mentioned as part of the appeal. *See id.*

On July 8, 2013, Lerman denied plaintiff's appeal, finding that "the Regulations were complied with in all aspects and that [plaintiff] [was] afforded all of the due process rights set forth in the Regulations." Ex. 24 to Def.'s Mot. [Dkt. # 18-24] ("Lerman Letter"). He upheld the decision to dismiss plaintiff from the Medical School. *Id.*

Plaintiff filed this lawsuit on May 30, 2014, bringing claims for breach of contract and breach of the implied covenant of good faith and fair dealing, and alleging discrimination, failure to accommodate, and retaliation in violation of the Rehabilitation Act and the Americans with Disabilities Act. Compl. On August 10, 2015, defendant moved for summary judgment on all four of plaintiff's claims. Def.'s Mot.; Mem. of P. & A. in Supp. of Def.'s Mot. [Dkt. # 18] ("Def.'s Mem."). Plaintiff opposed the motion on September 18, 2015, Pl.'s Opp., and defendant filed its reply on October 2, 2015. Def.'s Reply to Pl.'s Opp. [Dkt. # 25] ("Def.'s Reply").

**STANDARD OF REVIEW**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

9

which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted).

The mere existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is "material" only if it is capable of affecting the outcome of the litigation. *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). In assessing a party's motion, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations omitted), quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

## ANALYSIS

**I.     Defendant is entitled to summary judgment on Counts I and II because the University had a rational basis for dismissing plaintiff from the Medical School.**

In Count I, plaintiff alleges that he had a contract with the University based on his acceptance, his tuition payments, and the Regulations, and he insists that the University breached its contractual obligations by:

> (a) denying Plaintiff his right not to be sanctioned unless the decision maker is persuaded by a preponderance of the evidence that he is guilty as is set forth in the GWU Guide to Student Rights and Responsibilities, Section V (B)(4); and
>
> (b) finding Plaintiff responsible for a violation of the Honor Code Section F(2)(a)(6), which states that students may not "violate any other commonly understood principals of academic dishonestly" [sic] when, in fact, no such evidence exists that Plaintiff participated in academic dishonesty.

10

Compl. ¶¶ 28–29.  In Count II, plaintiff alleges that defendant breached the covenant of good faith and fair dealing "by making it impossible for [him] to realize the benefit of his contract and by permitting its agents to act in bad faith and in a manner which interfered with Plaintiff's contractual obligations."  *Id.* ¶ 37.  Defendant has moved for summary judgment on both claims, asserting that it had a rational basis for dismissing plaintiff based on his acknowledged misconduct during the December 14, 2012 Board Exam.  Def.'s Mem. at 10–12.

Courts in the District of Columbia "recognize the general rule 'that the relationship between a university and its students is contractual in nature.'"  *Manago v. District of Columbia*, 934 A.2d 925, 927 (D.C. 2007), quoting *Basch v. George Washington Univ.*, 370 A.2d 1364, 1366 (D.C. 1977).  "[T]his 'contract' is premised on the notion that if the student complies with the university's academic standards and completes his or her degree requirements, he or she will be entitled to receive a degree."  *Alden v. Georgetown Univ.*, 734 A.2d 1103, 1112 n.11 (D.C. 1999).  District of Columbia law also recognizes that "all contracts contain an implied duty of good faith and fair dealing."  *Murray v. Wells Fargo Home Mortg.*, 953 A.2d 308, 321 (D.C. 2008), quoting *Allworth v. Howard Univ.*, 890 A.2d 194, 201 (D.C. 2006).

But in cases involving an academic dismissal, the Court's review of the institution's decision is extremely deferential.  *See, e.g.*, *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985) ("When judges are asked to review the substance of a genuinely academic decision . . . they should show great respect for the faculty's professional judgment.").  Indeed, "courts have concluded that, *particularly for medical students*, professional comportment issues fall under the umbrella of deference to academic decisions."  *Hajjar-Nejad v. George Washington Univ.*, 37 F. Supp. 3d 90, 117 (D.D.C. 2014) (emphasis in original) (collecting cases).  Accordingly, a court may not overturn an academic dismissal decision "unless it is such a substantial departure from

11

accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Alden*, 734 A.2d at 1109. In other words:

> [I]n cases involving academic dismissal, educational institutions will be entitled to summary judgment unless the plaintiff can provide some evidence from which a fact finder "could conclude that there was no rational basis for the decision or that it was motivated by bad faith or ill will unrelated to academic performance."

*Id.*, quoting *Clements v. Nassau Cty.*, 835 F.2d 1000, 1004 (2d Cir. 1987). "This standard applies to all 'cases involving academic dismissal,' regardless of whether the Plaintiff has brought a breach of contract claim or a claim for breach of the implied covenant of good faith and fair dealing or both." *Paulin v. George Washington Univ. Sch. of Med. & Health Scis.*, 45 F. Supp. 3d 9, 12 (D.D.C. 2014), quoting *Alden*, 734 A.2d at 1109, and citing *Allworth*, 890 A.2d at 202.[3]

Here, the University determined that plaintiff should be dismissed because he "violated Section F(2)(a)(6) of the Honor Code that states that students will not 'violate any other commonly understood principles of academic honesty.'" Subcommittee Report at 4. This finding was reviewed pursuant to the University's Regulations, and it was upheld at each stage of the review and appeal process, including in decisions by the Dean of the Medical School and the University's Provost. *See* Regulations; MSEC Recommendation; Akman Letter; Lerman Letter.

Plaintiff makes clear that he is "not claiming [that] the administration of the proceedings were unlawful." Pls.' Opp. at 10. He does not proffer any evidence to show that the institution or any individual involved in the process acted out of bad faith or ill will, and he does not dispute the fact that he engaged in the conduct for which he was ultimately expelled: continuing to fill in his answer sheet after time was called and even after he was directed to stop, and preventing the

---

3       For this reason, the Court will examine plaintiff's contract claims in Counts I and II together.

proctor from collecting his exam. Chenari Dep. 266:10–267:9, 269:1–270:6. He admits that he knew he was supposed to stop filling in his answer sheet when the exam concluded, and that continuing to do so was wrong. *Id.* 217:5–13. In fact, in his Personal Statement to the MSEC, plaintiff acknowledged that he acted in "blatant disregard of the authority of Ms. Ruiz and th[e] University," and that "[his] actions were a clear violation of the most basic rules of th[e] University." Personal Statement.

Nevertheless, plaintiff maintains that the University breached its contractual obligations in dismissing him, because as he puts it, he "did not cheat on his exam." Pl.'s Opp. at 11. He insists that since he did not utter a deliberate lie or engage in outright deceit, there is "a genuine issue of material fact demonstrating a complete lack of rational basis for the decision rendered by GWU." *Id.* Plaintiff's contention is that "at no time did [he] attempt to engage in academic dishonesty or to conceal his actions" from the exam proctor, "[n]or did he ever intend to gain an unfair advantage or to cheat on the examination," so he cannot be said to have violated "any . . . commonly understood principles of academic honesty." *Id.* at 7, 12.

According to plaintiff, notwithstanding the fact that he was taking a timed examination, and the fact that all students had been warned that their answers had to be recorded on the answer sheet during the time provided, what he did was not cheating because he had already written his answers in the exam booklet, and all he was doing was transferring the answers to the answer sheet. *Id.* at 11–12. In other words, plaintiff's entire opposition to the motion for summary judgment comes down to his disagreement with the University's interpretation of its own regulation. *Id.*; *see also* Appeal Letter at 1 (arguing that the conclusion that plaintiff violated section F(2)(a)(6) "is not supportable by the agreed upon facts" because plaintiff "did not cheat, lie, dissemble, or do anything that could reasonably be interpreted as dishonest"). But the relevant

Honor Code provision is by its terms a broad catch all, and plaintiff has pointed to no facts that would indicate that University's consistent interpretation of its language at every level of the proceedings in this case was irrational.

In section F(2)(a), the University Regulations set forth a list of "Student Responsibilities," which directs that students shall not:

> (l) Give or receive aid during an examination;
> (2) Give or receive unpermitted aid in assignments;
> (3) Plagiarize any source in the preparation of academic papers or clinical presentations;
> (4) Falsify any clinical report or experimental results;
> (5) Infringe upon the rights of any other students to fair and equal access to educational materials; [or]
> (6) Violate any other commonly understood principles of academic honesty.

Regulations § F(2)(a). The first five subsections set out specific types of offenses – improper collaboration, plagiarism, or falsification of results – but the final provision broadly prohibits "any other" conduct that is inconsistent with "principles of academic honesty." *Id.* So the structure of the regulations makes it clear that section F(2)(a)(6) of the Honor Code is meant to encompass a range of other actions that could fall under the umbrella of "academic dishonesty" – not simply those offenses that involve an affirmative misrepresentation. It is also significant that the regulations speak of "commonly understood principles of *academic* honesty" emphasizing that the Code must be interpreted within the particular context of the school environment, and what is commonly understood to be acceptable or unacceptable there. In other words, "did you engage in academic dishonesty?" is the not the same question as, "did you lie?" and the case law is clear that it is the University itself that is in the best position to define the boundaries of the first inquiry. *See, e.g.*, *Hajjar-Nejad*, 37 F. Supp. 3d at 117.

Looking at the text of the regulation in that context, and according the University the deference to which it is entitled, it is clear that there was a rational basis for the finding that plaintiff

14

violated the Honor Code. Plaintiff chooses to ignore the fact that at bottom, he did cheat: he stole time. And he thereby gained an unfair advantage over the peers who adhered to the rules. Implicit in the submission of the answer sheet to the test proctor is the representation, "I completed these answers during the time allotted," but in this case, that representation was false.

Indeed, plaintiff's insistence that he did not violate commonly understood principles concerning honesty within the academic community is contradicted by his own admissions. He acknowledged in his Personal Statement that he "acted with blatant disregard . . . for the rights of [his] fellow students," and he admitted that he took up to two additional minutes to complete the answer sheet – time that was not available to his fellow students. Chenari Dep. 271:10–13. So contrary to his characterization of the events in his pleadings, *see* Pl.'s Opp. at 12, this afforded plaintiff "an unfair advantage" over other students, even if it was a small one. Plaintiff also admitted in the Appeal Letter, which was prepared with the assistance of counsel, that he "was clearly guilty of openly violating the rules of the exam when he continued to pencil in his answers after time was up," and that he was "guilty of insubordination when he did not comply with the proctor's request to put down his pencil." Appeal Letter at 1. Plaintiff offers nothing that would enable this Court to conclude that it was unreasonable for University officials to consider blatant disregard for the rights of fellow students, openly violating the rules of the exam, and insubordination to be contrary to "commonly understood principles of academic honesty" by University personnel.

Moreover, plaintiff points to nothing beyond his own self-serving opinion in support of his contention that his cramped reading of the Honor Code provision should carry the day. *See, e.g.*, Chenari Dep. 277:6–10 ("Q So are you telling me what you did was not cheating? A I believe what I did was – you know, I did not answer additional questions that were not on the exam."); *id.*

15

316:21–317:7 ("I believe I was not dishonest nor was I untruthful. . . . all I did was transfer answers from my booklet to my [answer sheet]. I didn't cheat off of anybody else, I didn't copy answers from my peers, I didn't answer any additional questions after time was called."). Plaintiff's own deposition testimony is insufficient to create a genuine dispute of material fact as to whether his conduct constituted a violation of the University's Honor Code. *See, e.g.*, *Arrington v. United States*, 473 F.3d 329, 343 (D.C. Cir. 2006) (emphasis in original) ("[S]ummary judgment 'is *most likely* when a plaintiff's claim is supported solely by the plaintiff's own self-serving testimony, unsupported by corroborating evidence, and undermined . . . by other credible evidence."), quoting *Johnson v. Wash. Metro. Area Transit Auth.*, 883 F.2d 125, 128 (D.C. Cir. 1989).

Plaintiff also claims that it was "common and accepted practice" that Medical School students "were permitted to transfer their final answers from the examination onto a multiple choice answer sheet after the time for the examination expired," and that his conduct therefore could not qualify as cheating. Pl.'s Opp. at 11–12; *see also* Decl. of Sina Chenari in Supp. of Pl.'s Opp. [Dkt. # 24-7] ("Chenari Decl.") ¶ 17. But this allegation is also unsupported by any independent evidence beyond plaintiff's own testimony, and without more, it cannot defeat defendant's motion for summary judgment. *See Arrington*, 473 F.3d at 343.

And even if transferring completed answers can be a common practice at the University, the specific rules in place for this exam made clear that it was expressly prohibited in this particular instance. NBME Manual at 12 ("If an examinee is observed marking answers or erasing on the answer sheet after the STOP announcement, it is a direct violation of the timing regulations for the examination."); *id.* at 16 ("[Y]ou will receive credit for an answer only if it is properly recorded in the appropriate space on the answer sheet. Time will not be extended beyond the close of this examination for transferring your answers."). The record shows that plaintiff was advised on

16

multiple occasions that he would not be permitted to transfer answers after time expired on this particular test. Ruiz Decl. ¶ 3; Chenari Dep. 217:5–13 (agreeing that it was likely that plaintiff was read the 30-minute warning about not transferring answers); *see also* Honor Code Violation Report at 7 (email from fellow student explaining that Ruiz "read aloud from the proctor's manual," including the instruction that students "would not be given additional time to bubble in answers . . . after time had been called"). So plaintiff's unsubstantiated claim regarding other students' practices has no bearing on whether it was reasonable for the University to conclude that plaintiff's misconduct during the December 14, 2012 exam constituted academic dishonesty, and the record instead supports a finding that the time element was of particular importance in this instance, and that the school's reaction to plaintiff's admitted blatant disregard of the rules was reasonable.

Plaintiff also complains that "[a]t no time, did Ms. Ruiz characterize the incident as academic dishonesty or cheating," and he also notes that he did in fact pass the exam. Pl.'s Opp. at 12. But whether plaintiff ultimately passed the test is irrelevant to whether the University reasonably concluded that he had engaged in academic dishonesty while taking it. And it is certainly not clear that he would have passed if he had handed in the answer sheet that was incomplete when time was called. Furthermore, the record shows that plaintiff's misconduct was consistently characterized as cheating from the very beginning of the disciplinary process, and the University continued to treat it as such throughout. *See, e.g.*, Dep. of Jessica Ruiz (Apr. 20, 2015), Ex. 5 to Pl.'s Opp. [Dkt. # 24-5] ("Ruiz Dep.") 29:3–11 ("I had told [the Dean] that there was a cheating incident that I needed to discuss with the Deans."); Honor Code Violation Report

17

(February 4, 2013 report "alleging a possible Honor Code violation" in which plaintiff was involved).[4]

Thus, plaintiff has failed to show that the University lacked a rational basis for its decision or that it exercised its professional judgment in bad faith when it concluded – at every level of the disciplinary proceedings – that he should be dismissed from the school for the conduct that he admitted was "deplorable" and a "clear violation of the most basic rules of th[e] University." Personal Statement. Since plaintiff has advanced no other basis for denying defendant's motion for summary judgment on his contract claims, the Court will grant defendant's motion on Counts I and II.

## II. Defendant is entitled to summary judgment on Counts III and IV because plaintiff cannot show that the University was aware of his ADHD or that he ever requested an accommodation for his disability.

In Count III, plaintiff alleges that defendant violated the Rehabilitation Act when it discriminated against him on the basis of his ADHD, failed to accommodate his disability by not dismissing him from the medical school,[5] and retaliated against him "when he began to advocate

---

4    In opposing summary judgment on Counts I and II, plaintiff also argues that "[t]here are genuine facts in contention related to [his] ADHD diagnosis in addition to his multiple attempts to seek help from GWU faculty for depression and anxiety related issues." Pl.'s Opp. at 11. But he fails to explain how these purported factual disputes would preclude granting summary judgment on his contract claims, and as discussed below in relation to his accommodation claims, his allegations that he informed the University of his disability, that he sought an accommodation, and that the school failed to help him are all contradicted by the record. So, this issue does not preclude the Court from granting defendant's motion for summary judgment on plaintiff's contract claims.
5    The only accommodation identified in the complaint is "not being dismissed from [the] medical school as a result of his disability." Compl. ¶ 41. But because he never even mentioned his ADHD during the disciplinary proceedings, let alone asked that it be accommodated, this claim fails, as discussed below. In his opposition, plaintiff also opines that defendant failed to accommodate him by giving him "extended time to take exams" or a "separate location to take exams where there are no distractions." Pl.'s Opp. at 18. But the record shows that plaintiff never requested these or any other accommodations, either. *See, e.g.*, Chenari Dep. 339:3–6 (admitting that he "didn't make a request" for any accommodations during his tenure at the University.").

18

for his rights." Compl. ¶¶ 41–46. And in Count IV, plaintiff asserts that defendant discriminated against him and denied him reasonable accommodations in violation the Americans with Disabilities Act. *Id.* ¶¶ 53–55. Defendant has moved for summary judgment on these counts, first because it contends that plaintiff is not disabled and therefore does not fall under the protections of either statute, and second, because plaintiff never notified the University of his purported disability, and he never asked the University to accommodate him. Defs.' Mem. at 15–26.

The Court will evaluate plaintiff's Rehabilitation Act and ADA claims together because "[c]laims and defenses under the two statutes are virtually identical." *Harrison v. Rubin*, 174 F.3d 249, 253 (D.C. Cir. 1999), citing *Zukle v. Regents of Univ. of Cal.,* 166 F.3d 1041, 1045 n.11 (9th Cir. 1999) ("There is no significant difference in analysis of the rights and obligations created by the ADA and the Rehabilitation Act."). And it finds that plaintiff's claim that the University failed to accommodate his disability fails for two reasons: first, there is no evidence in the record, beyond his own self-serving testimony, that plaintiff ever gave the University notice of his condition and any limitations it may have imposed on his ability to perform as a medical student; and second, the record demonstrates that plaintiff never requested any sort of accommodation for this alleged disability, before, during, or after the Board Exam.[6]

### A. Plaintiff never provided the University with notice that he was disabled.

"[I]n any action premised on failure to accommodate, the plaintiff typically bears the burden of providing notice of [his] disability and the limitations it imposes." *Faison v. Vance-Cooks*, 896 F. Supp. 2d 37, 57 (D.D.C. 2012), citing *Crandall v. Paralyzed Veterans of Am.*, 146 F.3d 894, 897–98 (D.C. Cir. 1998). Notice can be actual or constructive, but to satisfy the

---

6      Because the Court concludes that Counts III and IV fail for these reasons, it will not reach defendant's argument that plaintiff did not suffer from a disability under the statutes.

constructive notice requirement, the plaintiff's behavior must be "so obviously a manifestation 'of an underlying disability that it would be reasonable to infer that [the defendant] actually knew of the disability." *Stewart v. St. Elizabeths Hosp.*, 589 F.3d 1305, 1308 (D.C. Cir. 2010), quoting *Crandall*, 146 F.3d at 898.

Plaintiff cannot satisfy the notice requirement here. First, he admits that he did not notify the University of his ADHD during the disciplinary proceedings:

> Q  At any point during the disciplinary proceedings involved with respect to your conduct in the exam on December 14, 2012 . . . did you tell any of the people who were decision makers in that disciplinary process . . . that the reason you had any problems or difficulties was because you had ADHD?
>
> A  I didn't tell anyone I had ADHD.  I told them I had issues during my medical school career.

Chenari Dep. 329:14–330:2.

Nor did he ever claim that his condition had been the cause of his misconduct during the December 14, 2012 exam.  He did not mention it on February 4, 2013, when he first met with Dean Goldberg about the incident, and he instead characterized his behavior as "a mistake."  *See* Goldberg Dep. 22:19–23:3.  On March 5, 2013, plaintiff testified before the Subcommittee that the December 14, 2012 incident "was an unfortunate turn of events *due to his anxiety*," but he never mentioned a diagnosis.  Subcommittee Report at 2–3 (emphasis added).  Plaintiff's subsequent written Personal Statement to the MSEC also makes no mention of ADHD.  *See* Personal Statement.  Plaintiff specifically asked the MSEC to consider several mitigating factors, but not one of those factors is based upon a disability.  *Id.*  Plaintiff informed Dean Akman during their meeting on May 6, 2013 about "the difficulties he had in medical school up until that point" and his depression, but he never brought up ADHD, and the only explanation he offered for his

behavior was that "[he] had not transferred all of [his] answers to [his] answer sheet." Akman Dep. 17:2–22; Akman Letter at 2.

Finally, while plaintiff's Appeal Letter was prepared with the assistance of counsel, it made no reference to ADHD or the impact it might have had on plaintiff's conduct during the Board Exam. *See* Appeal Letter. Instead, it explained that plaintiff "made a careless and stupid mistake in forgetting to 'bubble' in his answers on the front of the answer sheet," and that "[h]e acted rashly in the heat of the moment." *Id.* at 2–3. The Appeal Letter urged the Provost to consider as mitigating factors the fact that plaintiff apologized for his misconduct, his lack of a prior disciplinary or criminal record, the absence of "premeditated intent," and the disproportionality of the offense to the sanction imposed, *id.*, but the letter did not mention plaintiff's condition, let alone ask the University to take it into account in reaching its final disciplinary decision.

Plaintiff states in his opposition to the motion for summary judgment that he advised University officials of his ADHD diagnosis on four separate occasions prior to the December 2012 incident, Pl.'s Opp. at 16, but these claims are not supported by the record. First, he contends that in February 2011, he "met with GWU faculty members and class mentors, Dr. Richard Cytowic and Dr. Seema Kakar, to discuss his mental-health issues, particularly that they were impacting his performance as a medical student." *Id.* Plaintiff cites to page 82 of his deposition transcript in support of this assertion, but that page of the transcript does not address this meeting, and his descriptions of the meeting at other points in the deposition do not indicate that his ADHD was a subject of the conversation. *Id.* at 219:9–16 (explaining that for Drs. Cytowic and Kakar, "there were some issues with [his] performance in that class where [they] practice with the standardized patients"); *id.* 220:8–19 ("I remember speaking with Dr. Kakar and Dr. Cytowic outside of that

21

standardized patient class. I think their concern mostly at that time was about my anxiety issues in that class.").

Second, plaintiff points out that he met with Dean Goldberg and Dean Matthew Mintz in February 2012 "to discuss issues of depression that were affecting his ability to perform as a medical student." Pl.'s Opp. at 16, citing Goldberg Dep. 52. And he states that he met with those two individuals again in March 2012 "because of concerns in his POM course wherein [he] had anxiety issues." *Id.*, citing Goldberg Dep. 20. But plaintiff does not claim that ADHD came up during either of these meetings either, *see id.*, and the testimony he cites does not establish that it was discussed. Goldberg Dep. 18:12–20:15 (stating that she met with plaintiff in March 2012 to discuss "some concern from his preceptors in his POM course" that "he was anxious, and maybe uncomfortable," and that she recommended that he see a counselor, but that they did not "discuss any type of medical issues with [plaintiff] at that time"); *id.* 49:14–50:5 (describing March 20, 2012 meeting with plaintiff where she discussed "the concerns they were having," including "[h]is inappropriate comments, his interaction with the patients").

The fourth occasion plaintiff identifies was a meeting with Deans Goldberg and Haywood in October 2012 at which plaintiff claims he discussed the ADHD diagnosis. Pl.'s Opp. at 16; *see also* Chenari Dep. 240:20–241:6 (explaining that plaintiff "spoke[] with [Deans Goldberg and Haywood] about his ADHD diagnosis" when he met with them in October 2012 to discuss moving forward with his studies). According to plaintiff's own testimony, this is the only point at which he mentioned his diagnosis to any University or Medical School official:

> Q At any time during all of the proceedings related to the exam you took on December 14, 2012, all the academic disciplinary proceedings related to that exam leading to your dismissal from The George Washington University Medical School, did you at any time put forth that the reason for your problem was that you had ADHD? Did you mention that at any point to any of these decision makers in the disciplinary process?

> A   The only time I spoke about it was during my meeting with Dean Yalonda [sic] Haywood and Dean Rhonda Goldberg.

Chenari Dep. 328:21–329:10.

But beyond his own self-serving testimony, plaintiff cannot identify any support in the

record for this claim. And his version of events is contradicted by Goldberg's recollection of the

October 2012 meeting:

> Q   Do you remember – do you remember anything that you talked about at the meeting?
>
> A   I think it was mainly about getting back on the schedule.
>
> Q   Do you recall Mr. Chenari talking to you about any medical or psychological issues that he was having at the time?
>
> A   No.
>
> Q   Do you recall specifically Mr. Chenari informing you that he had recently been diagnosed with ADHD?
>
> A   No.
>
>                                          \* \* \*
>
> Q   Do you know at that meeting if it was – if Mr. Chenari discussed with you any problems that he was having with his education?
>
> A   My recollection is we talked about the schedule, how we could get back on schedule.   I don't remember talking about other things that were going on.
>
> Q   Do you recall Mr. Chenari stating that he needed help with his studies to continue on?
>
> A   I don't remember that.

Goldberg Dep. 57:10–58:21.

As stated above, plaintiff's "own self-serving testimony, unsupported by corroborating

evidence, and undermined . . . by other credible evidence" is insufficient to create a genuine

dispute of material fact on this issue. *Arrington*, 473 F.3d at 343. For those reasons, the Court

23

concludes that no reasonable jury could find that plaintiff gave the University actual or constructive notice of his disability, and therefore, defendant is entitled to summary judgment on this issue. But even if plaintiff's testimony were sufficient to create a genuine factual dispute about the information conveyed during that one meeting, his Rehabilitation Act and ADA claims fail in the absence of any request for an accommodation.

### B. Plaintiff never requested an accommodation for his disability.

Even if there was evidence to support plaintiff's claim that he told Deans Goldberg and Haywood about his ADHD during the October 2012 meeting, defendant is still entitled to summary judgment on Counts III and IV because the record makes clear that plaintiff never requested that the University accommodate this disability.

"An underlying assumption of any reasonable accommodation claim is that the plaintiff . . . has requested an accommodation which the defendant . . . has denied." *Flemmings v. Howard Univ.*, 198 F.3d 857, 861 (D.C. Cir. 1999); *see also, e.g.*, *Goodman v. Potter*, No. 06-5071, 2006 WL 4449339, at \*1 (D.C. Cir. Nov. 14, 2006) (affirming district court's finding, at summary judgment, that the plaintiff "failed to establish a *prima facie* case of disability discrimination for failure to accommodate" "because there is nothing in the record that demonstrates appellant requested or substantiated her need for any . . . accommodation"). "Only those requests that are made at the time are protected . . . other requests for accommodation that have been suggested after the fact, by plaintiff's expert or other physicians, are irrelevant to the case." *Scarborough v. Natsios*, 190 F. Supp. 2d 5, 23–24 (D.D.C. 2002), citing *Flemmings*, 198 F.3d at 861–62.

Plaintiff has conceded that he never asked the University to provide him with any accommodation for his ADHD or any limitations that he may have suffered as a result:

24

Q ... Did – do I understand, therefore, that at no time did you yourself actually make a request to anybody at The George Washington University for an accommodation of any kind as the result of your claiming to have ADHD?

A I did not know of any accommodations to request.

Q So you didn't make a request for accommodations?

A I did not know of any available. I didn't make a request. I only informed them of the diagnosis.

Chenari Dep. 338:7–339:7. Plaintiff suggests, though, that he should be excused from his failure to seek an accommodation because he was not aware of the accommodations available to him, and because the University failed in its obligation "to engage in an interactive process to identify a reasonable accommodation." Pl.'s Opp. at 19, citing *Haneke v. Mid-Atl. Capital Mgmt.*, 131 F. App'x 399, 400 (4th Cir. 2005).

But any duty to engage in the "interactive process" arises only *after* the plaintiff has requested some sort of accommodation, which plaintiff has admitted he failed to do in this case. *See, e.g.*, *Sparrow v. D.C. Office of Human Rights*, 74 A.3d 698, 704 (D.C. 2013) ("*After an employee requests an accommodation*, the employer engages in the interactive process by communicating with the employee to determine the appropriate reasonable accommodation.") (emphasis added), citing *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 312–13 (3d Cir. 1999). And in any event, the record shows that the University did offer plaintiff opportunities to obtain counseling and assistance, at least for his test-related anxiety and his depression, but plaintiff failed to take advantage of them.

At the meeting in October 2012, Dean Goldberg provided plaintiff with contact information for the University's Counseling Center so that he could obtain counseling for his depression and anxiety issues. Chenari Dep. 243:8–9. Around the same time, faculty member Andrea Flory

25

referred plaintiff to Anne Gialanella, who specialized in working with students with test-taking anxiety and who Flory thought "might be a great help to [plaintiff]." Flory Email; Chenari Dep. 245:9–246:4. Plaintiff did not contact the Counseling Center because he says he felt "there was no time" to do so, and he states that he did not follow-up with Gialanella for the same reason. Chenari Dep. 243:17–21, 246:5–13. Plaintiff never asked to be excused from class or his other responsibilities so that he could seek treatment. *Id.* 246:17–19 ("Q Did you ask to be excused so you could go get therapy with Ms. Gialanella? A No.").

Plaintiff's claim that he was not aware of any accommodations that could be requested is also undermined by the record evidence showing that the University had provided plaintiff with the means to educate himself. At orientation, plaintiff received a manual entitled "Class of 2014 First Year Survival Guide." *Id.* 186:4–17; *see also* Ex. 7 to Def.'s Mot. [Dkt. # 18-7] ("Survival Guide"). The Survival Guide provides students with contact information for the University's Counseling Center, the Meltzer Center, which offers "psychotherapy on a sliding scale," the Clinic for Professional Psychology, and the Office of Disability Support Services. Survival Guide at 23. It specifically directs that "[s]tudents who suspect that they might have a disability, which may require an accommodation, should contact the Office of Disability Support Services" and it provides a contact number. *Id.* Plaintiff testified that he "remember[ed] looking through this document and looking specifically at the section on academic advice." Chenari Dep. 188:13–15. Yet he admits that he never sought counseling from any of these services or the professionals to which he was specifically referred. *Id.* 243:17–21; 246:5–14.

Additionally, Dean Goldberg testified that she makes a presentation each year to all first-year medical students "addressing various topics related to their success in medical school." Goldberg Decl. ¶ 2. During this presentation, Goldberg reviews the Disability Support Services

26

("DDS") office and its available services, and she advises students that "if they have a disability and need to request an accommodation, it is the student's responsibility to go to DDS to pursue that matter." *Id.* The DDS website provides guidelines specific to the Rehabilitation Act and the ADA for students seeking an accommodation for ADHD, including identifying the documents that would be required to obtain an accommodation. Ex. A to Decl. of Susan McMenamin, Ex. 6 to Def.'s Mot. [Dkt. # 18-6].

There is no dispute that Dean Goldberg's presentation was made to all first year students, and plaintiff has not testified that he missed it. He also admits that he had access to the University's website. Chenari Dep. 173:5–20. But he never contacted DDS. Decl. of Susan McMenamin, Ex. 6 to Def.'s Mot. [Dkt. # 18-6] ¶ 4 ("I have personally searched for any record that Sina 'Charlie' Chenari applied for any type of service or disability accommodation at DSS and have found no evidence that he ever contacted our office."). And he admits that he "didn't make a request" to anyone at the University for any accommodation for his ADHD at any point during his time there. Chenari Dep 338:18–339:7.

Thus, the Court finds that there is no genuine dispute of material fact that plaintiff never requested an accommodation for his disability, and defendant is entitled to summary judgment on plaintiff's failure to accommodate claims in Counts III and IV.

### C. Plaintiff cannot show that the University discriminated against him on the basis of his ADHD or retaliated against him for exercising his statutory rights.

In Counts III and IV, plaintiff also claims in passing that the University discriminated against him on the basis of his disability and retaliated against him "when he began to advocate for his rights" pursuant to the Rehabilitation Act. Compl. ¶¶ 41–46, 55.

The Rehabilitation Act "prohibits only discriminatory acts performed 'solely by reason of' the plaintiff's handicap." *Crandall*, 146 F.3d at 896, quoting 29 U.S.C. § 794. "[F]or this causal

27

link to be shown the [defendant] must have acted with an awareness of the disability itself, and not merely an awareness of some deficiency in the [plaintiff's] performance that might be a product of an unknown disability." *Id.* at 897. This is true "under both the Rehabilitation Act itself and the analogous provision of the Americans with Disabilities Act." *Id.*

Even if the Court were to credit plaintiff's unsupported claim that he informed Deans Goldberg and Haywood of his disability on October 3, 2012, *see* Chenari Dep. 243:1–5, plaintiff can point to no evidence that the actual decision makers – the Subcommittee, the MSEC panel, Dean Akman, or Provost Lerman – were ever made aware of plaintiff's condition. It is not mentioned in any of the published decision documents, and plaintiff never advised the University of his ADHD in any of his written statements. In fact, plaintiff himself concedes that he "didn't tell anyone [he] had ADHD" at any point during the disciplinary proceedings. *Id.* 329:14–330:2. Based on the record evidence, the Court finds that no reasonable juror could conclude that any of the actors responsible for the University's decision "acted with an awareness of [plaintiff's] disability" in deciding to dismiss him from the Medical School. *Crandall*, 146 F.3d at 897. Thus, plaintiff's discrimination claims in Counts III and IV must be dismissed.

The retaliation aspect of Counts III and IV also fails. "To make out a prima facie case of retaliation, an ADA plaintiff must show 'first, that she engaged in protected activity; second, that she was subjected to adverse action by the employer; and third, that there existed a causal link between the adverse action and the protected activity.'" *Mayers v. Laborers' Health & Safety Fund of N. Am.*, 478 F.3d 364, 369 (D.C. Cir. 2007), quoting *Smith v. District of Columbia*, 430 F.3d 450, 455 (D.C. Cir. 2005).

Here, the record is devoid of evidence of plaintiff's participation in any protected activity before or during the disciplinary process. Plaintiff alleges that he was retaliated against "when he

28

began to advocate for his rights" pursuant to the Rehabilitation Act, Compl. ¶ 44, but other than this filing this lawsuit almost a year after he was dismissed from the Medical School, *see* Lerman Letter, there is no indication that plaintiff ever sought to vindicate his rights under the ADA or the Rehabilitation Act. So there is no dispute of material fact as to the viability of plaintiff's retaliation claims, either, and defendant is entitled to summary judgment on Counts III and IV in their entirety.

## CONCLUSION

The Court finds that defendant is entitled to judgment as a matter of law on Counts I and II because the University had a rational basis for its decision to dismiss plaintiff based on his misconduct at the December 14, 2012 Board Exam and it followed its procedures and the Regulations in reaching that decision. Furthermore, the Court finds that defendant is entitled to summary judgment on Counts III and IV because there is no support in the record, other than plaintiff's own testimony, showing that plaintiff advised the University that he was suffering from the disability he identifies in the complaint, and the undisputed evidence establishes that plaintiff never requested any accommodation before or during the disciplinary proceedings against him. Therefore, defendant's motion for summary judgment will be granted and this case will be dismissed in its entirety.

A separate order will issue.

Amy B Jach

AMY BERMAN JACKSON
United States District Judge

DATE: March 23, 2016

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

SINA CHENARI,                                              )
                                                          )
        Plaintiff,                                )
                                                          )
    v.                                                    )    Civil Action No. 14-0929 (ABJ)
                                                          )
GEORGE WASHINGTON UNIVERSITY,                             )
                                                          )
        Defendant.                                )
_____)

## ORDER

Pursuant to Federal Rules of Civil Procedure 56 and 58, and for the reasons stated in the accompanying Memorandum Opinion, it is

**ORDERED** that defendant's Motion for Summary Judgment [Dkt. # 18] is **GRANTED** and this case is hereby dismissed in its entirety.

**SO ORDERED**.

AMY BERMAN JACKSON
United States District Judge

DATE: March 23, 2016